*PA 3006431*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

FILED

13 FEB 14 PM 12: 00

U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF INDIANA

|  |  |  |
|---|---|---|
| AMIT SHAH and | ) | |
| TIM DUGLE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No.: _3:13CV 103_ |
| | ) | |
| TERRY RODINO; STACEY RODINO; | ) | |
| ALLISON RODINO BAILEY; AARON | ) | |
| ZOU; DURO, INC. d/b/a LEE'S WOOD | ) | |
| PRODUCTS; DURO RECYCLING, INC. | ) | |
| d/b/a RECYCLED/NEW; DURO REALTY, | ) | |
| INC.; DURO TRANSPORT, INC.; APEX | ) | |
| PALLET, INC.; LUCKY LOU, LLC; | ) | |
| 2610 LLC; AMERICAN TRAVEL | ) | |
| PALACE, LLC; and ATP EXPORTS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR DAMAGES

The plaintiffs, Amit Shah and Tim Dugle (collectively, "Plaintiffs"), for their cause of

action against the defendants, Terry Rodino; Stacey Rodino; Allison Rodino Bailey; Aaron Zou;

Duro, Inc. d/b/a Lee's Wood Products; Duro Recycling, Inc. d/b/a Recycled/New; Duro Realty,

Inc.; Duro Transport, Inc.; Apex Pallet, Inc.; Lucky Lou, LLC; 2610 LLC; American Travel

Palace, LLC; and ATP Exports, Inc; (collectively, "Defendants"), state as follows:

### I.  PARTIES, JURISDICTION, AND VENUE

1.    This Court has subject matter jurisdiction over Counts I-VI pursuant to 28

U.S.C. § 1331 and 18 U.S.C. § 1964(a) and over the remaining counts pursuant to the Court's

supplemental jurisdiction under 28 U.S.C. § 1367.

2.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965.  Many of the events giving rise to this action occurred in the Northern District of Indiana, and numerous mailings and interstate wire communications in furtherance of the illicit schemes, each of which violated the federal mail and wire fraud statues (18 U.S.C. §§ 1341 and 1343), were made in and to the Northern District of Indiana.

3.    This Court has jurisdiction because claims in this lawsuit allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, *et al.*

4.    Plaintiffs, Amit Shah and Tim Dugle, are residents of Elkhart County, Indiana.

5.    Defendants Terry Rodino ("Mr. Rodino"), Stacey Rodino ("Mrs. Rodino"), Allison Rodino Bailey ("Mrs. Rodino Bailey") (collectively, "the Rodino Family") and Aaron Zou are residents of Elkhart County, Indiana.

6.    Defendants Duro, Inc. d/b/a Lee's Wood Products ("Lee's Wood Products"), Duro Recycling d/b/a Recycled/New ("Recycled/New"), Duro Realty, Inc. ("Duro Realty"), and Duro Transport (collectively, the "Duro Entities" or "Duro"), have principal offices located at 24478 County Road 45, Elkhart, Indiana 46516.  The Duro Entities are corporations duly organized under the Indiana Business Corporation Law.

7.    Mr. Rodino is the president, vice president, and secretary-treasurer, and he comprises the entire Board of Directors, of the Duro Entities.

8.    Defendant Apex Pallet is a corporation duly organized under the Indiana Business Corporation Law.  Apex Pallet operates out of the principal offices of the Duro Entities at 24478 CR 45, Elkhart, Indiana 46516, the home address of Mr. and Mrs. Rodino, 23393 Shorelane, Elkhart, Indiana 46514, and PO Box 145, Elkhart, Indiana 46515.

9.     Mr. Rodino is the President, Secretary, and Director of Apex Pallet. Mrs. Rodino is an agent of Apex Pallet with signature authority on the checking account for Apex Pallet.

10.     Defendant Lucky Lou, LLC ("Lucky Lou"), is a limited liability corporation incorporated under Indiana law in 2003. Lucky Lou's corporate address is Mr. and Mrs. Rodino's home address, 23393 Shorelane, Elkhart, Indiana 46514. Mr. Rodino and Mrs. Rodino Bailey are the controlling owners of Lucky Lou with 51% and 49% ownership interests, respectively. Lucky Lou holds title to multiple real estate properties from which Mr. Rodino and Mrs. Rodino Bailey receive the rental proceeds.

11.     Defendant 2610 LLC is a limited liability corporation incorporated under Indiana law on or about December 1, 2011. 2610 LLC operates from Mr. and Mrs. Rodino's home address, 23393 Shorelane, Elkhart, Indiana 46514.

12.     Defendant American Travel Palace LLC ("American Travel Palace") is a limited liability corporation incorporated under Indiana law on or about April 25, 2011. American Travel Palace operates from three different addresses, including PO Box 2680, Elkhart, IN 46515. American Travel Palace's shareholders are Mr. Rodino and Mr. Zou.

13.     Defendant ATP Exports, Inc., is a corporation incorporated under Indiana law on or about July 18, 2011. ATP Exports operates from PO Box 2680, Elkhart, IN 46515. The principals of ATP Exports are Mr. Rodino, Mr. Zou, and William D. Haut.

## II.     FACTUAL ALLEGATIONS

### A.     The Formation of Lee's Wood Products and Duro Realty.

14.     Before buying Lee's Wood Products, Terry Rodino had a variety of jobs. In the three years before becoming an owner of Lee's Wood Products, Mr. Rodino's annual salary was approximately $60,000.

15.   In 1997, Terry Rodino, Tim Dugle, and William Haut purchased an existing pallet company known as Lee's Wood Products.   The primary business of Lee's Wood Products is selling new wood pallets to other businesses in Indiana and other states.   Pallets are commonly used for transporting goods in interstate commerce.

16.   On July 11, 1997, Mr. Haut, an attorney with Warrick & Boyn LLP, incorporated Duro, Inc., d/b/a Lee's Wood Products and prepared its Articles of Incorporation.   Mr. Haut was identified as Lee's Wood Products's Registered Agent in the Articles of Incorporation.

17.   Lee's Wood Products was a previously existing business, but the name Duro, Inc., is a combination of the last names of Mr. Dugle and Mr. Rodino.

18.   When Lee's Wood Products was incorporated, the shareholders owned the following approximate percentages of shares: Rodino, 72%; Dugle, 23%; and Haut, 5%.   Their ownership percentages were based on the approximate percentages of the investment capital provided by each shareholder.   Mr. Rodino and Mr. Dugle provided the majority of capital for Lee's Wood Products.   Mr. Rodino did not have a job when Lee's Wood Products was purchased and, therefore, banks would not loan him the money to finance the purchase without another guarantor.   Mr. Dugle arranged for financing and served as the co-guarantor of the bank loans.

19.   Mr. Haut made a small capital contribution.   He received his shares primarily in return for representing Mr. Rodino and Mr. Dugle's interests in acquiring Lee's Wood Products.

20.   After purchasing Lee's Wood Products, Mr. Rodino was responsible for operations and sales.   Mr. Dugle was responsible for handling the company's financing, accounting, and other general business issues.   Mr. Haut and his firm served as counsel for Lee's Wood Products.

21.    On September 20, 1999, Mr. Rodino and Mr. Dugle incorporated Duro Realty, which was formed for the purpose of holding title to the building occupied by Lee's Wood Products.

**B.     The Formation of Recycled/New and Duro Transport.**

22.    In February 2000, Mr. Rodino and Mr. Dugle purchased the assets of Recycled/New, another pallet business located in Elkhart, Indiana.  Recycled/New also made new pallets, but its primary business was buying used pallets, recycling them, and re-selling them.   Mr. Rodino and Mr. Dugle purchased Recycled/New with the intent of using Recycled/New to exclusively recycle pallets, which would allow Lee's Wood Products to focus on building and selling new pallets.  Recycled/New's operations were located at a different address than Lee's Wood Products.  Duro Realty purchased and held title to the building for Recycled/New's operations.

23.    Mr. Haut incorporated Duro Recycling, Inc. d/b/a Recycled/New Pallets.  The shareholders of Recycled/New were Mr. Rodino, Mr. Dugle, Mr. Haut, and David Schnell, with each owning the following respective share percentages: Rodino 46%; Dugle, 44%; Haut, 5%; and Schnell, 5%.  The share percentages were based on the amount of capital investments by the shareholders.

24.    The roles of Mr. Dugle, Mr. Rodino, and Mr. Haut in Recycled/New were the same as their roles in Lee's Wood Products.  Mr. Dugle arranged the financing to purchase Recycled/New and served as the primary guarantor.  Mr. Haut served as counsel and registered agent for Recycled/New.

25.     Duro Transport was formed on March 8, 2000.  Duro Transport was formed for the purpose of holding title to trucks and other assets of Lee's Wood Products and Recycled/New.

**C.     Mr. Rodino Unlawfully Freezes Out Mr. Dugle from the Duro Entities.**

26.     In May 2003, the majority of the term notes used to finance the sales of Lee's Wood Products and Recycled/New had been paid off.  Lee's Wood Products and Recycled/New were about to begin paying off the remaining capital investments of the shareholders and making significantly higher distributions to Mr. Dugle and Mr. Rodino.

27.     Just as the Duro Entities were able to increase distributions to its shareholders, Mr. Rodino executed a scheme to take majority control of Recycled/New and freeze Mr. Dugle out of the corporations.  As part of this plan, in May 2003, Mr. Rodino unilaterally terminated Mr. Dugle from any involvement and employment with the Duro Entities.

28.     Prior to his termination, Mr. Dugle received a weekly wage and car lease from Lee's Wood Products and Recycled/New.  After his termination, Mr. Rodino stopped making any of these payments to Mr. Dugle.

29.     Between Lee's Wood Products's formation and 2003, Mr. Dugle was named the company's Registered Agent and Secretary.  On August 22, 2003, without Mr. Dugle's knowledge and at the direction of Mr. Rodino, Mr. Haut prepared paperwork with the Indiana Secretary of State to remove Mr. Dugle as Lee's Wood Products's Registered Agent and Secretary and to replace him with Mike Koons, Mr. Rodino's personal CPA ("CPA Koons").

30.     CPA Koons contacted Mr. Dugle to attempt to convince Mr. Dugle to give his shares to Mr. Rodino for little or no value.  Mr. Koons advised Mr. Dugle that (1) Mr. Rodino lawfully could refuse to make any distributions or dividend payments to Mr. Dugle, (2) Mr. Rodino could make a capital call at any time for the purpose of diluting Mr. Dugle's ownership

interests, and (3) Mr. Dugle could be forced to pay annual taxes on the profits of the Duro Entities but had no rights to any profits.

31.   The statements by CPA Koons and Mr. Haut were false and made with the intent to assist Mr. Rodino in freezing out Mr. Dugle by decreasing the value of his shares.

32.   On October 28, 2003, Mr. Rodino opened a new bank account for Lee's Wood Products at Elkhart Community Bank to prevent Mr. Dugle from having access to Lee's Wood Products's records and assets.

33.   Mr. Dugle offered to sell his shares in the Duro Entities to Mr. Rodino.   Mr. Rodino and Mr. Dugle could not agree on a proper valuation method for determining the value of the companies or the shares.  Mr. Rodino would not permit an audit or other outside valuation of the Duro Entities.

34.   Toward the end of 2003, Mr. Haut and Mr. Rodino completed the transaction whereby Mr. Haut sold his shares in both Lee's Wood Products and Recycled/New to Mr. Rodino—a transaction Mr. Rodino partially funded by writing a $1,000 check from the Recycled/New checking account.

35.   The transfer of Mr. Haut's 5% of ownership shares in Lee's Wood Products to Mr. Rodino gave Mr. Rodino 77% ownership of Lee's Wood Products and 51% ownership of Recycled/New.

36.   Other than a few small payments for his initial capital loan, Mr. Dugle has not received any money from the Duro Entities, despite his significant prior investments and continuing ownership interests in the Duro Entities.  Mr. Rodino only paid the initial capital loan after Mr. Dugle sued him.

37.     In 2003, Mr. Rodino carried out the threat made by CPA Koons. Mr. Rodino made a capital call in an attempt to dilute Mr. Dugle's shares in the Duro Entities. To prevent the dilution, Mr. Dugle was forced to pay an additional $40,000 in capital. The Duro Entities have never re-paid this capital contribution.

38.     Mr. Rodino has refused to pay Mr. Dugle any distributions from the Duro Entities since 2003. However, Mr. Rodino and his family have taken millions of dollars of unlawful payments from the Duro Entities. Mr. Dugle also pays taxes each year on the profits of the Duro Entities.

**D.     Mr. Dugle Attempts To Transfer His Shares To Mr. Shah.**

39.     In 2004, Mr. Dugle transferred the majority of his shares in the Duro Entities to Mr. Shah. At the time of this transfer, the operating agreements for the Duro Entities did not restrict Mr. Dugle from selling his shares to Mr. Shah.

40.     Mr. Rodino, upon the advice of counsel, revised the by-laws for the Duro Entities to provide additional protections for himself as the majority shareholder. The corporate by-laws were amended to incorporate a right of first refusal in the event that any shareholder wanted to sell his shares to anyone other than an existing shareholder. These amendments were made with the intent of freezing out Mr. Dugle, driving down the value of his interests, and forcing him to sell his shares to Mr. Rodino for little or no value.

41.     Mr. Rodino also objected to the transfer of Mr. Dugle's shares to Mr. Shah. In February 2005, Mr. Dugle filed suit in the Northern District of Indiana, Case Number was 3:05-cv-00102-AS-CAN, against the Duro Entities, seeking a declaratory judgment that he could legally transfer his shares to Mr. Shah.

42.     In mid-2008, after a four-year legal battle, Mr. Rodino withdrew his objections to Mr. Dugle's transfer of shares to Mr. Shah.  Since December 31, 2008, Mr. Rodino, Mr. Shah, and Mr. Dugle have had the following ownership interests in the Duro Entities:

## DURO RECYCLING, INC.

| SHAREHOLDER | NUMBER OF SHARES |
|---|---|
| Terry Rodino | 112 |
| Timothy Dugle | 2 |
| Amit Shah | 86 |

## DURO, INC.

| SHAREHOLDER | NUMBER OF SHARES |
|---|---|
| Terry Rodino | 76.25 |
| Timothy Dugle | 1 |
| Amit Shah | 22.75 |

## DURO REALTY, INC.

| SHAREHOLDER | NUMBER OF SHARES |
|---|---|
| Terry Rodino | 51 |
| Timothy Dugle | 1 |
| Amit Shah | 48 |

## DURO TRANSPORT, INC.

| SHAREHOLDER | NUMBER OF SHARES |
|---|---|
| Terry Rodino | 51 |
| Timothy Dugle | 1 |
| Amit Shah | 48 |

**E.     Mr. Rodino Begins Looting The Duro Entities.**

43.     Prior to Mr. Rodino obtaining majority control, Recycled/New was larger and had more revenue and value than Lee's Wood Products. After Mr. Rodino obtained majority control of Recycled/New, he began transferring business from Recycled/New to Lee's Wood Products.

44.     Mr. Rodino began stealing pallets and resources from Recycled/New to make Lee's Wood Products more profitable due to the fact that Mr. Rodino has a larger ownership interest in Lee's Wood Products.

45.     Rather than sell new and recycled pallets directly from Lee's Wood Products and Recycled/New to their respective customers, Mr. Rodino began commingling resources between the companies. Mr. Rodino purchased lumber through Lee's Wood Products and then resold the lumber to Recycled/New at a significant mark-up. Recycled/New used the lumber to refurbish pallets. Recycled/New paid the salaries of its employees and bore all of the expenses associated with refurbishing the pallets, including the costs of pallet delivery. However, Recycled/New would sell the pallets to Lee's Wood Products at a significantly discounted price, and Lee's Wood Products would sell them to customers and keep the profits.

46.     Mr. Rodino also removed recycled pallets from Recycled/New's inventory and sold them through Lee's Wood Products without compensating Recycled/New.

47.     From January 2002 through December 2010, the accounting records for Lee's Wood Products show that Lee's Wood Products paid Recycled/New a total of $2,247,950 for recycled pallets. During that same time period, and based on the inventory reports in the accounting records, Lee's Wood Products sold significantly more than this in recycled pallets.

48.     Mr. Rodino also created fraudulent invoices as purported documentation for large checks written from Recycled/New to Lee's Wood Products. From 2006 through 2009, there are monthly invoices from Lee's Wood Products to Recycled/New. The invoices simply state

"Misc. [MONTH]" and then state a bill for $25,000 or more.   There is no supporting documentation and no transfer of goods or assets in return for these payments.  Lee's Wood Products used the unsupported invoices to embezzle money from Recycled/New.  In 2008 alone, Recycled/New paid $323,656.86 to Lee's Wood Products based on these fraudulent invoices.

49.    To conceal this scheme, Mr. Rodino commingled the assets of Lee's Wood Products and Recycled/New to make it difficult to track each company's inventory, expenses, sales, and profits.  Mr. Rodino also failed to complete a periodic inventory count.

50.    Mr. Rodino also uses handwritten checks to conceal checks written for the various schemes outlined in this Complaint.  Lee's Wood Products and Recycled/New will issue printed checks from Quickbooks for most legitimate expenses.  Mr. Rodino maintains a separate manual check register, from which he hand-writes checks for fraudulent expenses and misappropriated funds.  With these checks, Mr. Rodino writes a check to one person and then codes the check to another person or entity in Quickbooks.  Mr. Rodino has refused to provide copies of the manual check register and, upon information and belief, he has destroyed records related to this check register to conceal how much money has been embezzled.

## F.    Mr. Rodino Forms Apex Pallet to Steal from Lee's Wood Products and Recycled/New.

i.    *Apex Pallet Misappropriates and Embezzles Pallets and Resources From Lee's Wood Products and Recycled/New.*

51.    On September 17, 2008, immediately after the stock transfer from Mr. Dugle to Mr. Shah became effective, Mr. Rodino created another business called Apex Pallet.

52.    According to Mr. Rodino's sworn testimony, Apex Pallet was formed to serve one customer, which he identified as KIK Packaging Corporation ("KIK").  Mr. Rodino testified that: (1) Apex Pallet was a broker only for the Duro Entities; and (2) the purpose of a broker is to buy

the pallets from a pallet manufacturer, e.g., Lee's Wood Products, and then sell them to the end-user, e.g., KIK.

53.    Mr. Rodino used Apex Pallet to steal supplies, pallets, money, and resources from Lee's Wood Products and Recycled/New.  From 2009 through 2012, Apex Pallet has not paid for the majority of pallets it sold to KIK.

54.    In 2009, Apex Pallet paid Lee's Wood Products and Recycled/New $2,184 and $30,730.20, respectively, for pallets.  (Exh. 1, Lee's Wood Products Sales Reports for Apex Pallet; Exh. 2, Recycled/New Sales Reports for Apex Pallet)  Hence, in 2009, Apex Pallet paid Lee's Wood Products and Recycled/New a combined total of $32,914.20 for pallets it claims to have brokered to KIK Packaging.

55.    According to its 2009 tax returns, Apex Pallet reported gross sales of $195,560. Apex Pallet also reported $155,695 in lumber and pallet purchases, $2,122 for heat treating processes, $3,000 for legal and accounting, $3,500 for repair and expenses, and $31,000 for commissions.  Apex Pallet took pallets and resources from Recycled/New and Lee's Wood Products and only paid them $32,914.20.  Recycled/New and Lee's Wood Products should have been paid $161,317 (total for lumber/pallet purchases, heat treating processes, and repair/expenses).

56.    In 2010, Mr. Rodino executed the same scheme.  Apex Pallet paid Lee's Wood Products and Recycled/New $9,139.70 and $53,644 for pallets, respectively.  (Exhs. 1 and 2) However, Apex Pallet had gross sales of over $505,000 in 2010.

57.    According to its 2010 tax return, Apex Pallet had expenses totaling $415,354, based on $231,295 for lumber and heat treating and $158,829 for scrap and used pallets.  All of this money should have gone to Lee's Wood Products and Recycled/New, but Apex Pallet only

paid $62,783.70 for pallets it claims to have brokered to KIK Packaging. Mr. Rodino, through Apex Pallet, misappropriated at least $352,570.30 in pallets from Recycled/New and Lee's Wood Products in 2010.

58.     From January 1, 2011 to March 2012, Mr. Rodino continued to steal new pallets from the Duro Entities and sell them directly from Apex Pallet. Mr. Rodino sold $604,706.00 in pallets from Apex Pallet from January 1, 2011, through March 2012. The bulk of the sales - $561,525.00 - were to KIK Packaging. (Exh. 3, KIK Packaging Checks to Apex Pallet) However, Mr. Rodino only purchased $39,369.55 in pallets from Lee's Wood Products and Recycled/New.

59.     Apex Pallet cannot build pallets, heat treat pallets, or repair pallets. Apex Pallet has no resources or employees for these functions. Instead, Apex Pallet uses the office staff from Recycled/New and Lee's Wood Products to create invoices and purchase orders. Apex Pallet also uses the Duro Entities' trucks, employees, and resources to deliver these pallets, without paying the Duro Entities for the same.

60.     Through this scheme, Apex Pallet kept all of the profits from the sales and limited its expenses. Because Rodino owns 100% of Apex Pallet, he gets to keep all of the money instead of splitting it with his partners in the Duro Entities.

ii.     *Apex Pallets diverts business away from Lee's Wood Products & Recycled/New*

61.     In 2011, Apex Pallet stopped buying the bulk of its pallets from the Duro Entities and diverted its purchases to other suppliers, despite being the sole broker for Lee's Wood Products and Recycled/New.

62.     From January 2011 through March 2012, Apex Pallet bought $218,945 of pallets from other suppliers. Instead of brokering the pallets from the Duro Entities, Mr. Rodino diverted

the business to other pallet manufacturers.  As a result, during this time period, the Duro Entities

lost sales of $218,945.00.  (Exh. 4, Redacted Apex Pallet Checks To Other Pallet Vendors)

63.     Apex Pallet also diverted several other customers from the Duro Entities.  From

January 2011 through March 2012, Apex Pallet had pallet sales of $43,181.00 to customers other

than KIK Packaging.

64.     During this time, Apex Pallet used the Duro Entities' employees to build pallets

from raw lumber.  Apex Pallet sold the pallets built by the Duro Entities' employees directly to

Apex Pallet's customers.  Apex Pallet did not pay Lee's Wood Products or Recycled/New for

building new pallets or repairing used pallets.  Nor did Apex Pallet pay the Duro Entities for fuel,

storage, and other related manufacturing costs.

   iii.   *Mr. Rodino, through Apex Pallet, makes a profit off of selling pallets to Recycled/New at a premium.*

65.     From January 2011 through March 2012, Apex Pallet claims to have purchased

$81,894 in scrap pallets from KIK Packaging and re-sold them directly to Recycled/New at a 25%

mark-up.  (Exh. 5, Apex Pallet Checks to KIK Packaging)

66.     During the same time period, Recycled/New paid Apex Pallet approximately

$110,069 for the same pallets Apex Pallet had bought from KIK Packaging, giving Apex Pallet a

a $28,175 profit from the mark-up to Recycled/New.  Apex Pallet used the Duro Entities' trucks

and employees to do the work associated with its sale of the used KIK Packaging pallets to

Recycled/New.

   iv.   *Mr. Rodino Creates Additional False Records to Conceal the Fraud by Apex Pallet*

67.     In addition to the misappropriation, Mr. Rodino and CPA Koons prepared

fraudulent tax returns for Apex Pallet.  All of the costs and expenses for the Apex Pallet purchases

should have been reported as expenses for the Duro Entities.  Instead, Mr. Rodino reported some of the expenses and costs through Apex Pallet.

68.     According to its 2010 tax return, Apex Pallet had gross sales of $505,539.00 and costs of goods sold of $415,354.00.  The stated gross profits in 2010 totaled $90,185.00.  Mr. Rodino deducted an additional $88,250.00.  This left him with reportable and taxable ordinary business income of $1,935.00.

69.     Mr. Rodino's handwritten notes to his CPA for the 2010 tax return claimed expenses related to lumber and heat treating ($231,295), scrap and used pallets ($158,829), and supplies, travel, and fuel ($25,230).  Mr. Rodino also purportedly paid commissions totaling $86,000.

70.     The costs reported by Apex Pallet - lumber and heat treating ($231,295), scrap and used pallets ($158,829), and supplies, travel, and fuel ($25,230) - should have been paid to Recycled/New and Lee's Wood Products.  Apex Pallet does not have any legitimate expenses for supplies, travel, or fuel.

71.     In 2010, Recycled/New wrote approximately 28 checks to Apex Pallet, totaling $112,595.00.  (Exh. 6, Recycled/New Transaction Detail for Apex Pallet)  Almost every check is written for a large round number that end in multiple zeros.

72.     In the Quickbooks file for every Recycled/New check to Apex Pallet in 2010, there are generic entries describing the loads of pallets that Apex Pallet allegedly purchased from KIK and then sold to Recycled/New Pallets.  Each of the 28 checks is documented in the Quickbooks entries with "10 scrap loads", "12 scrap loads", "12 loads of mixed pallets and drums", "12 mixed loads of pallets and barrels," or "15 mixed loads of pallets and barrels."

73.   Mr. Rodino does not have legitimate invoices from Apex Pallet to KIK, or purchase orders from KIK to Apex Pallet, to support any of these expenses.  Mr. Rodino has produced post-dated, falsified, handwritten invoices that he claims to have issued to KIK to document Apex Pallet's purchases of scrap pallets.

74.   The falsified invoices for Checks ##15329 through 16104 (with the exception of #15777) contain the following handwritten entry: "FIND ENCLOSED A CHECK FOR $_____ FOR TEN [TWELVE] LOADS OF SCRAP."  Each invoice identifies the check amount paid to KIK from Apex Pallet.  Recycled/New regularly paid Apex Pallet 25% more than the amount invoiced by Apex Pallet to KIK Packaging.

*v.*    *Mr. Rodino's Mail and Wire Fraud through Apex Pallet*

75.   To conceal his unlawful conduct, Mr. Rodino filed fraudulent 2009 and 2010 tax returns for Mr. and Mrs. Rodino and Apex Pallet with the IRS and the State of Indiana.  Apex Pallet reported fraudulent expenses and costs to lower its taxable income.  Mr. and Mrs. Rodino's personal tax returns reported significantly lower taxable income from Apex Pallet.  The IRS tax returns were transmitted electronically to an IRS processing center outside of Indiana.

76.   On their 2009 and 2010 tax returns, Mr. and Mrs. Rodino did not report any commissions or wages from Apex Pallet.  Apex Pallet did not issue either of them a W-2.  Mr. and Mrs. Rodino's only reported income from Apex Pallet was through the company's reported profits.

77.   Mr. and Mrs. Rodino accomplished their numerous schemes through Apex Pallet through a pattern of mail and wire fraud that has been ongoing continuously for several years.

78.   To conceal all of the different schemes he channeled through Apex Pallet, Mr. Rodino set up two separate checking accounts at PNC Bank.  The first identifies the 24478 CR 45

address for Apex Pallet.  The second account identifies PO Box 145, Elkhart, IN 46515 as the address for Apex Pallet.

79.    Mr. Rodino issued all outgoing payments from Apex Pallet's PNC Bank account on checks with this address for Apex Pallet:  24478 County Road 45, Elkhart, IN 46516.  This is the address where the Duro Entities' legitimate business operations are located.  Apex Pallet does not have another physical address or any assets.

80.    Using the duplicate addresses allowed Mr. Rodino to write and mail all of Apex Pallet's and the Duro Entities' checks from the computers at the Duro Entities.  Mr. Rodino maintains electronic copies of the books for Apex Pallet on the Duro Entities' computers.

81.    Mr. Rodino stores information regarding his fraudulent schemes with Apex Pallet on the hard drives of computers located at the Duro Entities.  Mr. Rodino has refused to produce copies of the hard drives.  His lawyers have assisted him in his efforts to prevent Plaintiffs from obtaining Apex Pallet records, including refusing to produce images of the hard drives.

82.    The majority of the payments made by Apex Pallet that are sent from 24478 County Road 45, are sent via U.S. mail.  In 2011, Apex Pallet spent $328.00 on postage.

83.    Apex Pallet uses the second PNC bank account and a separate mailing address to receive all payments mailed to Apex Pallet and for all of the checks mailed by Apex Pallet to Bank of America for the fraudulent credit card payments.  For all fraudulent payments and checks, Apex Pallet uses the second PNC Bank account and the Post Office Box address:  Apex Pallet, PO Box 145, Elkhart, IN 46515.

84.    From December 16, 2010, to March 15, 2012, Apex Pallet wrote 203 checks (Check ##1255 through 1457) from these two different addresses: Post Office Box 145, Elkhart,

Indiana, 46515; and 24478 CR 45, Elkhart Indiana, 46516. Rodino used the same check number order and account number regardless of which Apex Pallet address was used.

85. When Mr. Rodino wanted to receive payments or invoices directed to Apex Pallet, he used the PO Box 145 address. There is no legitimate reason for Apex Pallet to use a separate post office box to receive incoming payments or pay outgoing expenses. Mr. Rodino set up the separate Post Office Box 145 to conceal how much money was being transferred to and from Apex Pallet. (Exhs. 3-5, Checks to and from P.O. Box 145)

86. Post Office Box 145 lessened the risk that anyone at the Duro Entities, e.g., one of the Office Managers, would learn how much money Apex Pallet was making from the pallets built with Duro Entities' resources or stolen outright from the Duro Entities.

87. KIK International, LLC, located in Houston, Texas, mailed checks totaling $561,525.00 to Apex Pallet from January 6, 2011, to March 1, 2012. Every KIK check was mailed from Houston, Texas, to Apex Pallet, Inc., PO Box 145, Elkhart, Indiana, 46515. (Exh. 3, KIK Checks to Apex Pallet)

88. When Mr. Rodino wanted cash from Apex Pallet, he would write a check from the PNC Bank account with the Post Office Box 145 address and cash it at PNC Bank. (Exh. 7, Check Nos. 1255 ($5,000) and 1267 ($10,000))

**G.** **Creation of Lucky Lou to Steal from Lee's Wood Products and Recycled/New.**

89. The Rodino Family has created and used Lucky Lou to embezzle, misappropriate, and launder money from Recycled/New and Lee's Wood Products.

90. Lucky Lou owns title to multiple properties. The Rodino Family leases many of these properties and then receives significant rental income each year. Lucky Lou owns (or has owned) the following properties:

a.  23408 Greenleaf Blvd., Elkhart, IN 46514 ("23408 Greenleaf"), which is a 4-bedroom, 2-bath house that Lucky Lou purchased on December 19, 2003, for $210,000.  Lucky Lou uses this house as a rental property.  To finance the purchase, Lucky Lou signed a mortgage with Elkhart Community Bank.  As of December 31, 2010, 23408 Greenleaf had a mortgage balance of $165,998 with Elkhart Community Bank.  On June 30, 2011, Lucky Lou signed a 3-year, fixed conventional mortgage for $164,680 with PNC Bank and paid off the mortgage with Elkhart Community Bank.

b.  24503 County Road 45, Elkhart, IN 46516, which is a single-family residential rental property with an adjoining empty lot.  Lucky Lou purchased 24503 CR 45 on November 8, 2004, for $107,730.  To finance the purchase, Lucky Lou signed a fixed rate conventional mortgage with Elkhart Community Bank for $81,000.  As of December 31, 2010, 24503 CR 45 had a mortgage balance of $50,336 with Elkhart Community Bank.  On June 30, 2011, Lucky Lou signed a 10-year, fixed conventional mortgage for $48,799 with PNC Bank and paid off the mortgage with Elkhart Community Bank.

c.  621 Kollar Street, Elkhart, IN 46514, which is a warehouse purchased by Lucky Lou in 2004.  The Rodino Family stores personal items at this warehouse, including their collection of 10 cars.  621 Kollar was purchased in November 2004 for approximately $69,000, without financing or a mortgage.

d.  1132 Fulton Street, Elkhart, IN 46514 ("1132 Fulton"), which is a 2-bedroom, single-family residential property purchased for $24,000 on June 5, 2009, and

used as a rental property.  1132 Fulton does not have a mortgage.  Lucky Lou purchased 1132 Fulton through foreclosure proceedings.

    e.  22238 County Road 10, Elkhart, IN 46514, which is a single family residential property that Lucky Lou purchased on July 31, 2009 for $115,000.  The purchase was financed with a mortgage through Wells Fargo.  As of December 31, 2010, this property had a mortgage balance of $88,846.86 with Wells Fargo.

    f.  1109 Maple Row, Elkhart, IN 46514, which is a 2-bedroom, single-family residential property that Lucky Lou purchased on December 22, 2010.  Lucky Lou paid $23,000 in cash and did not mortgage the property.

91.    The Rodino Family purchased each of the Lucky Lou properties with money unlawfully taken from Lee's Wood Products and Recycled/New.  The amounts paid at all the closings for these properties is derived from money from Lee's Wood Products and Recycled/New.

92.    The Rodino Family pays the mortgages, including principal, interest, and taxes, on 23408 Greenleaf and 24503 County Road 45 to Elkhart Community Bank (a/k/a/ Indiana Community Bank) and PNC Bank, and the money for these payments comes directly from Lee's Wood Products.  (Exh. 8, Lee's Wood Products Report for payments to Indiana Community Bank; Exh. 9, Lee's Wood Products Expenses for Interest, Rent, LOC-ECB)  From 2003 through at least 2012, Mr. Rodino concealed the mortgage payments by commingling payments to a Duro line of credit with Elkhart Community Bank and PNC Bank with the Lucky Lou mortgage payments. (*Id.*)

93.    The majority of these mortgage payments were made by handwritten checks that Mr. Rodino mailed through the U.S. Postal Service.  Mr. Rodino did not make automatic

electronic payments or direct debit payments to Elkhart Community Bank and PNC Bank on the various commercial loans for Duro and Lucky Lou because those payments cannot be commingled.   Mr. Rodino handwrote the checks to "Elkhart Community Bank", "Indiana Community Bank", and "PNC Bank," and then provided the banks with instructions on how to divide the checks among the various Duro and Lucky Lou accounts.

94.     Mr. Rodino then falsely coded each monthly payment in the Quickbooks as a payment for a Duro Entity loan or line of credit, even though a significant portion of the money was paid to mortgages on properties in the name of Lucky Lou.  (Exh. 9, Lee's Wood Products, Expenses by Vendor Detail (Interest, Rent, LOC-ECB))

95.     The Rodino Family also pays for all maintenance, remodeling, and improvements on all Lucky Lou properties with funds taken directly from Lee's Wood Products and Recycled/New.  Mr. Rodino conceals these payments by miscoding them as expenses for Lee's Wood Products and Recycled/New.

96.     From 2005 through 2012, the Rodino Family misappropriated money by writing checks from both Recycled/New and Lee's Wood Products directly to Lucky Lou for its mortgages.

97.     The mortgages on the property for Recycled/New and Lee's Wood Products, located at 24478 CR 45, are paid by Recycled/New and Lee's Wood Products to Duro Realty each year.  Beginning in July 2005, Recycled/New and Lee's Wood Products began making payments to Lucky Lou, allegedly for "Rent & Lease of Land."  However, there is no written annual lease for these payments by Recycled/New and Lee's Wood Products.   In 2005 and 2006, Recycled/New paid $750 and $1,250 to Lucky Lou for "Rent & Lease."  Lee's Wood Products

paid $100 in 2005 and $0 in 2006.  (Exh. 10, Lee's Wood Products Report for Lucky Lou Payments; Exh. 11, Recycled/New Report for Lucky Lou Payments)

98.     Recycled/New and Lee's Wood Products did not make any legitimate "Rent & Lease" payments to Lucky Lou because Recycled/New and Lee's Wood Products do not utilize Lucky Lou's properties.  In 2005 and 2006, according to its tax records, Lucky Lou owned 23408 Greenleaf, 621 Kollar, and CR 45.  Recycled/New and Lee's Wood Products do not own or use these properties (with the exception that Recycled/New and/or Lee's Wood Products occasionally store trailers on a dirt lot connected to the single family residential property at CR 45).

99.     In 2007, Recycled/New and Lee's Wood Products paid a total of $13,000 over a period of 5 months to Lucky Lou.  (Exhs. 10 and 11)  Many of these payments were falsely coded as "Rent" payments to Lucky Lou.  Recycled/New and Lee's Wood Products do not lease any property from Lucky Lou.  One check, written on April 26, 2007 (Check #6722h), was written to Lucky Lou for "tickets," which Mr. Rodino falsely coded in Lee's Wood Products's Quickbooks as "Employee Benefits."

100.     In 2008 and 2009, Recycled/New and Lee's Wood Products paid a total of $12,000 each year to Lucky Lou.  (*Id.*)  In 2010, Recycled/New and Lee's Wood Products each paid $8,250 over the course of the year (a total of $16,500).  (*Id.*)  In 2011, Recycled/New and Lee's Wood Products paid $16,200 and $17,200 over the course of the year (a total of $33,400).

101.     There is no lease between Recycled/New and Lee's Wood Products for the "Rent" payments to Lucky Lou.  Moreover, the payments arbitrarily differ from year to year, and sometimes even from month to month.  Mr. Rodino used the payments from Recycled/New and Lee's Wood Products to pay the mortgage payments on Lucky Lou's properties.  Mr. Rodino mailed the mortgage payments each month from his home address (also Lucky Lou's address).

102.    These monthly payments were not used to pay the mortgages on Recycled/New and Lee's Wood Products. Lucky Lou used these additional payments, in addition to the money paid directly from Lee's Wood Products to Elkhart Community Bank as described above, to pay the mortgages on Lucky Lou's properties.

103.    Lucky Lou receives rental income each year on every property that it owns. Lucky Lou reported the following gross rental income from 2004 to 2010: $13,100 (2004); $36,600 (2005); $28,400 (2006); $31,350 (2007); $35,100 (2008); $43,000 (2009); and $58,700 (2010). While Lee's Wood Products and Recycled/New paid the mortgage and all expenses for Lucky Lou's properties, the Rodino Family received all of the rental income. The Rodino Family reinvested some or all of these profits in multiple personal investment accounts.

104.    Lucky Lou and Mr. Rodino and Mrs. Rodino Bailey filed fraudulent federal and state tax returns to further conceal the Lucky Lou scheme. Lee's Wood Products and Recycled/New paid the expenses and mortgages, but Lucky Lou claimed all of these payments on its annual tax returns, which reduced the taxable income on Lucky Lou's shareholders, Mr. Rodino and Mrs. Rodino Bailey. In every year from 2004 to 2010, the Rodino Family reported on their individual federal tax returns a net loss for Lucky Lou.

105.    During these same years, 2004 through 2010, Mr. Rodino recorded Lucky Lou-related expenses as expenses for Lee's Wood Products and Recycled/New. Mr. Rodino and his accountants then filed fraudulent federal and state tax returns each year.

106.    On June 30, 2011, Lucky Lou re-financed its mortgage on 24503 CR 45 for a loan of $48,799 from PNC Bank, with a 10-year term. The payment for this mortgage is $543.96 each month. The same day, Lucky Lou also re-financed its mortgage on 23408 Greenleaf for $164,680 with PNC Bank, for a 3-year mortgage term. The payment for this mortgage is

$1,244.10 each month, beginning on July 30, 2011. On July 30, 2014, Lucky Lou will make a final payment of $140,908.66. The monthly payments for both mortgages total approximately $21,455 per year.

107.   In 2011 and 2012, the Rodino Family continued to misappropriate money from Recycled/New and Lee's Wood Products to pay Lucky Lou's mortgages with Elkhart Community Bank and PNC Bank. In 2011, Recycled/New and Lee's Wood Products paid more than $33,000 to Lucky Lou. In 2012, Recycled/New and Lee's Wood Products each paid $12,000 in monthly rent payments (a total of $24,000) to Lucky Lou. All of these payments were fraudulently coded as "Rent" payments for Recycled/New and Lee's Wood Products, despite paying mortgages on properties that had nothing to do with Recycled/New and Lee's Wood Products.

108.   Between June 2011 and February 2012, Lucky Lou made one set of monthly mortgage payments of $1,244.10 and $543.96, via an electronic debit transaction directly from Lucky Lou's checking account at PNC Bank, on August 3, 2011. Lucky Lou has made and continues to make all other interest and principal payments to PNC Bank directly from the Lee's Wood Products and Recycled/New checking accounts under the false pretense of paying "Rent" for Lee's Wood Products and Recycled/New.

109.   As in prior years, Lucky Lou mailed each monthly payment in 2011 and 2012, made with a handwritten check signed by Mr. Rodino, to Elkhart Community Bank and PNC Bank.

110.   On December 1, 2011, Mr. Rodino formed another shell company called 2610 LLC. Mr. Haut, in his capacity as an attorney with Warrick & Boyn, is identified as the Registered Agent for 2610 LLC.

111.    2610 LLC owns a warehouse located at 2610 Sterling Avenue, Elkhart, IN 46516 (the "2610 Warehouse"). However, the entity address with the Indiana Secretary of State for 2610 LLC is the Rodino Family's home address. 2610 LLC was created in 2011 to conceal the Rodino Family's misconduct and to launder money unlawfully taken from the Duro Entities.

112.    Mr. Rodino purchased the 2610 Warehouse at a Sheriff's sale for $52,250. Mr. Rodino paid cash for the building, from money taken from the Duro Entities. The 2610 Warehouse is used to store pallets for one customer of the Duro Entities, but the majority of the warehouse space is set aside for another unrelated business venture involving the manufacture of furniture from recycled pallets.

113.    On or about December 14, 2011, Mr. Rodino borrowed a line of credit for $50,000 from Lake City Bank in Warsaw, Indiana, which he secured with an adjustable rate mortgage on the 2610 Warehouse property.

114.    Mr. Rodino did not use the $50,000 line of credit for the benefit of the Duro Entities. However, Mr. Rodino is using money from Lee's Wood Products and Recycled/New to pay the full balance of the mortgage payments made by 2610 LLC.

115.    Beginning in December 2011, Mr. Rodino began making additional payments from Recycled/New and Lee's Wood Products to 2610 LLC to pay off the line of credit.

116.    The payments are for purported "Rent." As with Lucky Lou, there is no lease agreement between 2610 LLC and Lee's Wood Products or Recycled/New. Mr. Rodino simply writes monthly checks to 2610 LLC under the false pretense of "Rent."

117.    On December 1, 2011, Lee's Wood Products wrote a check for $2,500 to 2610 LLC for a "Deposit." On December 2, 2011, Recycled/New wrote a check to 2610 LLC for $1,500 for "Rent." From January through December 2012, Recycled/New and Lee's Wood

Products each wrote $1,500 checks to 2610 LLC at the beginning of each month for "Rent." In 2012 alone, 2610 LLC received at least $36,000 from Recycled/New and Lee's Wood Products.

118.    Mr. Rodino also opened two credit card accounts with PNC Bank in 2011, which he used in 2011 and 2012 for maintenance and remodeling costs on the Lucky Lou and 2610 properties and for personal expenses of the Rodino Family. Each month, he made payments on the credit card balances from the checking accounts of Recycled/New and Lee's Wood Products. Each check was handwritten and mailed to PNC Bank at a post office box address in Kentucky. The checks were coded fraudulently in the companies' Quickbooks as paying for Duro Entities' expenses.

119.    In 2011 and 2012, Mr. Rodino made significant payments from Recycled/New and Lee's Wood Products to his brother, Tom Rodino, for maintenance work being performed on the rental properties owned by Lucky Lou and 2610.

120.    Mr. Rodino placed Mrs. Rodino Bailey on payroll and paid her a weekly salary. Mrs. Rodino Bailey did not perform any work for Lee's Wood Products or Recycled/New.

121.    Mr. Rodino failed to properly issue 1099s for work performed by independent contractors. For example, based on payroll records, Rodino paid thousands of dollars to multiple individuals who were not employees of the Duro Entities each year from 2008 through 2011. The Duro Entities also failed to issue a 1099 to these individuals.

**H.    Terry Rodino Created Multiple Fictional Loans To Conceal Unlawful Distributions.**

    *i.    Personal Loans, "Shareholder Notes," and Invoices.*

122.    Mr. Rodino created fictitious loans, "shareholder notes," and invoices to conceal payments made unlawfully from 2003 to 2010 to himself.

123.    On December 31, 2000, Mr. Rodino claims to have loaned approximately $155,318.40 to Lee's Wood Products. This loan is fictitious, and Mr. Rodino created a false entry in the accounting books to conceal that he was receiving unlawful distributions from Lee's Wood Products. (Exh. 12, Transaction Detail by Account (Terry Rodino Loans))    The loan is documented by a General Journal entry dated December 31, 2000.  However, this entry was not created until July 1, 2003, when Mr. Rodino altered the Quickbooks records and made numerous false entries to create a fake loan. (Exh. 13, 12/31/2000 General Journal Entry and Audit Report)

124.    On December 27, 2007, Mr. Rodino created a false entry in the books, claiming to have loaned $60,000 to Lee's Wood Products.  He did not loan any money to Lee's Wood Products.  However, in 2008, Mr. Rodino paid himself $60,000 in several checks to pay off a "Shareholder Loan" that was never made. (Exh. 12, Transaction Detail by Account (Terry Rodino Loans))

125.    Duro Realty owns the Duro Entities' buildings at 24478 CR 45 in Elkhart. This is the only asset of Duro Realty. Duro Realty has a mortgage on the buildings. Since 2005, the monthly mortgage payment, which includes property taxes, interest, and insurance, made by Duro Realty is $3,841.43, and the annual payments total $46,097.16.

126.    In 2006, 2007, 2008, and 2009, respectively, Duro Realty received $48,000, $60,000, $53,000, and $48,000 from Lee's Wood Products and Recycled/New. In 2010, Lee's Wood Products and Recycled/New payments to Duro Realty jumped to $75,000. However, Duro Realty's 2010 tax return reported gross rental income of $51,642.

127.    Mr. Rodino created a false "Note Payable" entry in the General Journal for Lee's Wood Products to cover up two checks totaling $12,500 that he wrote to himself at the end of

2010. The checks are dated 12/29/2010 and 01/01/2011 and purport to satisfy a note from Duro Realty issued on March 31, 2002. Duro Realty did not loan this money to Lee's Wood Products.

128.    Mr. Rodino created a false "Note Payable" entry in the General Journal for Recycled/New to cover up a check for $10,000.00 that he wrote to himself at the end of 2010. The check is dated 12/28/2010 and purports to satisfy a note from Duro Realty issued on February 28, 2002. Duro Realty did not loan this money to Recycled/New on February 28, 2002.

129.    There are no legitimate documents confirming the existence of these loans from Mr. Rodino to the Duro Entities.

ii.    *Mr. Rodino Opens a Fraudulent Line of Credit on Behalf of Lee's Wood Products.*

130.    On December 31, 2010, on behalf of Lee's Wood Products, Terry Rodino borrowed an additional $200,000 through a line of credit with PNC Bank, secured by a promissory note on Lee's Wood Products's property. Lee's Wood Products did not need a $200,000 line of credit. Lee's Wood Products had approximately $300,000 in its checking account and $50,000 in an investment account in January 2011.

131.    Lee's Wood Products did not receive or use any of the proceeds of this $200,000 line of credit. Nor was the line of credit recorded on Lee's Wood Products's balance sheets. Upon information and belief, the proceeds of this line of credit were used to finance an illegal scheme through American Travel Palace, as described below.

132.    In 2011 and 2012, Lee's Wood Products made significant monthly payments via handwritten checks that were mailed to PNC Bank to pay down the line of credit. Mr. Rodino did not set up automatic debit payments or pay electronically each month because those transactions

would be easier to trace by viewing the monthly statements. Mr. Rodino used handwritten checks and the mail system to better conceal the payments.

133.    Mr. Rodino also made significant draw-downs on the line of credit by handwriting checks to PNC Bank for "cash" from Lee's Wood Products's checking account. Mr. Rodino did not use these draw-downs for any legitimate Lee's Wood Products expense. Lee's Wood Products paid off the line of credit on or before June 19, 2012.

     iii.    *Mr. Rodino Opens Other Investment Accounts for Recycled/New and Lee's Wood Products and Conceals Their Existence From Plaintiffs.*

134.    On September 23, 2008, Mr. Rodino opened a Certificate of Deposit ("CD") at MutualBank and deposited $100,000 in the name of "Duro Recycling, Inc." However, Mr. Rodino did not plainly record the CD on Recycled/New's balance sheet. Mr. Rodino cashed this CD in 2010 and sent the money to an investment account in his and Mrs. Rodino's names.

135.    On October 26, 2010, Mr. Rodino handwrote Check #8790 for $200,000, from Recycled/New to First Clearing LLC. In the memo line, Rodino wrote: "Duro Recycling Inc. – acct. #5534-2971." The check was written out of an account with Mutual Bank in Elkhart, Indiana.

136.    Check #8790 was mailed on October 26, 2010, to First Clearing, LLC, a brokerage account located in St. Louis, Missouri. The account opened for Duro Recycling is managed by Ascend Advisory Group, an investment advisory and management group located in Dublin, Ohio.

137.    Ascend Advisory Group deposited the check, which cleared on November 2, 2010, into a brokerage account with First Clearing. Ascend Advisory Group then invested the $200,000 in a combination of cash assets, securities, and mutual funds.

138. Mr. Rodino fraudulently transferred this money out-of-state in an effort to prevent his minority shareholders from discovering the accounts existed. After Check #8790 was mailed and deposited, Mr. Rodino and CPA Koons created multiple fraudulent accounting and financial records to conceal the existence of the investment account at Ascend Advisory Group.

139. Check #8790 was entered in Recycled/New's Quickbooks under the name First Clearing LLC, but it was coded as a "Bank Charge" for Recycled/New. On October 31, 2010, Mr. Rodino made General Journey Entry No. 540, in which he noted that the $200,000 check had been "re-posted" to Recycled/New's checking account. This is a fraudulent entry. The money was never returned to the checking account.

140. Rodino created false reconciliation reports, with the assistance of CPA Koons. Rodino provided the October monthly statement from Mutual Bank and the Recycled/New Balance Sheet as of October 31, 2010, to CPA Koons. The Balance Sheet does not reflect as an asset the new $200,000.00 securities investment account with First Clearing, because the check was coded as a "Bank Charge." Accounting practices and IRS guidelines require Recycled/New to report this investment account as a separate asset on the Balance Sheet.

141. CPA Koons and Mr. Rodino then prepared a false monthly bank reconciliation report for Mutual Bank to conceal the new investment account. The bank reconciliation report is nothing more than an Excel spreadsheet that purports to account for all transactions in and out of the Mutual Bank accounts for Recycled/New.

142. The report reflects that the $200,000.00 was used to open a "Money Market Acct" with Mutual Bank. This entry is false. Mutual Bank has no other record for any other account opened by Recycled/New, and no part of Check #8790 for $200,000 was used to open a "Money Market Acct" at MutualBank.

143.    Rodino used this scheme to misappropriate money from the Duro Entities into separate accounts that would not show up on the books. Based on the fraudulent books created by Mr. Rodino, there is no evidence of the $200,000.00 securities investment account at Ascend Advisory Group.

144.    Mr. Rodino perpetrated the same scheme through Lee's Wood Products.   On October 26, 2010, Mr. Rodino handwrote and mailed a $50,000 check (#7296) to First Clearing from Lee's Wood Products's checking account.

145.    Mr. Rodino created all of the same fraudulent accounting records described above for Recycled/New, i.e., a false "re-posting" General Journal entry and false bank reconciliation reports.

146.    Mr. Rodino concealed the existence of these two investment accounts at Ascend Advisory/First Clearing by creating a false entity name to hold the accounts.  If an assets search was conducted for Duro Recycling, Inc., Recycled/New Pallets, Duro, Inc., or Lee's Wood Products, the search would not uncover the existence of the investment account with Ascend Advisory Group because the account number was hidden under the corporate name of "Dura Corporation."

147.    Rodino intentionally named the account "Dura Corporation" because it would limit the chances that anyone looking for the Duro Entities would locate these assets.  There are 94 companies in Indiana and 41 companies in Ohio that include the name "Dura."  Mr. Rodino has no affiliation with or ownership in any of these companies.

148.    From November 2010 through October 2011, Rodino and CPA Koons prepared a monthly bank reconciliation report based on the bank statement and a Quickbooks report of monthly transactions. Every reconciliation report states that the $200,000 and $50,000 payments

were sitting in money market accounts in Indiana or Ohio. Every monthly balance sheet during this time period fails to list the investment accounts as assets. The tax returns for Recycled/New and Lee's Wood Products fail to report the securities investment accounts as assets.

149. Since the initial deposits, Rodino has wired additional investments. On March 16, 2011, Mr. Rodino mailed or wired $104,217.78 from Lee's Wood Products to First Clearing. On October 22, 2012, Mr. Rodino mailed or wired an additional $100,000.00, via Check #9414, to the Recycled/New investment account. As of April 30, 2012, the "Dura Corp" accounts for Recycled/New and Lee's Wood Products held $209,893.87 and $156,880.08, respectively.

**J.** **The Rodino Family Uses Money From The Duro Entities To Pay Expenses For The Family.**

i.  *Use of the Duro Entities' Funds for Personal Expenses.*

150. The Rodino Family has used funds from the Duro Entities to pay for their personal vehicles, cell phones, credit cards and other personal expenses. (Exh. 14, DeJong Statement and supporting documents)

151. Mr. and Mrs. Rodino each drive a Lexus vehicle, and the Duro Entities have paid for the lease payments, insurance, and taxes for both vehicles. Mrs. Rodino is not an employee of the Duro Entities.

152. Mr. and Mrs. Rodino have personal credit cards in their names with Bank of America, Wells Fargo, MBNA, Huntington Bank, and MFB Visa and have paid these cards with money from the Duro Entities. Mr. and Mrs. Rodino also used credit cards from one or more of these same financial institutions, issued to Lee's Wood Products or Recycled/New, to pay for their personal expenses and/or other non-Duro Entities-related business expenses.

153. Mr. Rodino is financing litigation with his business partners, Mr. Dugle and Mr. Shah, from money from the Duro Entities.

154.    Mr. and Mrs. Rodino paid for their personal memberships and costs at multiple country clubs, including Eastlake Athletic Club, Christiana Creek Country Club, and Elcona Country Club, with money from the Duro Entities. (Exh. 14, DeJong Statement citing dates and amounts of payments)

155.    Mr. and Mrs. Rodino also have used the Duro Entities' money to pay for renovations and maintenance of their home at 23393 Shorelane. From 2005 to 2007, Mr. and Mrs. Rodino wrote checks totaling $41,000 to Wells Fargo to pay the mortgage on their home. (Exh. 15, Recycled/New Report for Wells Fargo Mortgage Payments)

156.    To pay for maintenance and renovations on their personal home and Lucky Lou and 2610 rental properties, Mr. and Mrs. Rodino bought goods and services from Campenello Home Consulting, Bollenbacher Construction, Oak Express Furniture, The Home Depot, Lowe's, Watt's Fine Furniture, Menard's, and Rolle Williams. (Exh. 14, DeJong Statement; Exh. 16, Lee's Wood Products Credit Card Transactions with Bank of America, Fifth Third Bank, First Source Bank, Lake City Bank, MBNA American Business, and Retailers National Bank; Exh. 17, Recycled/New Credit Card Transactions with Bank of America, Citibusiness, MBNA, and Mutual Bank Visa)

157.    The majority of the payments for these expenses were made via handwritten checks, which were then mailed to the vendors and/or electronic wire transfers that crossed state lines. (*Id.*)

158.    Mr. Rodino concealed many of these transactions by improperly applying the wrong expense codes in the Duro accounting records. For example, Mr. Rodino coded the September 24, 2004 payment to Campanello Home Consulting as a "Professional Legal Expense." For payments to the Elkhart Rotary, Mr. Rodino coded multiple payments as "Shop Supplies."

Certain payments to MBNA were miscoded as "Bank Charges." Lee's Wood Products payments to Bank of America were coded as "Employee Benefits." And thousands of dollars paid by Lee's Wood Products to Lake City Bank were miscoded as "Materials."

    *ii.*    *Commingling Personal and Apex Pallet Expenses on Lee's Wood Products and Recycled/New Business Credit Cards*

159. Recycled/New and Lee's Wood Products also paid for the Rodino Family's personal credit card expenses on a CitiBusiness Platinum Select Card and two Bank of America credit cards from January 18, 2005, through December 31, 2010. (Exh. 17, Recycled/New Credit Card Transactions; Exh. 16, Lee's Wood Products Credit Card Transactions) Lee's Wood Products and Recycled/New made the payments on these credit cards via U.S. Mail and/or electronic wire transfers that crossed state lines.

160. In 2008, the Duro Entities began making large expense purchases on the same credit cards used personally by the Rodino Family.

161. From September 2008 through December 2012, the Rodino Family made purchases using at least 3 different credit cards issued by Bank of America ("BOA"). Two of the credit cards are in the joint names of "Terry J. Rodino / Stacey S. Rodino". The third card is in the name of "Terry J Rodino, Duro Inc."

162. All monthly statements for the Duro Inc. card are mailed by BOA to Lee's Wood Products's address: 24478 County Road 45, Elkhart IN 46516-604378. Payments for this card are mailed or electronically transmitted to a processing center at Post Office Box 15710, Wilmington, DE 19886-5710.

163.   The Bank of America statements in Mr. and Mrs. Rodino's names are mailed to the Rodinos' home address, 23393 Shorelane, Elkhart IN 46514.  Payments for these cards are mailed or electronically transmitted to a Post Office Box in Wilmington, Delaware, or Dallas, Texas.

164.   Mr. Rodino produced copies of the 2010 BOA monthly statements for all three credit cards during discovery in litigation with the Plaintiffs.  However, to conceal his fraudulent scheme, Mr. Rodino altered the statements by redacting the bottom part of each statement, which showed that two of the accounts' monthly statements were sent to Mr. and Mrs. Rodino at their home address.  The produced statements did not indicate any redactions had been made.

165.   Mr. and Mrs. Rodino used the BOA Duro credit card to purchase goods and services from grocery stores (Martins, Meijer, Wal-Mart), restaurants (Lucchese's, Bonefish Grill), hardware stores (Lowe's, Menard's), country club monthly fees and dues, travel and other expenses on family vacations with Mrs. Rodino Bailey and her husband, and many other personal expenses.

166.   Recycled/New also made payments to BOA from June 2007 through 2012.  However, pursuant to its response to a subpoena, Bank of America has no record of any credit card issued in the name of Recycled/New.

167.   From December 2009 through December 2010, the Rodino Family spent the following monthly totals on one Bank of America credit card:  $8,360.69; $4,857.92; $7,885.96; $20,557.53; $15,449.50; $12,826.84; $17,910.85; $12,455.18; $23,813.77; $15,338.77; and, $31,215.38.

168.   The credit cards were used by Mr. and Mrs. Rodino and Mrs. Rodino Bailey.  The Rodino Family used the credit cards to purchase personal items that had nothing to do with the Duro Entities.  The credit card statements are filled with charges for restaurants, clothing stores,

and grocery stores.  The Rodino Family used the credit cards to pay for their vacation to Cancun, Mexico in December 2009.  Mr. and Mrs. Rodino purchased new patio furniture.  Mr. and Mrs. Rodino paid for parts of Mrs. Rodino Bailey's wedding with the credit cards.

169.    Mr. and Mrs. Rodino also paid for thousands of dollars in materials purchased from Lowe's, Menards, and Home Depot.  These materials are listed in receipts signed by Terry and Stacey Rodino.  These materials were not used for the Duro Entities or Apex Pallet.  The materials are used by the Rodino Family to refurbish multiple single-family residential properties that Lucky Lou owns.  The Rodino Family also use these materials for remodeling Mr. and Mrs. Rodino's own home, including installing a new paver patio and outdoor fireplace.  The Rodino Family paid for many of these expenses with money from the Duro Entities.

170.    In 2010 alone, Recycled/New paid $45,916.62 via 16 separate checks, the majority of them handwritten, to the Bank of America credit card in Mr. and Mrs. Rodino's name.  (Exh. 17, Recycled/New 2010 Bank of America Credit Card Transactions)  The Rodino Family used money from Recycled/New to pay for personal charges on this credit card.

171.    Mr. Rodino concealed the expenditures by creating false accounting records in Recycled/New and Lee's Wood Products accounting records.    For Recycled/New, in 2010, Mr. Rodino miscoded Bank of America payments as expenses of shop supplies, employee benefits, and nails.  (*Id.*)

172.    For Lee's Wood Products, Mr. Rodino coded payments of $7,108.62 on April 13, 2010 (Check #7177h) and $5,700.24 on May 12, 2010 (Check #7199h) as "Employee Benefits." (Exh. 16, Lee's Wood Products, 2010 Bank of America Credit Card Transactions)  In 2010, Lee's Wood Products's purported expenditures for "Employee Benefits" rose to $28,290.25, including payments of $1,103.73, $232.40, $2,694.22, $261.06, $7,108.62, $5,700.24, $5,389.98, $800.00,

and $5,000.00. These payments, made via handwritten checks, were made to entities that do not provide any employee benefits. Also, Mr. Rodino testified under oath that Lee's Wood Products does not provide any employee benefits such as health care insurance or profit-sharing plans.

173. In 2010, Mr. Rodino wrote and mailed 10 checks to Bank of America, totaling $22,730.00, allegedly for expenses attributable to Apex Pallet. Each check was received by Bank of America via mail. In 2011, Mr. Rodino wrote and mailed 14 checks to Bank of America, totaling $47,500, allegedly for expenses attributable to Apex Pallet. (Exh. 18, Apex Pallet Checks to Bank of America)

174. Apex Pallet has minimal expenses related to postage and a Post Office Box rental, along with minimal fees for attorneys and accountants. In 2010, its legal and accounting fees totaled $2,250.00. From January 2011 to March 2012, Apex Pallet's total expenses could not have been more than $3,270.50. To conceal the outgoing payments to Mr. and Mrs. Rodino's personal credit cards with Bank of America, Mr. Rodino used Apex Pallet's PO Box 145 address.

175. The credit card scheme continues through today, although the Rodino Family started using additional credit cards. Mr. Rodino wrote checks from Recycled/New's checking account to the following credit cards in 2011 and 2012:

   a. Bank of America: $2,342.52 (2/14/11); $3,469.79 (3/14/11, #7524h); $7,858.54 (4/1/11, #7538h); $5,000 (4/8/11, #9155); $8,039.73 (5/13/11, #7557h); $6,207.00 (6/13/11, #7578h); $7,185.49 (7/11/11, #7596h); $5,092.78 (8/15/11, #7617h); $3,087 (8/31/11, #7626h); $9,423.70 (8/31/11, #7627h); $12,664.57 (10/10/11); $7,500 (10/13/11); $7,571.89 (11/14/11); $1,172.15 (11/10/11); $7,137.70 (12/08/11); $6,982.03 (01/05/12); $1,437.27 (01/23/12); $4,699.00 (5/2/12);

$5,629.35 (06/29/12); $15,325.40 (7/31/12); $3,793.35 (9/6/12); $17,466.00 (10/4/12).

b. Citibusiness: $20,260.75 (9/13/11); $15,120.99 (10/13/11); $3,005.02 (11/10/11); $3,604.55 (12/08/11); $4,906.83 (01/23/12); $3,157.24 (02/10/12); $9,496.68 (4/11/12); $5,114.18 (5/10/12); $3,366.48 (7/11/12); $19,855.80 (8/14/12); $22,006.47 (9/11/12); $18,362.68 (10/16/12).

c. Mutual Bank Visa: $2,929.16 (4/27/12); $3,187.40 (7/31/12); $3,689.89 (8/30/12); $7,462.06 (9/28/12).

d. PNC Bank Visa: $4,672.43 (2/22/12); $3,942.76 (12/27/11).

176.    For each check written by Recycled/New, Mr. Rodino mailed a check or directed his bank to issue the payment electronically to an out-of-state credit card processing center, e.g., Citibusiness Card, Processing Center, Des Moines, IA 50363-0001.

177.    Many of the purchases made on these credit cards were for personal expenses for the Rodino Family. The Rodino Family used the credit cards to conceal these personal expenditures.

178.    In 2010, Mr. Shah filed a lawsuit seeking an audit of the Duro Entities' records. Before the lawsuit was filed, the Rodino Family simply took money directly from the Duro Entities. After Mr. Shah filed suit, the Rodino Family began using the credit cards to make more personal purchases, but Mr. Rodino also began buying more of the Duro Entities' materials, e.g., lumber and nails, on the same cards.

179.    From late 2010 through 2012, the Rodino Family commingled their personal purchases with purchases for Lee's Wood Products, Recycled/New, and Apex Pallet on multiple credit cards to avoid detection of the personal expenditures.

180.    Mr. Rodino attempted to conceal discovery of his unlawful conduct on the credit cards by refusing to provide his business partners with any access to financial records for Recycled/New, Lee's Wood Products, and Apex Pallet.  Mr. Rodino has objected to all discovery regarding Apex Pallet.  He has refused to produce years of records.

181.    Mr. Rodino knew that Plaintiffs eventually would obtain access to the Duro Entities' QuickBooks files, but those files can be manipulated.  The commingling scheme allowed Mr. Rodino to more easily manipulate the accounting records in Quickbooks.  Mr. Rodino documented large payments to the credit card companies and then used multiple generic expense codes, e.g., "Lumber", "Nails", but the expense record would not be tied directly to any invoice or purchase order.  This makes tracking the expenses difficult and allows the Rodino Family to lump their personal expenditures together with multiple other companies' expenses.

182.    The purpose of this scheme was to allow the Rodino Family to continue embezzling money from the Duro Entities and make it more difficult to detect their theft.

    iii.    *Through 2010, the Rodino Family Embezzled over $600,000 into Multiple Personal Investment Accounts and Doctored the Accounting Records to Conceal the Scheme*

183.    Mr. Rodino contributed to a Lee's Wood Products FBO retirement account with Edward Jones Consulting.  From 2004 through 2010, he contributed at least $10,000 each year to this account.  He contributed $11,960 in each year of 2005 and 2006.  The contributions were made via direct deposit from Mr. Rodino's salary paychecks with Lee's Wood Products.

184.    Shortly after freezing out Plaintiffs, the Rodino Family began embezzling additional monies into multiple personal investment accounts.

185.    In November 2002, Mr. Rodino began contributing to an annuity life insurance plan with Jackson National Life Insurance Company.  The plan was brokered by Royal Alliance

Associates.   The Rodino Family's advisor with Royal Alliance Associates was located in Columbus, Ohio.   This same advisor is now with Ascend Advisory Group and is still in Columbus.  After freezing out Plaintiffs, Mr. Rodino has contributed an additional $100,000 from Lee's Wood Products and Recycled/New.

186.   In 2003, the Rodino Family began embezzling significant sums of money from Lee's Wood Products and Recycled/New to a personal investment account with Royal Alliance Associates, Inc., which later became Ascend Advisory Group.  Through this scheme, the Rodino Family has accumulated unlawful proceeds that totaled $575,911 as of December 31, 2010.

187.   From 2003 through 2008, Mr. and Mrs. Rodino simply set up a direct deposit account for Lee's Wood Products and Recycled/New to electronically transfer money each week to their primary taxable investment account.   In 2006 alone, Lee's Wood Products and Recycled/New deposited at least $1,400 each week.  These transactions have been scrubbed from and/or concealed in the accounting records for both corporations, but they are documented in certain investment account records.

188.   Each year, Mr. and Mrs. Rodino used the cash deposits from the Duro Entities to purchase securities and bonds in their personal names.  Mr. and Mrs. Rodino purchased securities with a net cost of $139,228.50 in 2006; $30,097.50 in 2007; and $83,196.68 in 2008.  By May 2009, this investment account held a value of $326,111.  By December 31, 2009 and 2010, the account held a value of $421,746.20 and $575,911.62, respectively.

189.   In 2010 alone, Mr. and Mrs. Rodino misappropriated $114,500 in cash from the Duro Entities.  They made two cash deposits of $50,000 each on September 1 and November 18, 2010.

190.    The Rodino Family keeps all proceeds from these investment accounts, including all distributions and dividends, which have resulted in significant dividends payments to the Rodino Family.  In 2009 alone, Mr. and Mrs. Rodino withdrew $40,461 in cash.

191.    Mrs. Rodino Bailey also benefited from Mr. Rodino's embezzlement.  Mr. Rodino and Mrs. Rodino Bailey had a custodial investment account worth $2,668.02 on December 31, 2005, and $2,838.60 on December 31, 2006.  By 2010, through Mr. Rodino and Mrs. Rodino Bailey's embezzlement schemes, this account held a value of over $59,000.

192.    As of December 31, 2010, Mr. and Mrs. Rodino had $575,911 in a taxable investment account; Mr. Rodino had accumulated $162,703 in a simple IRA; and Mr. Rodino and Mrs. Rodino Bailey had $59,048 invested in a taxable investment account.

193.    Mr. and Mrs. Rodino have refused to provide information regarding their investment accounts for 2011 and 2012.  However, based on the prior pattern of embezzlement, they will have accumulated an additional $200,000 to $300,000 in unlawful proceeds.

194.    The unlawful transactions described above were made via electronic transfers from the Duro Entities' financial accounts in Indiana into accounts set up with the Rodino Family's investment advisors in Ohio and investment accounts in Ohio, Minnesota, Michigan, New York, and/or Missouri.  The securities and bonds purchased with these funds were cleared through Pershing LLC, in New Jersey, and First Clearing, LLC, in Missouri.  During the time period in question, there were over 100 interstate wire transactions involving funds unlawfully embezzled from the Duro Entities.

195.    Mr. Rodino, with the assistance of his accountants, entered fraudulent accounting records and altered existing accounting records to conceal the unlawful transfer of money from the Duro Entities into the Rodino Family's personal investment accounts.

**K.**     **Other Efforts To Conceal The Fraudulent Schemes**

196.    In addition to the measures identified above, the Rodino Family has taken a number of other actions to conceal their unlawful schemes from detection.

197.    The Rodino Family has filed false and fraudulent personal tax returns from 2005 through 2010. They also filed false and fraudulent corporate tax returns for: Duro in 2005-2010; Duro Recycling in 2005-2010; Apex Pallet in 2008-2010; and Lucky Lou in 2004-2010. All of the federal tax returns were filed by mail or electronically to out-of-state processing centers. Multiple state tax returns were filed by mail.

198.    Mr. Rodino changes banks and opens multiple accounts for the different corporate entities to make it difficult to track the money that is being embezzled and misappropriated from the Duro Entities.

199.    Mr. Rodino has refused to provide relevant information and documents for the Duro Entities and the other corporate defendants for over 9 years, despite multiple prior written agreements and court orders entered for the production of these documents. For example, Mr. Rodino and his attorneys blocked production of any records for more than a year, despite Plaintiffs' agreement to enter into protective orders. Immediately prior to a hearing to force production of these documents, Mr. Rodino agreed to sign the protective orders and produce financial and accounting records necessary to complete an audit, which is a detailed inspection of the books and all back-up documentation. The Court entered the protective order. Mr. Rodino subsequently refused to comply with all reasonable requests for documents and continues to refuse to produce documents.

200.    Based on the refusal of Mr. Rodino and the attorneys representing the Duro Entities to find and produce the audit records, Plaintiffs served subpoenas in 2012 on banks and financial

institutions where Defendants were likely to have accounts. Plaintiffs also served subpoenas on the Rodino Family's accountant, CPA Koons, at his current and former firms.

201. Mr. Rodino provided redacted spreadsheets and represented that they accurately reflected the Quickbook accounts for Lee's Wood Products and Recycled/New from 2003 through 2010. The redacted spreadsheets contain numerous false statements regarding the recorded entries. Certain entries do not match the entries in the Quickbooks files provided to CPA Koons. Mr. Rodino also provided conflicting and confusing numerical identifiers in the redacted spreadsheets that render it impossible to reconcile the recorded expenses with supporting documentation.

202. Mr. Rodino created false new entries and revised prior entries in the Quickbooks for Lee's Wood Products and Recycled/New to conceal his unlawful transactions.

203. Currently, the Duro Entities have a court-appointed independent financial manager who is responsible for approving all expenditures and income of the Duro Entities. The LaGrange Circuit Court has ordered that the financial manager will "have authority to access and provide all records and documents requested to complete the audit." Despite the LaGrange Circuit Court's order, Mr. Rodino has blocked the financial manager's efforts to produce any documents related to Lucky Lou, Apex Pallet, 2610 LLC, American Travel Palace, and ATP Exports.

204. Mr. Rodino claims that Apex Pallet is a separate corporate entity that has nothing to do with Lee's Wood Products and Recycled/New. This is false, per Mr. Rodino's sworn testimony that Apex Pallet should be brokering pallets to KIK and conducting no other business.

205. Upon information and belief, Mr. Rodino is no longer brokering any pallets through Apex Pallet. Rather, Mr. Rodino is stealing pallets from Lee's Wood Products and Recycled/New and selling them to multiple customers as products of Apex Pallet.

206.    The attorneys who have represented the Duro Entities since 2003 have aided and abetted Mr. Rodino in his efforts to hide incriminating evidence from Plaintiffs.

**L.     Commissioner Rodino and Mr. Zou Carried Out A Fraudulent Scheme Through American Travel Palace And ATP Exports, Inc.**

   *i.     Commissioner Rodino and Mr. Zou Travel To China Multiple Times Under the False Pretense of Developing Business Opportunities for Elkhart County Businesses and Residents.*

207.    Mr. Rodino, Mr. Zou, and Gordon Lord, Elkhart County's lawyer and an attorney with Yoder, Ainlay, Ulmer & Buckingham, LLP, carried out a fraudulent scheme involving Lee's Wood Products, Recycled/New, Apex Pallet, Aaron MacGregor & Associates, LLC, Indiana Gateway Fund, and numerous officials, servants, and agents of the Elkhart County Government.

208.    In March 2009, provincial government officials from Zhejiang province in eastern China visited Elkhart County to meet with local business and government representatives. (*See* July 27, 2010 E-Truth Article)  Mr. Rodino participated in the March 2009 meetings as an Elkhart County Commissioner.

209.    In early July 2010, Mr. Rodino and Mr. Zou visited China for a week.  During his trip, Mr. Rodino and Mr. Zou met with local government and business leaders, to develop business for Elkhart County.  Mr. Rodino signed a "sister city" agreement on behalf of Elkhart County with officials from the Zhejiang Province.  A "sister city" agreement is an agreement

between two cities, states, counties, provinces, etc., that reflects a mutual commitment to build relationships between governments, businesses, and individuals.

210. Upon his return from China in 2010, Mr. Rodino stated that business officials from Jinhua, a smaller geographic area within the Zheijang province, planned to visit Elkhart County. Mr. Rodino stated, "They were already calling us before we left to let us know they're interested." The next visit, Rodino said, likely would consist of other business leaders and officials. (*Id.*) Mr. Rodino stated that he saw "huge potential" for Elkhart County to develop ties between Elkhart County's recreational vehicle and bus manufacturing industries and the heavy automotive and related industries in the Jinhau area. (*Id.*)

211. According to Mr. Rodino, the Chinese were drawn to Elkhart County because of its automotive-related industries, its central U.S. location, and its transportation infrastructure, notably the Indiana Toll Road. (*Id.*) Mr. Rodino further stated: "I was amazed at all the American stuff they're putting in their buses." (*Id.*)

212. On September 10, 2010, Mr. Rodino attended a public meeting of the Elkhart County Convention & Visitors Bureau Commission and Board of Directors (the "ECCVB"). (Exh. 19, ECCVB September 2010 Meeting Minutes) Mr. Rodino spoke about a business/cultural exchange opportunity with Hangzhou, China, where Mr. Rodino had traveled earlier in the summer to promote Elkhart County. The Hangzhou authorities requested to meet with additional Elkhart County representatives to network with the Chinese "with the strict intent of a PR and marketing initiative for the Quilt Gardens <u>and to help our area businesses</u>." (*Id.* (emphasis added)) The ECCVB then unanimously voted to allocate $20,000 in county funds to pay for travel expenses of the group sent by Elkhart County. (*Id.*)

213.    On September 29, 2010, Mr. Zou and another business partner, Christopher Graff, formed a for-profit Indiana corporation called Indiana Gateway Fund. (*See* Indiana Secretary of State Business Records for Indiana Gateway Fund, LLC)

214.    Mr. Lord drafted the Articles of Incorporation and is identified as the Registered Agent for Indiana Gateway Fund.

215.    Indiana Gateway Fund was formed to create jobs and spur economic development in Elkhart County via international investment from foreign countries.  The primary focus for obtaining foreign investment dollars was China, and specifically the Zhejiang Province in the eastern part of the country. (*See* December 16, 2010 E-Truth News Article)

216.    Indiana Gateway Fund planned to request funds from a U.S. Citizenship and Immigration Services ("USCIS") program called the EB-5 visa program, which uses federal funds to encourage international investment by granting legal U.S. residency to the qualifying foreign participants. (*Id.*)

217.    Mr. Graff stated that he and Mr. Zou developed Indiana Gateway Fund because "both felt compelled to do something to give back to the [Elkhart] community." (*Id.*)

218.    On Monday, December 13, 2010, the Elkhart County Commissioners agreed to provide Indiana Gateway Fund with $10,000 to help defray the company's costs associated with obtaining approval from the USCIS.  Commissioners Terry Rodino and Mike Yoder voted to approve the grant to Indiana Gateway Fund. (*Id.*)

219.    Commissioner Yoder stated that the EB-5 visa program was another initiative that could bring jobs, capital and new industry to Elkhart County. (*Id.*)  Investment funds used as part of the EB-5 visa program can be invested in companies that are considered distressed to help save existing jobs.

-46-

220.    As part of the EB-5 program, the Elkhart County Commissioners agreed that Commissioner Rodino would travel with Mr. Zou to investigate investment opportunities for Elkhart County. (*Id.*)

221.    In March 2011, Mr. Rodino again visited Zhejiang Province for a week.  Again, he traveled and met with government and business officials in his official capacity as an Elkhart County Commissioner.  The purpose of the trip was to forge cultural and economic ties between Elkhart County and China. (*See* March 29, 2011 E-Truth Article)

222.    During the March 2011 trip, Commissioner Rodino, traveling with Mr. Zou and several others from Elkhart County, reaffirmed the "sister city" relationship between the County and Jinhua, which has a heavy manufacturing industry base.    (*See* Video Link, http://www.36tv.cn/viewnews-120446)

223.    Chinese media located in the Zhejiang Province reported on the visit.  According to the media report:

  a.  representatives from Jinhua welcomed a delegation from Elkhart County, including Mr. Rodino.  (*Id.*)

  b.  The focus of the trip was on increasing ties based on Jinhua's economic and social development/expansion, and development in the auto industry in particular, as well as in pharmaceuticals and medical devices.  (*Id.*)

  c.  The cities have engaged in broad cooperation in the past.  Rodino states that since last year, the cities have had an exchange in the economic and educational arenas, and hoped the visit could go a step further in deepening the cities' exchange and cooperation.  (*Id.*)

d. At the conclusion of the meeting shown in the video, Rodino and the Jinhua representative signed a friendly-city-relations agreement and memorandum of commercial understanding. *Id.*

224. The media clip also has some background facts about Indiana, such as location, population, and RV production (e.g. more than 60% of Recreational Vehicles are produced in Elkhart County). The video link shows Mr. Rodino and Elkhart County representatives touring a facility with Zhejiang Canwell International Product Co., Ltd., which according to its website "is a professional exporter of a complete range of auto accessories and related series, including power stations, air compressors, repair kits, neon & LED lights, camping items and so on."

225. After he returned from China, Mr. Rodino stated that Jinhua representatives may come to Elkhart County in July 2011. "Everything's made in China," he said. China has "a great amount of wealth they'd like to redistribute in some areas." Commissioner Rodino also stated: "They're very cordial and honorable people and they definitely want to do some business in the United States." (*See* March 29, 2011 E-Truth Article)

226. Mr. Rodino also stated that a joint public-private economic proposal could be forthcoming from China involving northern Indiana. He said there was plenty of interest among the Chinese in investment possibilities in the United States. (*Id.*) However, Mr. Rodino did not reveal any specific details of any "investment possibilities," did not offer any specific timelines, and stated vaguely, "Time will tell." (*Id.*)

227. Mr. Rodino was not sent to China because he owns pallet companies. He was sent to China because he is an Elkhart County Commissioner. Mr. Rodino's business trips to China were part of ongoing efforts by the County to develop business and investment opportunities for Elkhart County businesses and individuals. One of Mr. Rodino's central duties

-48-

as an Elkhart County Commissioner, for which he is paid an annual salary of approximately $40,000 per year, is to help generate business and economic opportunities for Elkhart County citizens and businesses.

228.    Mr. Rodino's statements about the status of potential business opportunities for Elkhart County were knowingly false.  When Mr. Rodino made statements to the press about his trips to China, he and Mr. Zou were already planning to make China-related investments for their own personal gains, and not for Elkhart County or Indiana Gateway Fund.

ii.    *Commissioner Rodino and Mr. Zou Diverted Business and Investment Opportunities For Their Personal Benefit.*

229.    On April 25, 2011, less than a month after they returned from China for the second time, Mr. Rodino and Mr. Zou formed American Travel Palace, LLC ("American Travel Palace"), an Indiana limited liability corporation.

230.    Mr. Haut and Warrick & Boyn drafted the corporation papers for American Travel Palace.  Mr. Haut, as an attorney for Warrick & Boyn, is the registered agent for American Travel Palace.  (*See* Indiana Secretary of State Records for American Travel Palace)

231.    Mr. Rodino and Mr. Zou are the managers and owners of American Travel Palace.  The tax ID documents identify an address for American Travel Palace:  58750 Oxbow Drive, Elkhart, IN 46516.  This is Mr. Zou's home address.  As with Mr. Rodino's other fraudulent schemes, American Travel Palace opened a separate address at PO Box 2680, Elkhart, IN 46515.

232.    On or about May 10 and May 17, 2011, Aaron Zou (through his company, Aaron, McGregor & Associates), and Terry Rodino each made an initial contribution of $5,000 to

American Travel Palace. (Exh. 20, American Travel Palace Transactions, Check ## 1158 and 1124)

233. On May 24, 2011, Aaron Zou invested an additional $10,000 into Travel Palace. (*Id.*, American Travel Palace Transactions, Check #984724) This $10,000 check is the same amount pledged by Elkhart County for the EB-5 program with Indiana Gateway Fund.

234. On May 25, 2011, Apex Pallet invested $50,000 in American Travel Palace, via Check #1372, which was signed by Terry Rodino and processed and deposited with American Travel Palace's bank (PNC Bank). (*Id.*, American Travel Palace Transactions, Check #1372 from Apex Pallet) The money invested by Apex Pallet is derived from the fraudulent schemes perpetuated by Mr. Rodino against the Duro Entities.

235. On May 25, 2011, American Travel Palace also paid $100,000 to an RV manufacturer in Elkhart, Indiana, for the purchase of recreational vehicles (RVs). Mr. Rodino personally signed the check. (*Id.*, American Travel Palace Transactions, Handwritten Check #001) This initial payment consisted of funds American Travel Palace obtained unlawfully from Lee's Wood Products, Recycled/New, and Elkhart County.

236. On July 7, 2011, American Travel Palace received the first part of the payment from the Chinese company that was purchasing the RVs. Galaxy Powersports, LLC, an American subsidiary of BenZhou Vehicle Industry Group Co., Ltd. ("BenZhou"), made a wire payment of $231,541 to American Travel Palace. (*Id.*, American Travel Palace Transactions, 07/07/2011 Wire Transfer)

237. Galaxy Powersports is located in Dallas, TX. Galaxy Powersports made the request to transfer the money from its bank in Bryan, TX, and this bank electronically requested that the money be sent via a wire transfer from CitiBank in New York, New York. The New

York bank wired the money to American Travel Palace's bank, PNC Bank Ohio, National City Bank, located in Cleveland, Ohio. (*Id.*)

238.   BenZhou is a Chinese company headquartered in Hangzhou, a city in Zhejiang Province, the same province that Mr. Rodino and Mr. Zou visited at least twice as representatives of Elkhart County. Elkhart County's ECCVB Board of Directors also granted $20,000 in county funds to Mr. Rodino and the group of Elkhart County representatives based on Mr. Rodino's representations about marketing and business opportunities in Hangzhou.

239.   On July 8, 2011, American Travel Palace received another wire transfer payment, this time for $1,399,985.00 from the Bank of China in Beijing, China. This payment was received via an international wire transfer. (*Id.*, American Travel Palace Transactions, 07/08/2011 Wire Transfer)   The wire transfer was received for American Travel Palace by PNCBank in Philadelphia, PA. (*Id.*)   The company that sent the money to American Travel Palace via this wire transfer was Grand Union Auto Trading and Service Co., LTD, from its bank located in Tianjin, China. (*Id.*)   Grand Union is an exporter of products and is located in Hong Kong.

240.   With the two combined wire transfers, American Travel Palace received a total of $1,631,526 as payment for the 5 RVs that Travel Palace planned to buy from an Elkhart RV manufacturer.

241.   On July 8, 2011, American Travel Palace's checking account balance was $1,625,994.15. (*Id.*, American Travel Palace Transactions, Monthly American Travel Palace Bank Statement for July 2011)

242.   On July 11, 2011, American Travel Palace purchased five RVs directly from an Elkhart manufacturer for $1,056,166.00. Mr. Rodino and Mr. Zou both personally signed the

American Travel Palace check used to pay for the RVs. The memo line reads "5 units RV to China". (*Id.*, American Travel Palace Transactions, Check # 1001)

243.   American Travel Palace also paid via check for shipping costs for the five RVs from Elkhart, Indiana to Welton Shipping Company, Inc.   (*Id.*, American Travel Palace Transactions, Check #1008)   Welton Shipping Company is located in Jamaica, New York. American Travel Palace sent the check to pay for shipping to Welton Shipping Company in early August 2011.

244.   Between July 11, 2011 and September 28, 2011, Mr. Rodino received $5,779.90 in payments from American Travel Palace's checking account, in the form of checks signed by Mr. Zou. (Exh. 21, Payments to Mr. Rodino from American Travel Palace, Check ##1002, 1005, 1011)

245.   Between July 8, 2011, and September 16, 2011, Mr. Zou received $32,305.55 in payments from American Travel Palace's checking account, in the form of checks signed by Mr. Rodino. (Exh. 22, Payments to Mr. Zou from American Travel Palace, Check ##1003, 1006, 1010)

246.   On August 5, 2011, Mr. Rodino and Mr. Zou transferred $538,378.26 into a money market account in American Travel Palace's name. (Exh. 20, American Travel Palace Transactions, 8/5/11 Handwritten Account Transfer Form)   The transfer form identifies yet a third address for Travel Palace – 24478 County Road 45, Elkhart, IN 46516 – which is also the address for the Duro Entities. (*Id.*)   On August 31, 2011, the American Travel Palace checking and money market accounts held a total of $561,540.03.

247.   Over the course of the next eight months, Mr. Zou and Mr. Rodino continued paying themselves large sums of money out of American Travel Palace's money market account.

248.   On October 1, 2011, American Travel Palace paid the Elkhart-based RV manufacturer $9,710.68 for "5 units Delivery Fee & Spare Parts." (*Id.*, American Travel Palace Transactions, Check #1012)

249.   On October 14, 2011, Rodino signed a check from American Travel Palace to ATP Exports, Inc., for $201,000. ATP Exports deposited the check to open an account with INTerra Credit Union in Northern Indiana. (*Id.*, American Travel Palace Transactions, Check #1013) ATP Exports was formed on July 18, 2011, by Mr. Haut and Warrick & Boyn. Mr. Haut is the registered agent and a principal of ATP Exports. ATP Exports' business entity address is PO Box 2680, one of the three addresses used by American Travel Palace.

250.   On October 26, 2011, Rodino received a $50,000 check from American Travel Palace. The check cleared on November 7, 2011, through a separate bank account with PNC Bank in Philadelphia, Pennsylvania. Mr. Zou signed the check. (Exh. 21, Payments to Mr. Rodino from American Travel Palace, Check #1014)

251.   On October 26, 2011, Zou received 3 separate checks – for $13,000, $20,000, and $17,000 – from American Travel Palace. These checks totaled $50,000. (Exh. 22, Payments to Mr. Zou from American Travel Palace, Check ##1015, 1016, 1017) On December 22, 2011, Mr. Zou received a check, signed by Mr. Rodino, for $21,267.89. (Exh. 22, Payments to Mr. Zou from American Travel Palace, Check #1019)

252.   On December 30, 2011, Mr. Zou wrote and signed a check from American Travel Palace to Apex Pallet for $30,000. According to the memo line, the check was "For 2011 & 2012 China Service Contract." (Exh. 21, Payments to Mr. Rodino from American Travel Palace, Check #1021 to Apex Pallet)

253.    Apex Pallet purportedly received a contract for 2011 and 2012 (the "China Service Contract") for $30,000.  However, no such contract exists.  Plaintiffs served a subpoena on Mr. Zou in November 2012 for documents regarding the American Travel Palace transactions.  Mr. Zou responded to the subpoena by stating that he had never heard of the "China Service Contract" for Apex Pallet and did not know what the check he signed on December 30, 2011 was for.  Mr. Zou further stated that he signed the check because Mr. Rodino could not sign checks to himself (*i.e.*, to Apex Pallet) from American Travel Palace.

254.    Mr. Zou claims not to have asked Mr. Rodino why their joint venture was paying Mr. Rodino's company, Apex Pallet, for the China Service Contract.

255.    Mr. Rodino and his lawyers at Warrick & Boyn and May Oberfell Lorber have refused to disclose any information about the China Service Contract.  They have refused to produce any information about any business activities regarding Apex Pallet, despite having ample notice of the illegal schemes by the Rodino Family and Apex Pallet.  Mr. Rodino and his lawyers have taken steps to prevent the disclosure of information from the Duro Entities' hard drive that have further evidence regarding these schemes.

256.    On March 13, 2012, Mr. Zou and Mr. Rodino each deposited a $49,000 check into two separate personal investment accounts with First Clearing.  (Exh. 21, Payments to Mr. Rodino from American Travel Palace, Check #1028; Exh. 22, Payments to Mr. Zou from American Travel Palace, Check #1029)

257.    As a result of the sale of the RVs, Mr. Rodino and Mr. Zou paid themselves each almost $100,000.  They also have an additional $201,000 deposited in an account owned by ATP Exports.

258.    Rodino and Zou are continuing this scheme through American Travel Palace. From July 13, 2011, to March 24, 2012, American Travel Palace wrote checks to various vendors for business cards, a logo, t-shirts, training expenses, website development, and sporting goods. On October 21, 2011, American Travel Palace donated $1,000 to Mike Pence for his gubernatorial campaign. (Exh. 20, American Travel Palace Transactions, Check ##1004, 1009, 058054, 1018, 1023, 1024, 1031.)

259.    American Travel Palace currently has an operational website, which provides: "[Travel Palace] is an exclusive authorized RV dealer … in the region of China. Travel Palace has experience in RV sales, consultation, comprehensive service and leasing consultation as well as tailored service provider in US and in China."

260.    Mr. Rodino will continue to receive proceeds from all future sales completed or aided by this distribution scheme.

   iii.    *The Travel Palace Transactions Were Completed Through a Fraudulent Scheme of Mail Fraud, Wire Fraud, And Money Laundering By Mr. Rodino And Mr. Zou.*

261.    Mr. Rodino and Mr. Zou opened a post office box in Elkhart, Indiana, and identified the post office box as the entity address for American Travel Palace. The American Travel Palace checks have the same address for American Travel Palace: "PO Box 2680, Elkhart, IN 46515."

262.    However, for certain transactions involving American Travel Palace, Mr. Rodino and Mr. Zou used Mr. Zou's home address of 58750 Ox Bow Drive, Elkhart, Indiana, 46516. For other transactions, they used the Duro Entities' address, 24478 CR 45, Elkhart Indiana, 46516.

263.    Each of the monthly bank statements for American Travel Palace from May 2011 through February 2012 was mailed to the post office box, to ensure that no one other than Mr. Zou and Mr. Rodino could retrieve and review it.

264.    Mr. Zou used another scheme to conceal detection of his involvement in American Travel Palace.  Mr. Zou used his business account with 1st Source Bank in South Bend for all investments in, and proceeds received from, American Travel Palace.  This account is in the name of Aaron, McGregor & Associates, LLC, a business owned by Mr. Zou.  (*See* Exh. 20, Check #1124; Exh. 21, Check ##1003, 1006, 1010, 1019)

265.    However, for the $50,000 that Mr. Zou received on October 26, 2011, he deposited two of the three checks with different banks, JP Morgan Chase (Check #1016), and Citibank (Check #1017).  (Exh. 22, Payments to Mr. Zou from American Travel Palace, Check ##1016-1017)  Check #1017 from American Travel Palace to Mr. Zou for $17,000 was deposited to a credit card account with Citibank, which processed the payment from a location in Columbus, Ohio, on October 31, 2011.  Mr. Zou mailed the check from Indiana to Columbus, Ohio.

266.    From these transactions, Mr. Rodino, Mr. Zou, Apex Pallet, American Travel Palace, ATP Export, and Aaron, McGregor & Associates received significant payments in 2011 and 2012.

    *iv.*    *Koons and Koons CPA and Elkhart County Agents And Officials Have Assisted Mr. Rodino And Mr. Zou With The Travel Palace Scheme.*

267.    In response to a subpoena, Koons & Koons stated that all of the responsive records for Mr. Rodino and his business ventures were located at Mr. Koons's prior CPA firm, Koons & Phillips, CPA.  This statement was knowingly false.  Mr. Rodino and Mr. Zou had

Koons & Koons prepare the 2011 tax return for American Travel Palace. Koons & Koons was paid via a check from American Travel Palace on or about February 16, 2012, for "2011 Return & Consultation."

268.     Koons & Koons assisted in the completion and/or continuance of this RICO scheme by lying in response to a valid order from an Indiana state court.

269.     Officials and agents of Elkhart County have demonstrated that they are unwilling to properly investigate Mr. Rodino's actions, or worse, that they have knowledge of Mr. Rodino's and Mr. Zou's actions and refuse to take the required actions to stop them.

270.     Elkhart County has three county commissioners: Mr. Rodino, Frank Lucchese and Mike Yoder. The Commissioners are responsible for setting policies, crafting ordinances, and advising the Elkhart County Council on spending and budget matters. Elkhart County has a budget for 2013 of $79.6 million. The Commissioners each earn a base annual salary of $40,034.

271.     Elkhart County's legal counsel, hired by the County to represent and advise the county government on legal issues, is Gordon Lord, an attorney with Yoder, Ainlay, Ulmer & Buckingham, LLP.

272.     Mr. Lord claims to have investigated the allegations against Mr. Rodino and Mr. Zou involving American Travel Palace and ATP Exports. On July 23, 2012, Plaintiffs sent public records requests, pursuant to Indiana's Sunshine Law, I.C. 5-15-1-1 and I.C. 36-2-17-5, to the Elkhart County Council and the Elkhart County Auditor. Plaintiffs requested all documents regarding Commissioner Rodino's interest or ownership in Apex Pallet, Travel Palace, and/or ATP Exports.

273.    The County Council and the County Auditor did not respond to these requests. Rather, the requests were forwarded immediately to the Elkhart County Administrator, Tom Byers, who works out of the County Commissioners' office.  Mr. Byers asked Mr. Lord to review the requests and help him prepare a response.  (Exh. 23, Nov. 12, 2012 Letter from Mr. Lord)

274.    Based on the contents of the requests, there was not a need for the County's lawyer to get involved.  However, the County took additional steps in responding to the Sunshine Law requests in an effort to protect Mr. Rodino, a long-serving County Commissioner.

275.    Even though Indiana law mandates that public records be made available within 7 days of a request being mailed, the County did not respond for several months.  Mr. Lord agreed to produce documents, but none were produced until November 2012.

276.    On September 25, 2012, Plaintiffs again asked for the documents previously requested.  With this letter, Plaintiffs provided Mr. Lord with a copy of the Amended Complaint from the LaGrange Circuit Court case, which contains many of the same detailed allegations set forth above regarding Commissioner Rodino and Mr. Zou's actions.

277.    On November 12, 2012, Mr. Lord responded to the records request.  (Exh. 23, Nov. 12, 2012 Letter from Mr. Lord)  Mr. Lord confirmed that the County reviewed its available records going back to 2005, when Mr. Rodino was first elected, and could not locate any disclosures made by Mr. Rodino regarding Apex Pallet, Travel Palace, or ATP Exports.  (*Id.* at p. 2)  In other words, Mr. Rodino did not disclose the existence of significant conflicts of interest to Elkhart County, despite prior representations made through his counsel that he had disclosed these conflicts.

278.    The other Commissioners (Lucchese and Yoder), Mr. Lord (as County Attorney), and County Administrator Byers all admit that they knew about Mr. Rodino's trips to China. (Exh. 23, Nov. 12, 2012 Letter at p. 3)  None of them can deny this based on the multiple media reports covering these trips.  Yet all of them deny that Mr. Rodino's trips to China have any connection at all to Elkhart County.  In fact, Mr. Lord states in his letter:

> Thus it is true that Mr. Rodino has alerted his fellow Commissioners, Mr. Byers, and me (as County Attorney) of trips to China, seemingly designed to generate private business activities for himself personally, or for the general good of Elkhart County, Mr. Rodino has undertaken those efforts at his own expense <u>and without any commitments from or contracts with Elkhart County Government being sought or established</u>, and he has assured me of such.

(*Id.* at p. 3 (emphasis added))  Mr. Lord also stated that representatives from China have toured Elkhart County with Mr. Rodino, "though again such undertakings are not part of the true public records of Elkhart County Government." (*Id.*)

279.    These statements by Mr. Lord are false and have been made to conceal the unlawful scheme being carried out by Mr. Zou and Mr. Rodino.

280.    As set forth above, Elkhart County officially sought out and established cultural, business, and investment ties with the Zhejiang Province in China.  Commissioner Rodino was one of the elected officials from Elkhart County involved in developing the relationship with the Chinese province.

281.    Mr. Lord also represents Mr. Zou and the Indiana Gateway Fund.  Mr. Lord drafted the corporate formation papers for the Indiana Gateway Fund.  Mr. Lord also represented Mr. Zou in forming his other company, Aaron, McGregor & Associates, Inc.

282.    Mr. Zou formed Indiana Gateway Fund for the stated purpose of creating jobs and spurring economic development in Elkhart County via international investments from China.

According to Mr. Graff, Commissioner Rodino traveled to Zhejiang Province to investigate investment opportunities. During his trips to China, Mr. Rodino held himself out for who he was – the President of the Elkhart County Board of Commissioners and a delegate acting on behalf of Elkhart County.

283.   The Commissioners voted to provide funds from Elkhart County Government ($10,000) to Indiana Gateway Fund.

284.   Elkhart County residents and businesses who pay county and local taxes, including Plaintiffs and their businesses in Elkhart, have an intangible right of honest services from Mr. Rodino. Elkhart County officials, servants, and agents, even when properly notified of the bribes and kickbacks paid to Mr. Rodino, have failed to take the necessary actions to remedy the harm caused. Rather, Commissioner Rodino's co-conspirators in this scheme have committed fraud and constructive fraud in an effort to help conceal his and Mr. Zou's actions.

285.   Rodino and Zou's scheme has defrauded Elkhart County and deprived its citizens of opportunities for employment. The EB-5 program supported by Elkhart County Commissioners (Mr. Rodino and Mr. Yoder) permits each $500,000 investment to be invested in a "distressed" firm to help save existing jobs.

286.   Rodino and Zou have been allowed to usurp business opportunities from other Elkhart County businesses. One of Elkhart County's largest industries for years has been RV manufacturing and sales. With the one transaction that has been discovered, the sale of 5 RVs to China generated significant profits for Mr. Rodino and Mr. Zou.

287.   In 2009, at the height of the recession, the RV industry dropped by 60%. Elkhart County was devastated, at one point seeing its unemployment rate rise to 20%, the highest in the

country. There were a number of RV companies in Elkhart that would have qualified as "distressed" pursuant to the EB-5 program.

288. Elkhart County also relies heavily on the RV industry. Elkhart has 51,000 residents. Almost half of the jobs in Elkhart County are in manufacturing. No county in the entire country has a greater share of its jobs in manufacturing. And fully half of Elkhart County's manufacturing jobs are in making RVs or their parts. The additional sales revenue generated by American Travel Palace could have been used by an RV-manufacturer to expand or re-invest in new equipment, leading to the creation of new jobs. Unemployed Elkhart County citizens and residents have lost the additional employment opportunities that would have been created by these increased prices and profits if the sales flowed directly to the RV manufacturer.

## COUNT I.

### (Violation of 18 U.S.C. § 1962(c))

289. Plaintiffs reallege and incorporate by reference paragraphs 1 through 288 of the Complaint.

290. Under the RICO Act, "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1962(c) prohibits the (1) conduct by a person (2) of an enterprise (3) through a pattern (4) of racketeering activity.

291.    For the fraudulent schemes involving American Travel Palace, Mr. Rodino, Mr. Zou, and Mr. Lord are "person(s)" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

292.    At all relevant times, American Travel Palace, ATP Exports, Indiana Gateway Fund, Lee's Wood Products, Recycled/New, Apex Pallet, and Elkhart County constituted enterprises, as that term is defined in 18 U.S.C. § 1961(4), which engaged in and the affairs of which affected interstate commerce. The statutory definition of a RICO "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact, although not a legal entity." 18 U.S.C. § 1961(4).

293.    Mr. Rodino, Mr. Zou, and Mr. Lord used these enterprises to facilitate and conduct a pattern of unlawful racketeering activities.

294.    These corporate defendant enterprises, along with Mr. Rodino, Mr. Zou, and Mr. Lord, also constitute an "association-in-fact" enterprise under 18 U.S.C. § 1961(4). An association-in-fact enterprise may be a group of individuals and/or corporations that shares a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.

295.    Mr. Rodino and Mr. Zou, as the majority owners, directed, influenced, conducted, and/or controlled the operations of American Travel Palace and ATP Exports. Mr. Zou and Mr. Lord, as owner and attorney, respectively, directed, influenced, conducted, and/or controlled the operations of Indiana Gateway Fund. Mr. Rodino directed, influenced, conducted, and/or controlled the operations of Lee's Wood Products, Recycled/New, and Apex Pallet. And Mr. Rodino and Mr. Lord, as County Commissioner and attorney for the County, directed, influenced, conducted, and/or controlled the operations of Elkhart County and/or the Elkhart County Commissioners.

296. Mr. Rodino, Mr. Zou, Mr. Lord, and the corporate/governmental entities carried out and implemented decisions and, by their acts and omissions, furthered and concealed the illicit schemes regarding the purchase and re-sale of RVs from an Elkhart-based manufacturer.

297. The activities of Mr. Rodino, Mr. Zou, Mr. Lord, and the corporate/governmental entities constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(5). They committed acts indictable under the mail fraud and wire fraud statutes (18 U.S.C. §§ 1341 and 1343), the money laundering statute (18 U.S.C. § 1956), and the anti-kickback/honest services statute (18 U.S.C. § 1346).

298. The unlawful actions in connection with these corporate defendants are interrelated in that all of the predicate acts were part of the same schemes to misappropriate, embezzle, and launder money and resources from Lee's Wood Products, Recycled/New, and Elkhart County. The unlawful actions also are continuous because (a) they occurred over an extended, substantial period of time from 2009 through 2012, and/or (b) they continue to occur today. The persons in this Count of the Complaint engaged in a series of related predicate acts from 2009 through 2012, and the evidence establishes a legitimate threat that the persons will continue their unlawful behavior in the future.

299. The persons in this Count used the U.S. postal mail service and interstate and international wire transfers and laundered money embezzled from Lee's Wood Products and Recycled/New to carry out a scheme or artifice to defraud Recycled/New, Lee's Wood Products, and the county and people of Elkhart County of (1) money and property and (2) the intangible right to Mr. Rodino's and Mr. Lord's honest services as city officials and/or agents.

300. The persons in this Count created multiple new legal entities that operated out of multiple addresses. The persons opened a separate post office box for certain mail to be delivered

for American Travel Palace and ATP Exports. The post office box was used to conceal the scheme.

301. The actions of Mr. Rodino, Mr. Zou, and Mr. Lord also constitute a bribery and/or kickback scheme that violates the duties and obligations of Mr. Rodino and Mr. Lord to provide honest services in their capacities as an elected official and agent of the County.

302. By failing to fairly, honestly, and candidly carry out his duties as Elkhart County Commissioner, Mr. Rodino defrauded Elkhart County and its citizens of their right to his honest services. He intentionally misused his position as Commissioner and received the benefit of several illegal payments, which is prohibited under 18 U.S.C. § 1346.

303. Mr. Rodino used his position as President of the Elkhart County Commissioners to secure county funds for Mr. Zou and Mr. Rodino to use in developing transactions and contracts for their personal interests, e.g., American Travel Palace and Apex Pallet. Mr. Rodino received significant money as a bribe and/or kickback.

304. In response to a lawfully served subpoena, Mr. Zou claimed through counsel not to know why Mr. Rodino had requested or received $30,000 for Apex Pallet. The $30,000 payment was a kick-back to Mr. Rodino as Elkhart County Commissioner.

305. Mr. Lord subsequently assisted Mr. Rodino and Mr. Zou in covering up their unlawful transactions by providing false information in response to a public records request and intentionally failing to disclose information regarding his representation of Mr. Zou and his companies, including but not limited to Indiana Gateway Fund.

306. The conduct of Mr. Rodino and Mr. Zou constitutes bribery and violates IC 35-44-1-1, which is a Class C felony. Mr. Zou offered, agreed to confer, and conferred on Mr. Rodino certain property, which Mr. Rodino solicited and accepted, (1) with the intent to control

the performance of Mr. Rodino in relation to his official duties and employment as Elkhart County Commissioner and/or (2) because of the official acts performed and to be performed by Mr. Rodino as Commissioner.

307.   Mr. Rodino's actions also constitute official misconduct in violation of IC 35-44-1-2, which is a Class D felony.

308.   Mr. Rodino also violated Indiana's conflict of interest statute, IC 35-44-1-3, which is a Class C felony.  Mr. Rodino received profits and contracts for American Travel Palace and Apex Pallet, and these profits and contracts were connected directly to the efforts of Elkhart County, and specifically the Elkhart County Commissioners, to develop business and economic opportunities in China for businesses and citizens of Elkhart County.

309.   Mr. Rodino had a pecuniary interest in the various transactions involving American Travel Palace.  *See* IC 35-44-1-2(B).  The illegal transactions resulted in an ascertainable interest in Mr. Rodino's income and net worth, including one payment of $49,000 that Mr. Rodino has invested in other stocks and bonds.

310.   Plaintiffs have suffered significant injuries to their business and property as a result of the actions of persons identified in this Count.  Pursuant to 18 U.S.C. § 1956(c), Plaintiffs are entitled to recover all proceeds, including the gross receipts of $1,631,526, of all property derived from or obtained or retained, directly or indirectly, through the unlawful activities of American Travel Palace.

## COUNT II.

### (Violation of 18 U.S.C. § 1962(c))

311.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 310 of the Complaint.

312.    Mr. and Mrs. Rodino have embezzled and misappropriated money and resources from the Duro Entities through Apex Pallet in several schemes that involved predicate acts of mail and wire fraud and money laundering.

313.    For the fraudulent schemes involving Apex Pallet, Mr. and Mrs. Rodino are "person(s)" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

314.    At all relevant times, Lee's Wood Products, Recycled/New, and Apex Pallet constituted enterprises, as that term is defined in 18 U.S.C. § 1961(4), which engaged in and the affairs of which effected interstate commerce.  Mr. and Mrs. Rodino used these enterprises to facilitate and conduct a pattern of unlawful racketeering activities.

315.    Mr. and Mrs. Rodino, Lee's Wood Products, Recycled/New, and Apex Pallet constitute an "association-in-fact" enterprise under 18 U.S.C. § 1961(4).

316.    Mr. and Mrs. Rodino, as the majority owners and/or agents of Apex Pallet, directed, influenced conducted, and/or controlled the operations of Apex Pallet, Lee's Wood Products, and Recycled/New.  Mr. and Mrs. Rodino carried out and implemented decisions and, by their acts and omissions, furthered and concealed the illicit schemes through which Apex Pallet misappropriated and embezzled money and property from Recycled/New and Lee's Wood Products.

317.    The activities of Mr. and Mrs. Rodino constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(5).  They committed acts indictable under the mail fraud and wire fraud statutes and the money laundering statute.  The unlawful actions in connection with Apex Pallet are interrelated in that all of the predicate acts were part of the same scheme to misappropriate, embezzle, and launder money and resources from Lee's Wood Products and Recycled/New.  The unlawful actions also are continuous because (a) they occurred over an

extended, substantial period of time from 2008 through 2012, and/or (b) they continue to occur today.

318.    Mr. and Mrs. Rodino engaged in a series of related predicate acts from 2008 through 2012, and the evidence establishes a legitimate threat that they will continue their unlawful behavior in the future.  Mr. and Mrs. Rodino developed the Apex Pallet schemes while engaged in litigation with Plaintiffs in which Plaintiffs were seeking to complete an audit of the Duro Entities.

319.    Mr. and Mrs. Rodino used the U.S. postal mail service and interstate and international wire transfers and laundered money embezzled from Lee's Wood Products and Recycled/New to carry out a scheme or artifice to defraud Recycled/New and Lee's Wood Products.  Mr. and Mrs. Rodino created multiple banking accounts and used different mailing addresses for Apex Pallet, including opening a separate post office box to conceal unlawful transactions by Apex Pallet.

### COUNT III.

### (Violation of 18 U.S.C. 1962(c))

320.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 319 of the Complaint.

321.    For the fraudulent RICO schemes involving the Duro Entities, Mr. and Mrs. Rodino, Mrs. Rodino Bailey, Lucky Lou, and 2610 LLC are "person(s)" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

322.    At all relevant times, the Duro Entities, Lucky Lou, and 2610 LLC constituted enterprises, as that term is defined in 18 U.S.C. § 1961(4), which engaged in and the affairs of

which effected interstate commerce. The Rodino Family used these enterprises to facilitate and conduct a pattern of unlawful racketeering activities.

323.    The Rodino Family and the Duro Entities, Lucky Lou, and 2610 LLC also constitute an "association-in-fact" enterprise under 18 U.S.C. § 1961(4). An association-in-fact enterprise may be a group of individuals and/or corporations that shares a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.

324.    The Rodino Family, individually and as an association-in-fact, directed, influenced, conducted, and/or controlled the operations of the Duro Entities, Lucky Lou, and/or 2610 LLC. The Rodino Family carried out and implemented decisions and, by their acts and omissions, furthered and concealed the illicit schemes regarding the misappropriation and embezzlement of money and property from Lee's Wood Products and Recycled/New. These schemes involved the use of multiple credit cards, fraudulent loans, real estate transactions through Lucky Lou and 2610 LLC, and fraudulent mortgages.

325.    The activities of the Rodino Family constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(5). Each member of the Rodino Family committed acts indictable under the mail fraud and wire fraud statutes and the money laundering statute.

326.    The unlawful actions in connection with Lee's Wood Products, Recycled/New, Lucky Lou, and/or 2610 LLC are interrelated in that all of the predicate acts were part of the same schemes to misappropriate, embezzle, and launder money and resources from Lee's Wood Products and Recycled/New. The unlawful actions also are continuous because (a) they occurred over an extended, substantial period of time from 2003 through 2012, and/or (b) they continue to occur today.

327.    The Rodino Family engaged in a series of related predicate acts from 2003 through 2012, and the evidence establishes a legitimate threat that they will continue their unlawful behavior in the future.

328.    The Rodino Family, individually and/or in concert with each other, used the U.S. postal mail service and interstate wire transfers and laundered money to carry out multiple fraudulent schemes to defraud Recycled/New and Lee's Wood Products of money and property.

## COUNT IV.

### (Violation of 18 U.S.C. § 1962(a))

329.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 328 of the Complaint.

330.    The Rodino Family, Lucky Lou, and 2610 LLC received income from a pattern of racketeering activity and invested the income in other business enterprises in violation of 18 U.S.C. § 1962(a).

331.    Plaintiffs, Lee's Wood Products, and Recycled/New suffered injury to business and property, and Plaintiffs are entitled to recover actual damages, prejudgment interest, treble damages, costs and expenses, and reasonable attorneys' fees.

## COUNT V.

### (Violation of 18 U.S.C. § 1962(d))

332.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 331 of the Complaint.

333.    Beginning in 2003 and continuing through the end of 2012, Mr. and Mrs. Rodino, Mrs. Rodino Bailey, Mr. Zou, and the corporate Defendants knowingly combined, conspired, confederated, and agreed with each other to: (1) conduct the affairs of the RICO enterprises

through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), and (2) to receive income from a pattern of racketeering activity in violation of 18 U.S.C. § 1962(a), all in violation of 18 U.S.C. § 1962(d).

334.    It was part of the conspiracy that the Defendants would take steps to conceal the conspiracy.

## COUNT VI.

### (Violation of 18 U.S.C. § 1956)

335.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 334 of the Complaint.

336.    The claims in Counts I through V also constitute predicate acts of money laundering in violation of 18 U.S.C. 1956.

337.    The persons in Counts I through V have:  (1) engaged in financial transactions involving the proceeds of certain crimes in order to conceal the nature, source, or ownership of proceeds they produced, 18 U.S.C. § 1956(a)(1)(B)(ii); (2) engaged in financial transaction involving the proceeds of certain crimes in order to promote further offenses, 18 U.S.C. § 1956(a)(1)(A)(i); (3) transported funds generated by certain criminal activities into, out of, or through the United States in order to promote further criminal activities, or to conceal the nature, source, or ownership of the criminal proceeds, or to evade reporting requirements, 18 U.S.C. § 1956(a)(2); and, (4) engaged in a financial transaction involving criminal proceeds in order to evade taxes on the income produced by the illicit activity, 18 U.S.C. § 1956(a)(1)(A)(ii).

## COUNT VII.

### (Fraud)

338.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 337 of the Complaint.

339.   Mr. and Mrs. Rodino, Mrs. Rodino Bailey, Lucky Lou, 2610 LLC, and Apex Pallet defrauded Plaintiffs and the Duro Entities through the previously alleged schemes to misappropriate, embezzle, and/or launder monies and property through a series of knowingly false and fraudulent material misstatements and omissions, including but not limited to preparing and submitting false accounting records, financial records, and tax return documents to Plaintiffs, Elkhart County officials, the IRS, and the State of Indiana.

340.   Defendants' conduct has directly and proximately injuries to Plaintiffs.

## COUNT VIII.

### (Conversion)

341.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 340 of the Complaint.

342.   Defendants Mr. and Mrs. Rodino and Mrs. Rodino Bailey have converted significant funds from the Duro Entities, without the authorization of Plaintiffs, and in a manner that benefitted these Defendants personally and caused harm to the Duro Entities.

343.   The conversions have come in the form of using money from the Duro Entities to pay for personal expenses, invest in other business ventures, and build personal investment and retirement accounts.

344.   Defendants Mr. and Mrs. Rodino and Mrs. Rodino Bailey Rodino are each liable for conversion under IC §§ 35-43-4.

345.    Defendants Mr. and Mrs. Rodino and Mrs. Rodino Bailey knowingly and intentionally exerted unauthorized control over property belonging to the Duro Entities and Plaintiffs.

346.    As a result of the conversion, Plaintiffs have suffered a pecuniary loss and are entitled to all relief under IC § 34-23-3-1, including:

    a.  An amount not to exceed three times the actual damages;

    b.  The costs of this action;

    c.  Reasonable attorneys' fees;

    d.  Actual travel expenses not otherwise reimbursed; and,

    e.  All other reasonable costs of collection.

## COUNT IX

### (Deception)

347.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 346 of the Complaint.

348.    Mr. Rodino knowingly and intentionally created several false and misleading written accounting and ledger statements in an effort to conceal his and his family's fraudulent schemes and misappropriation.

349.    Mr. Rodino produced during discovery redacted spreadsheets and represented that they accurately reflected the Quickbook accounts for Lee's Wood Products and Recycled/New from late 2008 through end of year 2012.  The spreadsheets contain numerous false statements. The checking redacted reports show that Lee's Wood Products wrote a check for $50,000 to First Clearing, LLC, on October 26, 2010.  However, the General Ledger redacted report has the same

check as being posted six different times. The General Ledger for Recycled/New similarly has entries falsely claiming that the October 2010 check for $200,000 to First Clearing had been returned to Recycled/New's checking account.

350.     The falsification of these accounting and ledger documents constitutes deception pursuant to IC § 35-43-5-3.

351.     As a result of the deception, Plaintiffs have suffered pecuniary losses and is entitled to all relief under IC § 34-23-3-1, including:

      a.     An amount not to exceed three times their actual damages;

      b.     The costs of this action;

      c.     Reasonable attorneys' fees;

      d.     Actual travel expenses not otherwise reimbursed; and,

      e.     All other reasonable costs of collection.

### COUNT X.

### (Breach of Fiduciary Duties against Mr. Rodino)

352.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 351 of the Complaint.

353.     The acts and omissions of Mr. Rodino violated his fiduciary duties to Plaintiffs, Lee's Wood Products, and Recycled/New, including the duties to manage the Duro Entities for the benefit of all of its shareholders and to refrain from engaging in self-dealing, fraud, misappropriation, conversion, and deception.

354.     For over eight years, from May 2003 through today, Rodino has frozen out his minority shareholders and operated the Duro Entities without regard to his fiduciary duties to the minority shareholders.

355.   Shareholders of closed corporations owe fiduciary duties that are substantially different from the duties owed by their counterparts in publicly traded corporations.  Closely-held corporations are treated as incorporated partnerships and, therefore, all shareholding partners must deal fairly with the corporation and their fellow shareholders.  Shareholders in closed corporations may not act out of avarice, expediency, or self-interest in derogation of their duty of loyalty to other shareholders and the corporations.

356.   Mr. Rodino's actions, as described above, violated his fiduciary obligations to Plaintiffs related to the operation of the Duro Entities.

357.   During the course of his fiduciary breaches, Mr. Rodino also paid himself an excessive salary and benefits from Lee's Wood Products and Recycled/New, in addition to the millions he misappropriated pursuant to the fraudulent schemes described above.

358.   As a consequence of his fiduciary breaches, Lee's Wood Products and Recycled/New are entitled to recover all salary and benefits paid to Mr. Rodino during the period of his fiduciary breaches.

359.   Mr. Rodino has diverted business opportunities from the Duro Entities to Apex Pallet, Lucky Lou, 2610 LLC, and/or American Travel Palace.

360.   Mr. Rodino refused all reasonable requests for accounting and financial records related to the Duro Entities.  Mr. Rodino has failed to keep accurate and reliable books and accounting and financial records.  Mr. Rodino and his attorneys have obstructed an independent audit from being completed, causing significant additional damages to the Duro Entities.

361.   Mr. Rodino has reimbursed himself and multiple family members for expenses unrelated to the Duro Entities.  Mr. Rodino and his attorneys have attempted to hide these reimbursements by refusing to produce accurate, complete and reliable copies of the accounting

records for the Duro Entities.  When Mr. Rodino has produced documents voluntarily, he has produced altered and manipulated financial records to confuse and render it impossible to properly account for Defendants' expenditures.

362.    Since May 2003, Mr. Rodino and the Duro Entities have never made any distributions of income or profits to Plaintiffs, despite their significant ownership interest in each of the Duro Entities.  During this same time period, Mr. Rodino and his family have received millions of dollars through the assets of the Duro Entities.

363.    By treating all profits and income of the Duro Entities as his own, Mr. Rodino has breached a fiduciary duty to Plaintiffs by accepting unreasonable compensation.  Mr. Rodino has distributed payments that exceed the amounts that could have been distributed without violating IC 23-18-5-6 and, therefore, he is personally liable for unlawful distributions under IC 23-18-5-7.

364.    Mr. Rodino has filed multiple fraudulent federal and state tax returns, which may result in significant additional tax liabilities for the Duro Entities and its shareholders.

365.    Mr. Rodino has violated his fiduciary duties to the Duro Entities and its shareholders by diverting opportunities from Recycled/New, in which Plaintiffs own 49% of the shares, to Lee Wood Products.

366.    Mr. Rodino is forcing Mr. Shah to pay income taxes on income for the Duro Entities, even though Mr. Rodino has refused to make a single payment of profits or dividends to Mr. Shah since he purchased his interests in the Duro Entities.

367.    Mr. Rodino has paid himself a bonus in some years to pay for his income tax obligations for the prior year, but he mis-classifies the payments in the books and refuses to make similar distributions to Plaintiffs.

368.    Mr. Rodino has failed to properly report W2 wages and pay payroll taxes for employees who performed work for the Duro Entities.

369.    Mr. Rodino's conduct has breached his fiduciary duties under Indiana's Business Flexibility Act, IC §§ 23-18-1-1 through -19.

370.    Mr. Rodino has acted with malice, fraud, gross negligence and oppression, and Plaintiffs are entitled to punitive damages.

## COUNT XI.

### (Unjust Enrichment)

371.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 370 of the Complaint.

372.    Mr. and Mrs. Rodino, Mrs. Rodino Bailey, Mr. Zou, Mr. Lord, Apex Pallet, Lucky Lou, and 2610 LLC benefitted from the misappropriation of monies belonging to Lee's Wood Products and Recycled/New and transactions belonging to Elkhart County, to their respective detriment.

373.    Under principles of equity and good conscience, these same Defendants should not be allowed to keep these monies and other assets that rightfully belong to Lee's Wood Products and Recycled/New.

## RELIEF AND DAMAGES SOUGHT

374.    Plaintiffs seek to recover all damages caused by Defendants' actions, including the millions of dollars embezzled and laundered by Defendants from the Duro Entities.  The full extent of the damages caused by Defendants is unknown.

375.    Plaintiffs seek to recover all amounts invested by the Rodino Family in investment and retirement accounts, which as of December 31, 2010, totaled at least $813,369 with Ascend Advisory Group, and $118,387 with National Life Insurance Company.

376.    Plaintiffs seek to recover all monies embezzled, misappropriated, and laundered through the credit card schemes.

377.    Plaintiffs seek to recover all monies embezzled, misappropriated, and laundered through Lucky Lou and 2610 LLC, which are currently calculated to be at least $620,082 and $88,250, respectively.

378.    Plaintiffs seek to recover all monies embezzled, misappropriated, and laundered through Apex Pallet, which are currently calculated to be at least $480,972 for 2009 and 2010.

379.    Plaintiffs seek to recover all proceeds embezzled, misappropriated, and laundered through American Travel Palace, which are currently calculated to exceed $500,000.

380.    Any and all property, including any real estate, in which (1) any member of the Rodino Family, (2) Mr. Patrick Bailey (Mrs. Rodino Bailey's husband), (3) Lucky Lou, (4) 2610 LLC, (5) Apex Pallet, (6) American Travel Palace, and (7) all other companies that have received any proceeds through the unlawful RICO schemes, have an ownership interest shall be seized and held in trust to satisfy any judgments entered by the Court.  This includes the properties purchased by Lucky Lou and 2610 LLC, as well as Mr. and Mrs. Rodino's and Mr. and Mrs. Rodino Bailey's primary residential homes in Elkhart.

381.    Pursuant to RICO, 18 U.S.C. § 1964(a), the Court should divest Mr. Rodino of any interest in the Duro Entities and all other enterprises in which he currently has any interest and enter an order that Mr. Rodino must refrain from engaging in any commercial activity or making any commercial investments.

382. Pursuant to RICO, 18 U.S.C. §§ 1962(c) and 1964(c), Plaintiffs seek to recover treble damages, reasonable attorneys' fees, and costs of this lawsuit. The actual damages outlined above are at least $3,752,586, but this does not account for all damages caused by certain RICO schemes, e.g., the credit cards, Apex Pallet for 2011 and 2012, and the Rodino Family's investments in 2011 and 2012. The total actual damages are likely to exceed $4,000,000, which should be trebled and Plaintiffs should be awarded damages in excess of $12,000,000, plus reasonable attorneys' fees and costs.

383. Alternatively, pursuant to RICO, 18 U.S.C. 1964(a), the court should order the dissolution and/or reorganization of the Duro Entities and all other enterprises that have been utilized by Defendants as part of the criminal enterprises.

384. Plaintiffs also seek recovery of all salary and benefits paid to Mr. Rodino from Lee's Wood Products and Recycled/New from 2004 through 2012. From 2004 to 2010, Mr. Rodino paid himself salary and benefits totaling $422,532.24 for Lee's Wood Products. From 2004 through 2010, Mr. Rodino paid himself $1,224,287 in salary and benefits from Recycled/New. These payments do not account for the contributions to his simple IRA.

385. Plaintiffs seek to recover all other damages caused by Defendants' fraud, negligence, gross negligence, unjust enrichment, conversion, deception, and breaches of fiduciary duties, including attorneys' fees, costs, exemplary, punitive, and/or treble damages.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues triable by a jury.

WHEREFORE, Plaintiffs pray the Court enter judgment against Defendants and compensate Plaintiffs for their damages, for attorneys' fees, costs, treble damages, punitive damages, and all other proper relief.

Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By:_____
    Todd Kaiser, #10846-49
    John K. Henning, #25203-49
    Amanda Couture, #24838-53
    Michelle Maslowski, #27238-49
    111 Monument Circle, Suite 4600
    Indianapolis, IN  46204
    Telephone:  317.916.1300
    Facsimile:  317.916.9076
    *todd.kaiser@ogletreedeakins.com*
    *john.henning@ogletreedeakins.com*
    *amanda.couture@ogletreedeakins.com*
    *michelle.maslowski@ogletreedeakins.com*

Attorneys for Plaintiffs

14003298.1 (OGLETREE)