UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DURO INC, DURO RECYCLING INC,
DURO REALTY INC,

     Plaintiffs,

     v.                                                    Case No. 3:13-CV-103 JD

E SPENCER WALTON JR,
GEORGIANNE M WALKER, MAY
OBERFELL LORBER,

     Defendants.

## <u>OPINION AND ORDER</u>

This case arises from Defendants E. Spencer Walton, Jr., Georgianne M. Walker and

May Oberfell Lorber's (collectively "MOL") representation of Terry Rodino and Plaintiffs Duro,

Inc., Duro Recycling and Duro Realty, Inc. (collectively "Duro") in state and federal court

litigation filed by minority shareholders, Amit Shah and Tim Dugle. Duro's remaining claims

against MOL include legal malpractice and conspiracy to violate the Computer Fraud and Abuse

Act ("CFAA"). [DE 408; 443]. MOL moves for summary judgment in its favor as to both

claims. [DE 473]. This motion is ripe for decision. [DE 487; 494]. The parties have also filed

motions relating to the designated evidence submitted in support of their briefs. [DE 484; 497;

498; 499]. These motions are also ripe and addressed below.

## I. FACTUAL BACKGROUND

This case began as a business dispute between the majority and minority shareholders of

Duro and its related entities over the management of those companies by Mr. Rodino.[1] Duro was

---

[1] The facts of this case stem, in part, from events as early as 2004, involving many individuals who are no longer parties to the action. The factual background here only includes relevant facts as they relate to the remaining claims of the Third Amended Complaint between Duro and MOL.

in the business of selling pallets, which are commonly used for transporting goods. [DE 408 at 3–4]. Mr. Rodino was the president and majority shareholder of Duro until September 2017, which is the time period Duro alleges Mr. Rodino misappropriated assets. [DE 474-9 at 2–3]. Mr. Shah and Mr. Dugle were minority shareholders during the relevant time. Mr. Rodino decided how expenses would be coded, whether to make distributions to shareholders, how he was compensated, whether to use company assets for his own benefit, how money was allocated among the various Duro Entities, how labor and materials were apportioned among the Duro Entities, and what documents would be provided in litigation. [DE 476-1 at 35–37]. Duro asserts that when Mr. Rodino engaged in such actions, he committed unlawful conduct including fraud, embezzlement, conversion, breach of fiduciary duty, and misappropriation of funds. [DE 408 at 17–19].

In September 2008, Mr. Rodino created another business called Apex Pallet, Inc. ("Apex"), which was a brokering company for pallets. Apex would purchase pallets from a pallet company and sell them to a customer. [DE 485-4 at 7]. Mr. Rodino testified that Apex did not receive a commission on the sales, but it would receive the profits of the sale. *Id.* Mr. Rodino was the sole owner and shareholder of Apex. Mr. Rodino testified that Apex was created to service KIK, a customer that needed pallets. Prior to Apex's formation, KIK was a customer of Duro. Mr. Rodino testified that he created Apex to serve as a go-between for Duro and KIK because KIK indicated it would not do business with a company owned by any of the Shahs, including Mr. Shah, who had just become a minority shareholder in Duro. *Id.* at 8–9. When he learned this, Mr. Rodino went to the offices of Warrick & Boyn and told them to incorporate Apex. *Id.* at 10. Mr. Rodino formed Apex to keep KIK's busines and ultimately Apex was "extremely profitable for the Duro companies." *Id.* at 9. Duro asserts that Apex was created and

used to steal customers, supplies, pallets, money, and resources from Duro. [DE 408 at 9]. Mr. Walton testified that he was told by Bill Haut at Warrick & Boyn that Apex was formed because KIK would no longer do business with Duro once it learned Mr. Shah owned shares. [DE 486-2 at 29]. Mr. Walton further testified that when Mr. Rodino spoke with him about his conversation with KIK regarding Mr. Shah, Mr. Walton asked Mr. Rodino if "there [was] anything in writing to substantiate" the conversation. *Id.* at 30. Mr. Walton asked Mr. Rodino if he was able to get it in writing and the result of that was an email from KIK that stated, "[m]anagement's direction at the time was to avoid doing business with anyone associated with the Shahs." *Id.*

Mr. Shah and Mr. Dugle, as minority shareholders, filed their original complaint in this action on February 14, 2013. As minority shareholders in the Duro Entities they raised eleven claims against Mr. Rodino, Duro, and others, alleging violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, and the federal money laundering criminal statute, as well as state law claims for fraud, conversion, deception, breach of fiduciary duty, and unjust enrichment. On March 24, 2014, this Court dismissed all eleven claims without prejudice in response to Defendants' motion to dismiss. As to the RICO claims, the Court "decline[d] to allow Plaintiffs to bring their derivative claims in a direct action" while "expressly stat[ing] no opinion as to whether such claims are appropriate in this case." [DE 68 at 12]. Having dismissed all of the federal claims, the Court declined to exercise supplemental jurisdiction over the state law claims. *Id.* The Court, however, granted them leave to file an amended complaint. *Id.* at 15. Having limited the scope of an amended complaint, the Court prohibited Mr. Shah and Mr. Dugle from adding new claims or new defendants without leave of court. *Id.* On April 23, 2014, Mr. Shah and Mr. Dugle filed a Motion for Leave to Amend the Complaint. In that proposed Amended Complaint, they clarified the claims raised in their original complaint and included

new defendants and claims based on conduct during the pendency of the motion to dismiss. The minority shareholders also alleged new claims related to Mr. Rodino's alleged destruction of computer documents and computer trespass, federal RICO claims, Indiana RICO claims, and legal malpractice claims against the attorneys representing Duro.

Before the Court could rule on the first motion to amend, Mr. Shah and Mr. Dugle filed another Motion for Leave to File a Second Amended Complaint. In their proposed Second Amended Complaint, Mr. Shah and Mr. Dugle repeated the claims included in their proposed First Amended Complaint and added new claims against Elkhart County and Scott Mills (an IT professional at Duro) as defendants for their part in Mr. Rodino's alleged destruction of computer files in violation of the federal CFAA and Indiana's computer tampering statute. In addition, Plaintiffs proposed an additional derivative claim against Defendant MOL for allegedly conspiring with and assisting Mr. Rodino and Mr. Mills in violating the CFAA and the state computer tampering statute. The Court granted the motion for leave to file the Second Amended Complaint, which was then filed on June 29, 2015. [DE 89; 90].

During the underlying litigation, Mr. Shah and Mr. Dugle moved to disqualify MOL as counsel for Mr. Rodino and Duro on two occasions. [DE 15; 144]. The first was on March 26, 2013, and the motion asserted that MOL's concurrent representation of Mr. Rodino and Duro created a conflict under Indiana Rules of Professional Conduct 1.7 and that Duro's interest in determining the party responsible for the alleged mismanagement of Duro put MOL at odds with the interests of Mr. Rodino who Mr. Shah and Mr. Dugle alleged engaged in the mismanagement. [DE 54 at 7]. They also asserted that MOL knew of Mr. Rodino's alleged misconduct and intent to continue and thus should have withdrawn under Rule 1.13(b) and the concurrent representation was improper under Rule 1.13(g) for failing to obtain consent from the

4

minority shareholders. *Id.* After a hearing, Magistrate Judge Nuechterlein denied the motion, finding that Defendants demonstrated that the interests of Mr. Rodino and Duro were aligned. *Id.* at 9–10. On July 30, 2015, Mr. Shah and Mr. Dugle filed a new motion to disqualify MOL. [DE 144]. The minority shareholders again asserted the past and present concurrent representation constituted a conflict of interest and the representation has caused harm to Duro. *Id.* at 3. They also argued that MOL should be disqualified because they allegedly conspired with Mr. Rodino to violate the CFAA and MOL was added as defendants to the recently filed Second Amended Complaint. Magistrate Judge Martin denied the motion, holding that the issue had already been decided, MOL's inclusion as defendants could not be a basis for disqualifying counsel, and the motion was premature because there was a pending motion to dismiss the Second Amended Complaint nor had discovery begun. It was uncertain if MOL would remain as defendants. [DE 226 at 3–5].

On June 14, 2016, MOL moved to withdraw as Mr. Rodino's counsel, which the Court granted. [DE 255–58]. After two status conferences regarding Duro's representation, the Court granted MOL's second set of motions to withdraw from representing Duro on May 17, 2017. [DE 340]. On September 21, 2017 the claims against Duro, Mr. Rodino, his family members and others were settled and subsequently dismissed, including the derivative claims made by Mr. Shah and Mr. Dugle on behalf of Duro. [DE 381; 391; 396]. All shares previously owned by Mr. Rodino were redeemed by Duro. [DE 408 at 3]. The same day all of Mr. Dugle's shares were also redeemed, thereby making Mr. Shah the sole shareholder of Duro. [DE 476-1 at 26]. Duro paid Mr. Rodino $1.4 million for his shares and Duro did not receive money from Mr. Rodino. *Id.* at 31–32, 34. The settlement and dismissal of claims against Mr. Rodino and others preserved whatever claims Duro might have against MOL and Warrick & Byon. [DE 408 at 3; 471 at 9].

5

As consideration, the settlement required Mr. Rodino to execute a separately signed affidavit that waived all attorney-client and attorney work product privilege regarding all communications, disclosures, advice, and documents between him and MOL. [DE 471 at 5]. That waiver did not include the attorney-client privilege held with his new attorneys. [DE 474-7 at 28].

Part of the express consideration for the settlement was that Mr. Shah would receive "all stock, title, and interest in [Duro]."[2] [DE 471 at 4]. Shortly after the September 2017 settlement was effectuated, Mr. Shah transferred all of Duro's assets, worth millions of dollars, to his pallet company, Green Stream. [DE 476-1 at 15–16, 27]. After Mr. Shah took over, Duro no longer had any hard assets, operations, revenue, income, employees, or customers. *Id.* at 15–18, 27. The only "asset" that Duro has now is this lawsuit. *Id.* at 15–16. After this case is resolved, Mr. Shah does not know what he will do with Duro. *Id.* at 28. Since Mr. Shah took over, he has distributed all of the cash left over in Duro to himself. *Id.* at 16.

The Third Amended Complaint was filed on June 8, 2018 and asserted claims by Duro, Mr. Shah, and Mr. Dugle against MOL as well as Warrick & Boyn and its attorneys. [DE 408]. Pursuant to MOL's motion, the Court dismissed Count 1 for legal malpractice as to Mr. Shah and Mr. Dugle and dismissed Count 2 for a claim entitled conflict of interest, in its entirety. [DE 437; 443]. On May 6, 2020, the Court granted a stipulation to dismiss between Plaintiffs and Defendants Warrick & Boyn, William Haut, and Timothy Shelly. [DE 460]. On January 22, 2021, MOL moved for summary judgment as to both remaining claims of the Third Amended Complaint. [DE 473]. For the following reasons, the Court grants MOL's motion.

## II.  STANDARD OF REVIEW

---

[2] The Settlement Agreement indicated plaintiffs, Mr. Shah and Mr. Dugle, would receive "all stock, title, and interest" however, Mr. Dugle's previous 1% of Duro was redeemed the same day of the Redemption Agreement, so Mr. Shah owns 100% of Duro. [DE 476-1 at 26].

On summary judgment, the burden is on the moving party to demonstrate that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That means that the Court must construe all facts in the light most favorable to the nonmoving party, making every legitimate inference and resolving every doubt in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not a tool to decide legitimately contested issues, and it may not be granted unless no reasonable jury could decide in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the absence of [a] genuine issue of material fact." *Id.* at 323. Once the moving party meets this burden, the nonmoving party may not rest on allegations or denials in its own pleading but must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard v. Whitley Cty. REMC*, 840 F.2d 405, 410 (7th Cir. 1988). The disputed facts must be *material*, which means that they "might affect the outcome of the suit under the governing law." *Brown v. City of Lafayette*, 2010 WL 1570805, at *2 (N.D. Ind. Apr. 16, 2010). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir. 1996).

### III. ANCILARY MOTIONS

The parties have filed a number of ancillary motions relating to the designated evidence submitted in support of their briefs. Duro moves to strike two of MOL's exhibits. [DE 484]. MOL moves to strike or exclude Duro's expert opinion of Lucian Pera [DE 497] and Ronald

Braver [DE 498], as well as portions of John Henning's declaration [DE 499]. Before reaching the merits of the motion for summary judgment, the Court will address these motions in turn.

### A.    Duro's Motion to Strike Exhibits 16 and 9 of MOL's Designated Evidence

Duro moves to strike two of MOL's designated exhibits—16 and 9. [DE 484]. MOL responded in opposition [DE 496], to which Duro did not reply. For the following reasons, the Court denies Duro's motion to strike Exhibits 16 and 9.

#### 1.  *Exhibit 16*

By way of background, on March 18, 2014, Mr. Shah and Mr. Dugle filed a grievance with the Indiana Supreme Court Disciplinary Commission ("the Commission"), which is an administrative agency of the Indiana Supreme Court responsible for investigating and prosecuting claims of misconduct against lawyers licensed to practice law in Indiana and protecting lawyers against unwarranted claims of misconduct. *See* Indiana Rules for Admission to the Bar and Discipline of Attorneys, Rule 23. The grievance was about MOL's representation in this action. On April 15, 2014, a member of the Commission sent Mr. Walton a letter stating the grievance was "dismissed as not raising a substantial question of misconduct that would warrant disciplinary action." [DE 474-17 at 1]. In support of its motion for summary judgment, MOL designated Exhibit 16, which includes the April 15 letter from the Commission, the March 18 grievance, and the letter from attorney John Henning to the Commission enclosing the grievance. *Id.* at 1–3. Duro argues Exhibit 16 should be stricken and not considered by the Court for several reasons: 1) the documents are unauthenticated; 2) the letter is improper and inadmissible hearsay evidence under Rule 802 and no exception applies; 3) the opinions contained in the letter constitute undisclosed opinion testimony; and 4) the substance of the letter is irrelevant.

"To be considered on summary judgment, evidence must be admissible at trial, though 'the form produced at summary judgment need not be admissible.'" *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) (quoting *Wragg v. Vill. of Thornton*, 604 F.3d 464, 466 (7th Cir. 2010)). "A party may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). "In other words, the Court must determine whether the material can be presented in a form that would be admissible at trial, not whether the material is admissible in its present form." *Stevens v. Interactive Fin. Advisors, Inc.*, 2015 WL 791384, at *2 (N.D. Ill. Feb. 24, 2015) *aff'd in part*, 830 F.3d 735 (7th Cir. 2016). As the Seventh Circuit has specifically noted, "the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014).

First, Duro argues that Exhibit 16 should be stricken because the documents are unauthenticated and therefore inadmissible under Federal Rule of Evidence 901, which states "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Duro notes in its motion that Mr. Henning laid a foundation for the grievance and the letter he wrote enclosed with the grievance but argues no foundation has been laid for the letter from the Commission. [DE 484 at 3]. In its response to Duro's motion, MOL filed a supplemental designation of evidence that contains an affidavit from Mr. Walton authenticating Exhibit 16, particularly the letter from the Commission. [DE 495-3]. *Cehovic-Dixneuf v. Wong*, 895 F.3d 927, 932 (7th Cir. 2018) (noting that parties can submit supplemental affidavits to cure evidentiary defects). In his affidavit, Mr. Walton attests to the Exhibit 16 documents being true

9

and accurate copies of the letter he received from the Commission and its enclosures. Further, at trial, Mr. Walton could testify that it is a true and accurate copy of what he received from the Commission and a records custodian of the Commission could testify or submit an affidavit that it is a true and accurate copy. Duro has not subsequently challenged this affidavit or the foundation and authentication it provides. Therefore, the Court finds Exhibit 16 has been authenticated.

Second, Duro argues that Exhibit 16 contains inadmissible hearsay. The Commission's letter states that the grievance was "dismissed as not raising a substantial question of misconduct that would warrant disciplinary action." [DE 474-17 at 1]. Duro argues that MOL is attempting to use Exhibit 16 to prove that Duro's claims are prohibited by Indiana law and that Mr. Shah is improperly bringing the pending claims. However, the Court disagrees with this characterization and does not find it is being offered for the truth of the matter asserted—that is, no misconduct existed. In its motion for summary judgment, MOL cites to Exhibit 16 on two occasions. First, it cites to the filing of the grievance at the direction of Mr. Shah as evidence that Mr. Shah wanted to "strike back" at the attorneys who represented Mr. Rodino and Duro during the litigation. [DE 476 at 34]. Next, MOL cites to Exhibit 16 in support of its arguments on why attorney fees should not be disgorged. *Id.* at 58. MOL argues that an important factor in this analysis is the willfulness of the alleged violation. MOL argues in part that the alleged violation was not willful because, among other evidence, it had been made aware the grievance was dismissed as there was no substantial question of misconduct. Thus, the Court finds that MOL is not offering the Commission's letter for the truth of the matter asserted and therefore is not hearsay.

Third, Duro argues the Commission's letter constitutes undisclosed opinion evidence and must be stricken. Duro asserts that MOL is attempting to use the letter to show that MOL

committed no misconduct, however MOL never identified members of the Commission as witnesses in discovery disclosures and did not identify the opinion or provide opinion disclosures as required by the Federal Rules. MOL argues that for the same reason the Commission's letter is not hearsay—it is not offered for the truth of the matter asserted—the letter does not constitute undisclosed expert opinion. MOL has not offered the letter as an expert opinion that no misconduct occurred, but rather for the reasons stated above, relating to evidence of Mr. Shah's motivation in pursuing MOL and the disgorgement of attorney fees analysis. The Court agrees and does not find that the Commission's letters is being offered as undisclosed opinion evidence.

Fourth, Duro argues Exhibit 16 is irrelevant to the underlying issues in the present case because its experts' opinion contradicts the letter. Federal Rule of Evidence 401 defines relevant evidence as evidence which "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." However, again, MOL is not offering the letter to establish no misconduct occurred, but rather argues its relevancy is the impact the letter had on MOL, which is a fact of consequence to some of Duro's allegations. The Court agrees and therefore finds Exhibit 16 relevant.

Lastly, to the extent Duro argues the grievance filed by Mr. Henning at the request of Mr. Shah and the letter enclosed with it is hearsay, the Court disagrees. A statement offered against an opposing party that was made by a person whom the party authorized to make a statement on the subject or by the party's agent on a matter within the scope of that relationship while it existed is not hearsay. Fed. R. Evid. 801(d)(2)(C), (D). Here, there is evidence that Mr. Henning filed this grievance at the request of Mr. Shah and Mr. Dugle. [DE 474-15 at 9]. At the time of the grievance, they were minority shareholders of Duro and requested their attorney, Mr. Henning to pursue the alleged violations with the Commission. Mr. Shah is now the sole owner

of Duro pursuing claims related to the underlying litigation. Further, at trial, Mr. Henning, the declarant, could testify to the letter and grievance he authored. Thus, the Court finds the grievance and letter from Mr. Henning are not hearsay under Rule 801(d)(2)(C)-(D). Accordingly, for the above reasons, Duro's motion to strike MOL's Exhibit 16 is denied.

### 2. Exhibit 9

In support of its motion for summary judgment MOL designated an Affidavit of Terry Rodino dated January 16, 2020 as Exhibit 9. Duro argues Mr. Rodino's affidavit should be stricken and not considered by the Court because it is inconsistent with his previous affidavit from September 2017 and his later deposition testimony taken in July 2020. [DE 484 at 9]. Duro asserts that Mr. Rodino's story has changed about whether or not MOL provided him with advice regarding various business practices and decisions related to Duro, and therefore the inconsistences and contradictions in his story make the January 2020 affidavit implausible and not credible and should be disregarded by the Court.

Any affidavit submitted for the court's consideration in ruling on a motion for summary judgment must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "[A]lthough personal knowledge may include reasonable inferences, those inferences must be 'grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience.'" *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003) (quoting *Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc)). The Seventh Circuit has held the term "self-serving" "must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill v. Tangherlini*, 724 F.3d

965, 967 (7th Cir. 2013). The mere fact that an affidavit is self-serving does not preclude the court from considering it on summary judgment, as long as the affidavit meets the requirements of Rule 56(c). *See Payne*, 337 F.3d at 773 ("lay[ing] to rest the misconception that evidence presented in a 'self-serving' affidavit is never sufficient to thwart a summary judgment motion.").

A party generally may not "create an issue of fact by submitting an affidavit whose conclusions contradict [that party's own] prior deposition or other sworn testimony." *Buckner v. Sam's Club, Inc.*, 75 F.3d 290, 292 (7th Cir. 1996). "The concern in litigation, of course, is that a party will first admit no knowledge of a fact but will later come up with a specific recollection that would override the earlier admission." *Id.* Rule 56 thus requires a judge to scrutinize the substance of an affidavit offered in response to a summary-judgment motion to determine whether a reasonable jury could rely on the factual statements it contains. *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020). In this Circuit the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony. *Id.* at 316.

The Seventh Circuit has recognized exceptions to the sham-affidavit rule. *Id.* at 317. The rule provides that an affidavit is inadmissible only when it directly contradicts the affiant's previous sworn testimony unless the earlier testimony was ambiguous, confusing, or the result of a memory lapse. *Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015). The submission of a supplemental affidavit that clarifies ambiguous or confusing deposition testimony is allowed. *James*, 959 F.3d at 317. The sham affidavit doctrine, therefore, reflects the judgment that affidavits cut from whole cloth and offered solely to create issues of fact "are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant

gives a plausible explanation for the discrepancy." *Beckel v. Wal-Mart Assos., Inc.*, 301 F.3d 621, 623 (7th Cir. 2002). "Changes in testimony normally affect the witness's credibility rather than the admissibility of the testimony, and thus the sham-affidavit rule applies only when a change in testimony 'is incredible and unexplained.'" *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016) (quoting *Cook*, 803 F.3d at 298). "Without the doctrine, even an affidavit involving contradictions so clear that the only reasonable inference was that the affidavit was a sham designed to thwart the purposes of summary judgment would in fact preclude summary judgment, because the court otherwise could not grant summary judgment without intruding upon the jury's role in resolving questions of credibility." *United States ex rel. Robinson v. Indiana Univ. Health, Inc.*, 204 F.Supp.3d 1040, 1044 (S.D. Ind. 2016) (citing *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996) (internal quotations and citations omitted)). The Seventh Circuit has emphasized that the rule is to be used with "great caution." *Id.*

In September 2017, following mediation in the underlying litigation, Mr. Rodino entered into the Redemption Agreement with Mr. Shah, Mr. Dugle, and Duro. [DE 474-7]. As an exhibit to the Redemption Agreement, Mr. Rodino submitted a sworn affidavit ("September 2017 Affidavit"). *Id.* at 26–28; [DE 484-5 at 2–4].[3] In the September 2017 Affidavit, Mr. Rodino provided sworn statements that he consulted with MOL and Warrick & Boyn and relied on their advice regarding various business practices and decisions related to Duro. Specifically, Mr. Rodino provided the following sworn statements:

> 6. On various occasions I ***consulted with attorneys at Warrick & Boyn and/or May Oberfell Lorber*** regarding various business practices and decisions related to

---

[3] The Redemption Agreement was filed by MOL in support of its motion for summary judgment at DE 474-7, including its "Exhibit E," which is an affidavit signed by Mr. Rodino in September 2017. However, this affidavit is not the same September 2017 Affidavit that Duro attaches to its motion to strike. Neither party addresses this discrepancy.

the Duro Entities, including, but not limited to: the incorporation of the Duro Entities; firing my then minority shareholder Tim Dugle; electing on behalf of the various Duro Entities to not pay shareholder dividends; opposing Dugle's attempts to sell his shares in our businesses to Amit Shah; the formation of Apex Pallet to handle K.I.K. Custom Products business; various lawsuits which erupted between Shah, Dugle, the Duro Entities, my other businesses, my family and Aaron Zou; and amending Duro's By-Laws to allow for indemnification of an officer or director for actions or omissions related to their management of the Duro Entities.

7. On all occasions mentioned above I fully apprised these lawyers, to the best of my ability, regarding the facts and circumstances surrounding each issue.

9. On all occasions mentioned above I ***relied on the advice of the lawyers at May Oberfell Lorber and Warrick & Boyn*** and carried out that advice to the best of my ability.

[DE 484-5 at 3–4] (emphasis added). In January 2020, Mr. Rodino submitted another sworn affidavit in this matter ("January 2020 Affidavit"), which is MOL's Exhibit 9 and the subject of Duro's instant motion to strike. In the January 2020 Affidavit, Mr. Rodino provided sworn statements, among others, that he did not consult with or rely on MOL's advice:

6. I did not seek or receive advice from MOL regarding changing the Duro Entities by-laws to provide indemnity to officers of Duro Entities.

8. I did not seek, receive or need advice from MOL, that I could pay MOL's fees for their representation of me from the Duro Entities accounts.

9. I did not seek, receive or need advice from MOL regarding the formation of Apex Pallet, Inc.

16. I did not seek, receive or need advice from MOL regarding the incorporation of the Duro Entities.

17. I did not seek, receive or need advice from MOL regarding firing minority shareholder Tim Dugle.

18. I did not seek, receive or need advice from MOL regarding the payment of shareholder dividends. At all times relevant to the allegations made against me in state and federal court, I understood that if I, as the majority shareholder, decided to pay dividends that dividends would paid to all shareholders proportionally.

20. MOL did not advise me that I had no obligation to pay dividends or distributions.

15

[DE 474-10 at 2, 4]. Lastly, in July 2020, Mr. Rodino gave deposition testimony in this case. He testified that he could not remember one way or another whether he consulted with or relied on MOL's advice regarding Duro. [DE 484-4 at 9–10, 13]. He also testified that he had no recollection of the circumstances in the drafting or execution of the January 2020 Affidavit, and no recollection of communications with MOL on various relevant topics. *Id.* at 4–5.

Duro argues these inconsistencies and contradictions throughout Mr. Rodino's two affidavits and deposition testimony make the January 2020 Affidavit implausible and no reasonable factfinder could credit it. MOL argues that the primary purpose of the "sham affidavit" rule is to preclude a party from preventing the entry of summary judgment through the use of an affidavit created during the summary judgment process that directly contradicts earlier deposition testimony. While it is important to note that the affidavit in question was obtained months before Mr. Rodino was deposed and before any motion for summary judgment was filed, it is not dispositive because the sham-affidavit rule can apply to contradictions or inconsistencies with "other sworn testimony," not just *previous* deposition testimony. *James*, 959 F.3d at 316.

First, the Court compares the September 2017 Affidavit and the January 2020 Affidavit. MOL argues that these affidavits are not inherently inconsistent with one another. As MOL notes, the September 2017 Affidavit uses "and/or" when describing what law firm he consulted. For example, the affidavit states, "I consulted with attorneys at Warrick & Boyn **and/or** May Oberfell Lorber regarding various business practices and decisions related to the Duro Entities, including but not limited to . . . ." [DE 484-5 at 3] (emphasis added). Applying the ordinary meaning of "and/or" results in a reading as "I consulted with attorneys at Warrick & Boyn [or] May Oberfell Lorber [or both] regarding various business practices and decisions related to the Duro Entities." This language does not affirmatively establish only one outcome, such as, that

MOL definitively provided the advice discussed. Rather, it established the possibility that one or both of the law firms provided the advice. Therefore, the September 2017 Affidavit is ambiguous and subject to further explanation because it failed to define what each law firm did or did not provide Mr. Rodino. The affidavit left open the possibility that either or both law firms could have provided the advice on each topic. Mr. Rodino's January 2020 Affidavit is more specific than his September 2017 Affidavit, not inconsistent.

Further, the January 2020 Affidavit in Exhibit 9 is consistent with other established facts of the case. In its Answer to the Third Amended Complaint, Warrick & Boyn admitted that Mr. Haut, one of its attorneys, incorporated Duro and prepared its Articles of Incorporation. [DE 418 at 5]. Warrick & Boyn admitted that it prepared the corporate formation documents for Duro Realty. *Id.* at 6. Warrick & Boyn admitted that it incorporated Duro Recycling. *Id.* at 7. Thus, the fact that MOL did not provide advice on the incorporation of Duro is consistent with the established fact that Warrick & Boyn provided that advice. Additionally, Warrick & Boyn admitted that Mr. Rodino consulted with Warrick & Boyn about the formation of Apex, the corporate formation documents for Apex reveal that Warrick & Boyn prepared them, and Mr. Rodino testified to going to Warrick & Boyn's office to get Apex incorporated. *Id.* at 16–17; [DE 485-4 at 28; 485-4 at 10]. Thus, the fact that Exhibit 9 attests that Mr. Rodino did not consult with MOL about the formation of Apex, is consistent with the established facts of the case that he consulted with Warrick & Boyn.

In July 2020, five months after the January 2020 Affidavit and six months before the motion for summary judgment was filed, Mr. Rodino was deposed. Mr. Rodino testified that he had no recollection of the circumstances in the drafting or execution of the Affidavit. [DE 484-4 at 4–5]. Mr. Rodino also testified that he did not draft the January 2020 Affidavit, did not know

who drafted it, did not know how he received it, and had no recollection of receiving any instructions from anyone about reviewing or signing it. *Id.* at 5. He also testified he had no recollection of who asked him to sign it and whether he reviewed anything before signing it. *Id.* When asked if he spoke with any attorneys from MOL prior to signing it or preparing it, he responded, "I don't think so" and "not that I'm aware of." *Id.* Later in his testimony, he stated he did recall signing it under the penalty of perjury that it was true and accurate. [DE 496-1 at 6–7]. After reviewing the affidavit, he testified that it "appear[s] to be accurate." *Id.* at 7. As to the advice he received from MOL, Mr. Rodino testified he could not remember the advice given or not given to him by MOL. He testified to having no recollection of consulting with or relying on advice from MOL about the firing of Mr. Dugle [DE 484-4 at 13], payment of shareholder dividends (*id.* at 7, 11), the formation of Apex (*id.* at 9–10), various lawsuits (*id.* at 6), and amending Duro's by-laws (*id.* at 13). He confirmed that he did not seek or receive advice from MOL concerning payment of distributions. *Id.* at 7.

The Court is persuaded by MOL's arguments and reiterates the lack of rebuttal by Duro before the Court. *See Wojtas v. Capital Guardian Tr. Co.*, 477 F.3d 924, 926 (7th Cir. 2007) (stating that failure to oppose an argument constitutes waiver). While some responses in his deposition were "arguably evasive answers," *Knauf Realty, LLC v. Prudential Real Est. Affiliates, Inc.*, 486 F. Supp. 2d 855, 857 (W.D. Wis. 2007), Mr. Rodino's failure to recall information after he previously provided specific facts does not make his deposition inherently inconsistent or contradictory to his previous affidavits. *See Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir. 1995) (When a "deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the

circumstances a plausible explanation for the discrepancy."). In fact, during the deposition Mr.
Rodino explained why he believed he could not recall the events discussed: "[This lawsuit has]
been extremely stressful for me and my family, and I have tried to forget everything that has
happened with it. So my memory is a little unclear because I have worked as hard as I can since
this thing's been done with to forget about it." [DE 484-4 at 5]. He further testified that he did
not believe there was anything that could refresh his recollection regarding his conversations
with MOL because he was trying to forget them, and he was having trouble remembering
because speaking with Plaintiff's counsel was upsetting him. *Id.* at 6; [DE 496-1 at 3–5]. Exhibit
9 was created a year before any motion for summary judgment was filed and does not inherently
contradict Mr. Rodino's previous sworn statement. Rather, it is more specific than the prior
ambiguous language used in the September 2017 Affidavit. Additionally, other established facts
of the case are consistent with Exhibit 9. Further, Mr. Rodino's failure to recall what he
previously remembered months prior does not inherently contradict the facts contained in Exhibit
9 either and does not render the affidavit so implausible that no reasonable factfinder could credit
it. Accordingly, the Court finds that Mr. Rodino's January 2020 Affidavit is not a "sham
affidavit" and Duro's motion to strike Exhibit 9 is denied.

### B.      MOL's Motion to Strike Portions of the Declaration of John Henning

MOL moves to strike over half of the 62 paragraphs included in the Declaration of John
Henning because they contain statements not based on personal knowledge, conclusions without
proper supporting evidence, legal arguments, speculation, and conclusions regarding alleged data
destruction that can only be offered by a properly disclosed expert, which MOL argues Mr.
Henning is not. [DE 499]. Duro responded in opposition to the motion [DE 502], to which MOL

replied [DE 509]. For the following reasons, the Court grants in part and denies in part MOL's motion to strike.

Federal Rule of Civil Procedure 56 states that affidavits filed in support of summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "An affidavit not in compliance with Rule 56 can neither lend support to, nor defeat, a summary judgment motion." *Paniaguas v. Aldon Companies, Inc.*, 2006 WL 2568210, at *4 (N.D. Ind. Sept. 5, 2006) (citing *Zayre Corp. v. S.M. & R. Co.*, 882 F.2d 1145, 1148–49 (7th Cir. 1989); *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1572 (7th Cir. 1989)). "[W]hen considering a motion to strike portions of an affidavit in support of a motion for summary judgment, courts will only strike and disregard the improper portions of the affidavit and allow all appropriate recitations of fact to stand." *Id.* (citations omitted). Specifically, the following statements are not properly included in an affidavit and should be disregarded: (1) conclusory allegations lacking supporting evidence, *see Young v. Monahan*, 420 F. App'x 578, 583 (7th Cir. 2011); (2) legal argument, *see Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985); (3) inferences or opinions not "grounded in observation or other first-hand experience," *Visser*, 924 F.2d at 659; (4) mere speculation or conjecture, *see Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); and (5) statements in affidavits which blatantly contradict prior sworn testimony in an attempt to create sham issues of genuine dispute, *see Beckel*, 301 F.3d at 624; *Allied Signal*, 75 F.3d at 1168–69. As discussed above in Section III.A. in more detail, "the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form." *Olson*, 750 F.3d at 714.

Mr. Henning is an attorney and previously represented Mr. Shah and Mr. Dugle from approximately 2010-2017 when he was at the law firm Ogletree Deakins. [DE 485-10 ¶ 3]. Though Mr. Henning does not personally represent Plaintiffs any longer, Ogletree Deakins continues to represent them. The declaration states that the "evidence and information set forth in this Declaration supports the claims alleging [MOL], [Mr. Rodino], and Scott Mills. . .conspired to conceal and destroy evidence as early as December 2010 in violation of 18 U.S.C. § 1030(a)(4)." *Id.* at ¶ 4.[4] He also states that he has not been offered or received any compensation for his declaration. *Id.*

First, MOL moves to strike several paragraphs for being legal arguments, conclusions, and opinions. For example, in paragraphs 4 and 5, Mr. Henning states that MOL "conspired to conceal and destroy evidence as early as December 2010 in violation of 18 U.S.C. § 1030(a)(4)" and "tried to prevent Plaintiffs from gaining meaningful access to relevant documents and evidence at every turn." *Id.* at ¶¶ 4, 5. MOL argues that similar legal conclusions are made throughout Mr. Henning's declaration. The Court agrees that Mr. Henning makes legal arguments and conclusions throughout his declaration and strikes paragraphs 4 and 5, as well as the following paragraphs on that basis: ¶ 6 (stating MOL made false representations), ¶ 7 (stating MOL "engaged in obstructionist discovery practices designed to prevent [Duro] from completing a financial accounting"), ¶ 20 (stating MOL refused to allow Duro's expert to access records and that MOL took action to prevent the audit), ¶¶ 39-40 (stating MOL made misrepresentations to the Court), ¶ 41 (stating MOL maintained a position "despite [Duro's] evidence to the contrary"), ¶ 57 (stating Defendants knowingly refused to produce relevant material), and ¶ 59 (stating the minority shareholders had evidence Mr. Rodino was

---

[4] Mr. Mills was an IT professional at Duro and is no longer a party to this case.

misappropriating assets and MOL knew this). *See Greene v. Westfield Ins. Co.*, 963 F.3d 619, 627 (7th Cir. 2020) ("affidavits are for stating facts, not legal conclusions."); *Pfeil*, 757 F.2d at 862 ("Because legal argumentation is an expression of legal opinion and is not a recitation of a 'fact' to which an affiant is competent to testify, legal argument in an affidavit may be disregarded.").

However, the Court does not strike the following paragraphs because they are Mr. Henning's characterization of the facts based on his own personal knowledge gained through the years spent litigating this case with MOL as opposing counsel: ¶ 38 (stating that MOL did not permit access to missing financial records), ¶ 60 (stating MOL refused to provide relevant documents that were necessary to complete an audit), and ¶¶ 61-62 (stating MOL refused to produce "basic financial records" necessary to complete an audit). "It is true that "personal knowledge" includes inferences—all knowledge is inferential—and therefore opinions." *Visser*, 924 F.2d at 659. But all that is required for inferences to be admissible is that they are "grounded in observation or other first-hand personal experience" rather than "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Id.* Further, some of these paragraphs cite to corroborating documents. To the extent MOL disagrees with the characterization of the documents Mr. Henning cites, MOL is free to challenge the facts Mr. Henning recounts and the inferences he draws from them. But those concerns relate to the credibility and the weight of the evidence, which the Court does not determine or weigh at this stage. For that reason, the Court does not strike the following paragraphs: ¶ 11 (Mr. Rodino replaced the Duro server in December 2010), ¶¶ 17, 34, 37 (stating the hours Mr. Mills worked), ¶ 36 (stating MOL refused to provide records needed for the forensic accounting and allow a

financial manager to access records), and ¶ 55 (stating MOL objected to computer experts' steps to determine whether data was destroyed).

Next, MOL moves to strike paragraphs that include conclusory statements beyond Mr. Henning's personal knowledge. It argues Mr. Henning has not established that he observed or has some other form of personal knowledge as to whether Mr. Rodino replaced computers, altered the books, and purchased different versions of QuickBooks, and therefore paragraph 24 should be stricken. However, the only portion of paragraph 24 that is conclusory without factual support is "[w]hile MOL prevented the disclosure of any paper records, Rodino replaced the computers and altered the books for the Duro Entities" and therefore must be stricken. [DE 485-10 ¶ 24]. The same reason applies to the statement "[w]hile Rodino shredded documents, MOL worked to cut off Plaintiffs' access to Duro's financial records" and therefore is stricken. *Id.* at ¶ 12. MOL asserts that Mr. Henning has not established that he has personal knowledge of other paragraphs throughout the declaration and therefore should be stricken. The Court agrees and accordingly strikes the following paragraphs: ¶ 13 (stating when MOL began drafting motions), ¶ 50 (stating Mr. Mills accessed a Duro computer remotely and worked on QuickBooks files on June 12, 2013), and ¶ 51 (stating the Duro computers were taken offline for a week).

Lastly, and most dispositive to the underlying issues of the case, MOL argues that paragraphs 16, 26, 33, 35, 48, 49, 52-54, and 56, should be stricken because they are "analyzing whether files have been altered and deleted from a server and reaching a conclusion on the issue is not within the realm of a layperson" and instead requires an expert opinion that complies with the Federal Rules. [DE 499; 509]. During the underlying litigation, Mr. Henning and MOL agreed to hire Protek International to image and forensically review Duro's computers. Protek handles computer forensics, investigative and advisory services, as well as eDiscovery. [DE 145-

17]. Protek imaged the computers and ran a "deleted file sweep" to identify metadata for any deleted files. Protek then sent work product to Mr. Henning and his colleagues, as well as MOL, listing what Protek categorized as "previously existing" files. In his declaration, Mr. Henning attests to the conclusions reached in these emails and work product.[5]

It is undisputed that Mr. Henning has not demonstrated an expertise in computers and has not been designated as an expert in this matter. [DE 499-1; 502]. However, Duro argues that an expert is not required to admit this evidence and if one were, its failure to designate a witness as an expert is harmless. First, Duro argues that there is no authority for the proposition that an expert is required to admit an electronic record into evidence. It supports this assertion by citing *U.S. E.E.O.C. v. Olsten Staffing Servs. Corp.*, 657 F.Supp.2d 1029 (W.D. Wis. 2009). In *Olsten*, the court found it was sufficient to admit an email based on testimony of "someone who personally retrieved the email from the computer" or other "circumstantial evidence."). Duro attempts to analogize this to Mr. Henning's direction and management of Protek's collection of Duro's electronic records and states this "ought to be sufficient circumstantial evidence of the authenticity of the data retrieved." [DE 502 at 10]. However, unlike *Olsten*, Mr. Henning did not personally retrieve, identify, or analyze the metadata used to support his statements in his declaration. Mr. Henning specifically avers that the identification of metadata shows that over 9,000 emails and hundreds of PDFs, zip files, excel spreadsheets, and word documents were deleted and attests to the dates of the alleged deletion or alteration. [DE 485-10 ¶¶ 16, 33, 35, 48-50, 52-54, 56]. Duro argues that it can produce the person at Protek who retrieved the data to

---

[5] The Court notes that the vast majority of the cited documents in Mr. Henning's declaration, particularly those in the disputed paragraphs 16, 26, 33, 35, 48, 49, 52-54, and 56 are found on the docket in the appendix of exhibits the Plaintiffs' filed in July 2015 in support of their renewed motion to disqualify MOL as counsel for Mr. Rodino and Duro. [DE 145]. The original motion to disqualify MOL was filed in March 2013 and was denied by the Magistrate Judge [DE 54], as previously discussed in more detail in Section I.

establish the "*non-technical* fact" that he retrieved the data to authenticate the deleted files' report. [DE 502 at 11] (emphasis in original). However, this argument fails. Even the mere retrieval of the information purported to be in the deleted files report is technical, and such testimony would be inextricably intertwined with scientific, technical, and specialized knowledge regarding the retrieval, identification, and analysis of metadata.

Contrary to Duro's argument there is authority in this Circuit that requires expert testimony regarding the retrieving, identifying, and analyzing of metadata as it requires a technical, scientific, or specialized knowledge. *See United States v. Wehrle*, 985 F.3d 549, 554 (7th Cir. 2021). In *Wehrle*, the Seventh Circuit held the trial court abused its discretion by failing to qualify an individual who testified regarding the forensic-examination process as an expert.[6] *Id.* "A forensic-examination process falls within Rule 702's ambit if it involves 'specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–91 (1993). The "technical concepts beyond ordinary knowledge" included testimony relating to a forensic examination of a device, data-extraction software, the reliability of data retrieval and safeguards, and "other technical concepts such as . . . metadata (data which gives information about other data)." *Id.* Further, Judge St. Eve states in her concurring opinion that certain cases require expert testimony regarding the collection of digital data such as one with a "sophisticated nature of the particular forensic analysis or the equipment deployed, or the technical nature of the testimony" or the alleged *deletion of data*. *Id.* at 596 (St. Eve., J., concurring). MOL points out that Mr. Henning refers to Protek as "forensic computer experts" in his declaration and Walt Sigmund's, a Protek representative, email signature includes, among

---

[6] Ultimately, the Seventh Circuit concluded the trial court's abuse of discretion was harmless error because the guilt of defendant "was overwhelming." *Id.* at 554.

other titles, "Forensic Computer Examiner." [DE 145-32 at 7]. Additionally, MOL attached an email to its reply from August 15, 2013, from Mr. Henning to Ms. Walker indicating that "[w]e need the experts to review the metadata and opine on the spoliation. You need one too. Protek cannot do that." [DE 499-3]. Counsel for Duro (who was previously counsel for minority shareholders), knew an expert's opinion was necessary when it came to reviewing the metadata. Although that discussion was premised on an allegation of spoliation of evidence, the technical skill required does not change under the CFAA. Mr. Henning is not a computer forensic expert, nor did he retrieve, identify, or analyze the metadata cited by Duro to help support the CFAA claim.

MOL argues that Mr. Henning, though not an expert himself, cannot not be used as a mouthpiece for an expert in another field. The Seventh Circuit has previously discussed situations where one expert cannot be used as "the mouthpiece" of another:

> A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science. A theoretical economist, however able, would not be allowed to testify to the findings of an econometric study conducted by another economist if he lacked expertise in econometrics and the study raised questions that only an econometrician could answer. If it were apparent that the study was not cut and dried, the author would have to testify; he could not hide behind the theoretician.

*Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002). The same logic applies here, perhaps even more so since Mr. Henning is *not* an expert. Where the Seventh Circuit has found one expert cannot speak for another, it is even more necessary to conclude that a *non-expert* cannot speak on behalf of an expert, which is what Duro is seeking to do. Mr. Henning did not author or create the documents nor did he retrieve, identify, or analyze the metadata that Duro uses to establish documents were deleted from its computers. He has no firsthand or technical knowledge as to what exactly Protek did to extract the data in its reports,

how Protek performed the deleted files sweep, or explain the reasoning behind its ultimate conclusions about what documents were deleted and when. Nor does he have expertise in these topics. Therefore, his declaration cannot be used to relay the alleged findings of an undisclosed expert, Protek[7] and the Court strikes paragraphs 16, 26, 33, 35, 48, 49, 52-54, and 56.

Alternatively, Duro argues that if expert testimony is needed for the evidence to be admissible at trial (which the Court has now found that it is), its failure to designate an expert witness was harmless. Under Federal Rules of Civil Procedure, an expert must provide "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii). "Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *Salgado by Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998). The reason for that disclosure requirement is so that "opposing counsel is not forced to depose an expert in order to avoid ambush at trial[.]" *Id.*; *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008) ("The purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before the deposition—as to what the expert witness will testify[.]"). As the Seventh Circuit noted in *Ciomber*, "this purpose would be completely undermined if parties were allowed to cure deficient reports with later deposition testimony." 527 F.3d at 642.

If a party fails to provide information as required by Rule 26(a), "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed R. Civ. P. 37(c)(1). The party who violated Federal Rule 26 has the burden to prove the violation was justified or harmless. *See*

---

[7] The Court expressly makes no opinion as to whether Protek or its representatives qualify as an expert under the Federal Rules of Evidence as that issue has not been presented to the Court for decision.

generally *Brown v. Chicago Transit Auth.*, 2020 WL 777296 at *1 (N.D. Ill. Feb. 14, 2020) (quoting *Keach v. U.S. Tr. Co.*, 419 F.3d 626, 639 (7th Cir. 2005)). "The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004). The determination of whether a failure is harmless or justified is left to the broad discretion of the district court. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). The trial court need not make explicit findings regarding a justification or the harmlessness of the Rule 26 violation, however, the court should consider the following factors to determine whether the failure was substantially justified or harmless: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.*

Duro does not argue its failure to disclose an expert witness is substantially justified, however it does argue it is harmless because there is no prejudice or surprise. *See Wojtas*, 477 F.3d at 926 (stating that failure to oppose an argument constitutes waiver). Duro argues that MOL has known about these deleted files reports for more than five years and has had ample opportunity to try to dispute them. However, this same argument cuts against Duro as to whether its failure to disclose an expert witness was willful as it knew it needed an expert to review the metadata as early as 2013. Duro also argues that MOL and their clients "admitted" that the files Protek's report identified as deleted were in fact deleted, citing to an interrogatory response. The interrogatory asks Mr. Rodino and Duro to identify documents that have been deleted since a certain date. The response does not admit that the reports were accurate but rather asserts that none of the data contained in the "deleted items lists" were "intentionally destroyed or

28

overwritten," asserting that they were "deleted in the normal course of business" and "much" of them continue to exist elsewhere in an "inaccessible" form, "which does not constitute a violation of the duty to preserve electronically stored information." [DE 145-34 at 5]. Duro argues its failure does not cause prejudice because the trial date will not be delayed by any need to authenticate the report by additional declaration or deposition. However, while a trial date has not been set in this case, further delay is prejudicial to MOL. This action has been pending since 2013, with the operative Third Amended Complaint pending since 2018. All discovery in this case was closed on November 30, 2020. The reopening of expert discovery would not simply require the declaration or deposition of a Protek representative. But rather require time for the preparation of an expert report, both by Duro and potentially MOL's rebuttal expert, followed by the depositions of both these experts and any attempt to disqualify either expert through *Daubert* motions. As MOL argues in its reply, it had no reason to retain its own forensic computer expert because Duro never disclosed any expert who would testify as to the technical process used to determine what files were deleted, whether those files were recoverable, when the files were accessed/deleted, and who accessed/deleted them. The deadline for discovery, just as they pertain to the Third Amended Complaint, was extended three times. Counsel for Duro has been aware that the review of metadata and the conclusions derived from that review would require expert opinion since 2013. The underlying CFAA claim Duro seeks to prove stems from the unauthorized access or alteration of information on a computer. Although MOL has had these reports since 2013, it is only now that Duro attempts to use them as proof that it conspired with Mr. Rodino to violate the CFAA. Duro has not met its burden that this failure to disclose an expert witness is harmless. *See Musser*, 356 F.3d at 757–58 (7th Cir. 2004) (finding Gentiva was prejudiced by Musser's failure to disclose experts because "there are countermeasures that could

have been taken that are not applicable to fact witnesses, such as attempting to disqualify the expert testimony on grounds set forth in [*Daubert*], retaining rebuttal experts, and holding additional depositions to retrieve the information not available because of the absence of a report."); *Knox v. Butler*, 2021 WL 86605, at *1 (S.D. Ill. Jan. 11, 2021) (finding summary judgment warranted, in part, because plaintiff failed to offer an expert witness who would be competent to testify on the underlying facts that forms the basis of the information in pamphlets on the dangers of smoking).

Without an expert testifying to the identification, retrieval, and analysis of the deleted files found in the reports created by Protek cited in paragraphs 16, 26, 33, 35, 48, 49, 52-54, and 56, Duro has not presented evidence where the underlying facts are admissible at trial. *Olson*, 750 F.3d at 714. Not only would expert testimony be required, but Mr. Henning could not testify to the report's contents for the truth of the matter they assert—again, that someone deleted files at Duro—as it would be impermissible hearsay. And therefore, this evidence cannot be considered at summary judgment.[8] Accordingly, consistent with the foregoing, the Court grants in part and denies in part MOL's motion to strike Mr. Henning's declaration. [9]

### C.      MOL's Motion to Strike and/or Exclude Expert Opinion of Lucian Pera

MOL moves to strike or exclude a portion of Lucian Pera's expert opinion testimony. [DE 497]. Specifically, MOL seeks to strike Mr. Pera's testimony that MOL's reliance on the Court's two previous orders denying the minority shareholders' motion to disqualify MOL as

---

[8] As discussed further below in Section IV.D., Duro attempts to use the Protek reports to show that Mr. Rodino deleted the files. Neither the reports nor Mr. Henning seem to reach this conclusion, at least not directly. And any inference falls short. Moreover, the evidence that MOL was involved in the deletions is even thinner. Even if, there can be no conspiracy without an agreement to commit an illegal act. And as will be discussed later, the Court finds no illegal act occurred.

[9] In its reply to the motion to strike, MOL addresses a Supreme Court decision, *Van Buren v. United States*, 141 S. Ct. 1648 (2021), which was decided after the parties completed their briefing on the merits of the motion for summary judgment. Because it is applicable to the merits of the CFAA claim, the Court addresses the case below in Section IV.D.

counsel is "not prudent." [DE 485-1 at 15]. MOL's motion is denied for two reasons. First, to the extent Mr. Pera's opinion is meant to be in support of the issue of disgorgement of attorney fees, the Court does not reach the issue, as discussed below, and thus, the motion is denied as moot.

Second, MOL's motion is premised on a mischaracterization of Mr. Pera's testimony, perhaps in part, due to Duro's use of the testimony in its opposition to the motion for summary judgment. MOL's motion sets forth that Mr. Pera attests to whether the *Court* should consider its past rulings on the motion to disqualify counsel. However, this is a better description of Duro's argument *in light of* Mr. Pera's testimony. Mr. Pera's testimony is squarely regarding whether he believes it is prudent for *attorneys* to rely on decisions denying a motion to disqualify or a dismissal of a disciplinary action when evaluating whether a conflict of interest exists in their representation. In fact, he testifies that those decisions may be "persuasive to a later decider." *Id.*

To the extent MOL asserts what Mr. Pera actually opined is improper, the Court does not agree. Mr. Pera's testimony is not improper as it relates to his opinions on the standard of care of an attorney and what he believes or does not believe is prudent for an attorney to consider when evaluating the existence of a conflict of interest. Though these opinions may not have been in Mr. Pera's previously disclosed expert report, MOL is not prejudiced by his later testimony. Mr. Pera's opinion is not a surprise to MOL given the testimony was elicited by hypothetical questions posed by MOL's counsel during his deposition and Mr. Pera is not expected to anticipate every question at his deposition. *See Lott v. ITW Food Equip. Grp. LLC*, 2013 WL 3728581, at *23 (N.D. Ill. July 15, 2013) (recognizing that "Rule 26 does not automatically exclude evidence that an expert could have included in his original report as '[s]uch a rule would lead to the inclusion of vast amounts of arguably irrelevant material in an expert's report on the off chance that failing to include any information in anticipation of a particular criticism would

forever bar the expert from later introducing relevant material.'") (quoting *City of Gary v. Shafer*, 2009 WL 1370997, at *5 (N.D. Ind. May 13, 2009)). Also, Duro asserts that the opinion stated in his testimony was not included in his previously disclosed declaration because the opinion is irrelevant to his expert opinion regarding MOL's compliance with the Indiana Rules of Professional Conduct. Therefore, MOL's motion to strike is denied.

### D. MOL's Motion to Strike and/or Exclude Expert Opinion of Ronald Braver

MOL moves to strike or exclude the expert opinion of Ronald Braver that was not included in his expert report. [DE 498]. MOL argues that Mr. Braver's expert opinion regarding the $1.1 million in damages caused by Mr. Rodino should be stricken or excluded from Duro's response to MOL's motion for summary judgment because the opinion was not included in Mr. Braver's expert report. However, because the Court does not reach the issue of legal malpractice damages, as discussed below, it denies MOL's motion to strike as moot.

### IV. DISCUSSION

In the Third Amended Complaint, Duro alleges two claims against MOL—legal malpractice and conspiracy to violate the CFAA. [DE 408]. Particularly, it alleges that Mr. Rodino breached his fiduciary duties to minority shareholders as the sole director and officer of Duro and did so with the express consent of or based on the legal advice of MOL. [DE 408 at 16]. It alleges that based on the legal advice of MOL, Mr. Rodino engaged in a laundry list of unlawful conduct, to which MOL did not take adequate steps to protect Duro or conspired to commit with Mr. Rodino. MOL moves for summary judgment on both of the remaining claims of the Third Amended Complaint. [DE 473]. MOL offers several arguments in support of summary judgment asserting Duro: 1) is barred by Indiana's prohibition against assignment of claims; 2) is barred by the doctrine of *in pari delicto*; 3) cannot establish the elements of legal

32

malpractice; 4) cannot establish it is entitled to the disgorgement of attorney fees; and 5) cannot establish a claim under the CFAA. The motion is ripe for decision and the Court addresses each issue in turn.

### A.    Indiana's Prohibition against Assignment of Claims

MOL asserts summary judgment must be granted in its favor on both the legal malpractice claim and the conspiracy to violate the CFAA claim because Indiana law prohibits the assignment of claims. First, the Court addresses the assignment of a legal malpractice claim. The law in Indiana is clear—assignments of a legal malpractice claim, to a former litigation adversary or otherwise, is prohibited. In *Picadilly*, the Supreme Court of Indiana held that a party may not assign a legal malpractice claim to someone who was his adversary in underlying litigation. *Picadilly, Inc. v. Raikos*, 582 N.E.2d 338 (Ind. 1991), *abrogated on other grounds by Liggett v. Young*, 877 N.E.2d 178 (Ind. 2007). In *Picadilly*, a bar (Picadilly) overserved a patron who later caused an accident resulting in injuries to Charles Colvin. Mr. Colvin sued Picadilly and a jury awarded him compensatory and punitive damages. Picadilly then filed a legal malpractice claim against its attorneys, alleging they were negligent when they allowed an improper punitive damages jury instruction. The attorneys moved for and were granted summary judgment. Picadilly then sought protection from its creditors by filing bankruptcy. As part of the plan for reorganization, the punitive damages award to Mr. Colvin was discharged, however, in return, he was assigned Picadilly's malpractice claim against the attorneys. Mr. Colvin immediately filed a motion challenging summary judgment. The case reached Indiana's highest court which held "legal malpractice claims are not assignable" to a former litigation adversary. *Id.* at 339.

The *Picadilly* court supports its finding with public policy. "Assignment should be permitted or prohibited based on the effect it will likely have on modern society, and the legal system in particular." *Id.* at 341. The court asserted that the free assignment of legal malpractice claims would weaken at least two standards that define the lawyer's duty to the client—the duty to act loyally and the duty to maintain client confidentiality. First, the court reasoned that:

> An attorney's loyalty is likely to be weakened by the knowledge that a client can sell off a malpractice claim, particularly if an adversary can buy it. If an attorney is providing zealous representation to a client, the client's adversary will likely be motivated to strike back at the attorney in any permissible fashion. If an adversary can retaliate by buying up a client's malpractice action, attorneys will begin to rethink the wisdom of zealous advocacy. A legal system that discourages loyalty to the client, disserves that client.

*Id.* at 342. If assignments were permitted, the court speculated that they would "become an important bargaining chip in the negotiation of settlements—particularly for clients without a deep pocket. An adversary might well make a favorable settlement offer to a judgment-proof or financially strapped client in exchange for the assignment of that client's right to bring a malpractice claim against his attorney." *Id.* Attorneys in such negotiations would quickly learn that their interests and those of their clients were incompatible and they would need to "sacrifice their own hides (and the deep pockets of their malpractice insurance carriers) in order to secure a favorable settlement for their client." *Id.* at 342.

Next, the *Picadilly* court analyzes the duty to maintain confidentiality and the threat it faces by the assignment of legal malpractice claims. When a client sues an attorney, the attorney is permitted to reveal confidential client information reasonably necessary to establish a defense. *Id.* at 343 (citing Ind. Professional Conduct Rule 1.6(b)(2)). This allows for the client to control the scope of the disclosure. However, once the claim is assigned, the client's control over the litigation is lost, but the attorney's right to defend himself or herself by revealing client information survives. *Id.* This could lead to an attorney reasonably responding to the assignee's

claim by revealing information the client would have preferred to remain confidential, but the client can no longer prevent the attorney's disclosures. This would encourage clients to withhold damaging information from their attorney "in order to preserve their ability to sell off a malpractice claim without the fear of losing control over that information," which "erodes the principles fostered by the duty of confidentiality." *Id.* In 2007, the Indiana Supreme Court again confirmed that the public policy of Indiana expressed in *Picadilly* holds true and again held that "[a]ssignment should be permitted or prohibited based on the effect it will likely have on modern society, and the legal system in particular." *State Farm Mut. Auto. Ins. Co. v. Estep*, 873 N.E.2d 1021, 1025 (Ind. 2007).

MOL argues that while the claims against it are brought in the name of Duro, there can be no question that Mr. Shah is the one bringing these claims, given his sole ownership of Duro, and as a former litigation adversary of Duro, the settlement between Mr. Shah, Mr. Dugle, Mr. Rodino, and Duro served as a *de facto* assignment to Mr. Shah of the legal malpractice claims belonging to Duro. MOL argues it is undisputed that Mr. Shah was Duro's litigation adversary because he advanced claims against Duro for years and sought damages from it or the dissolution of the corporation. In response, Duro argues that Mr. Shah is not and never was a litigation adversary of Duro because Duro was only included as a nominal defendant in the derivative shareholder action. However, as MOL addresses in their reply, whether or not Mr. Shah is a litigation adversary is not dispositive under Indiana law. In *Rosby*, the Indiana Court of Appeals held that "*Picadilly* represents a bright-line rule drawn by the supreme court holding that ***no malpractice claims may be assigned, regardless whether they are assigned to an adversary***" and "find void as a matter of law all such assignments." *Rosby Corp. v. Townsend, Yosha, Cline & Price*, 800 N.E.2d 661, 665, 666 (Ind. Ct. App. 2003) (emphasis added). The court reasoned

35

that although the *Picadilly* court "discussed the implications of a role reversal where an assignment to an adversary was involved, it made no indication that its holding was limited to such facts" and thus, held that "*Picadilly* bars the assignment of all legal malpractice claims." *Id.* at 666. Accordingly, Duro's argument that Mr. Shah was not a litigation adversary, and therefore any assignment cannot be invalid, is not relevant to the Court's analysis of whether the *de facto* assignment occurred and is prohibited.

Both Duro and MOL argue *Summit* to support their positions. In *Summit*, the Indiana Court of Appeals found that *Picadilly* did not bar a legal malpractice claim that was assigned to a successor corporation, which was a direct continuation of its predecessor. *Summit Acct. & Computer Serv., Inc. v. RJH of Florida, Inc.*, 690 N.E.2d 723 (Ind. Ct. App. 1998). There, the defendant law firm and attorney appealed the judgment against them on the basis that the claims for punitive damages and legal malpractice had been improperly assigned. The claims originally belonged to Kimco Leasing, which sold all of its assets, including the claims against the defendants, to Hoffman, which then subsequently sold the same assets to RJH of Florida, which operated under the name of Kimco Leasing. The trial court distinguished the case from *Picadilly* as it did not involve a suit on behalf of a former adversary and thus the public policy concerns expressed in *Picadilly* were not applicable. *Id.* at 728. Duro cites to *Summit* for the proposition that the court affirmed the decision to distinguish *Picadilly* based on the lack of involvement of a former litigation adversary. However, *Summit* was decided before *Rosby*, which held that *Picadilly*'s holding is not limited to only assignments to former litigation adversaries. The *Rosby* court held that because there was no evidence before it to support that the plaintiff was a successor corporation, the rule of *Summit* did not apply. *Rosby*, 800 N.E.2d at 667.

Although the outcome of *Summit* indicates Indiana carved out an exception to its prohibition of assignment of legal malpractice claims when it is assigned to a successor corporation that is a direct continuation of its predecessor, the factors considered in that case, when applied to the undisputed facts here, are ultimately not favorable to Duro because they indicate that Indiana law looks past the name of the corporate entity when considering whether an impermissible assignment has occurred. These factors include 1) whether the corporation's ownership was the same, 2) if it engaged in the same business, 3) if its operations continued, and 4) if it did so in the same place. In *Summit*, Kimco Leasing sold all of its assets, including its claims against the Defendants, to Hoffman, Inc., who subsequently sold all the same assets to RJH of Florida, Inc., which operated under the name of Kimco Leasing. 690 N.E.2d at 728. Richard Hoffman was the sole shareholder, director, and officer of all three corporations and the corporations conducted business of the same nature from the same place. *Id.* Given these facts, the court concluded the successor corporation was a "a direct continuation of" its predecessors and "should have the same rights and liabilities." *Id. See also Mishawaka Brass Mfg. Inc. v. Milwaukee Valve Co.*, 444 N.E.2d 855, 858 (Ind. Ct. App. 1983) (finding the record supported the conclusion that one corporation was "a direct continuation" of another corporation with which the plaintiff conducted the underlying transaction because both were wholly owned by the same individual, had virtually the same officers and directors, operated on the same business premises and conducted the same business).

Here, the evidence does not support that the current Duro is a direct continuation of the Duro prior to Mr. Shah's ownership, despite the *lack* of name change. First, the ownership is different. Mr. Rodino was previously the majority shareholder and now Mr. Shah is the sole owner, with no other officers, directors, or shareholders. Second, Duro no longer conducts the

same business as it previously did before the change in ownership. In fact, Mr. Shah testified that Duro is not operating at all, nor does it have any hard assets, revenue, income, employees, or customers, and its future business plans are unknown. [DE 476-1 at 15–18, 27]. Shortly after the settlement was effectuated, Mr. Shah transferred all of Duro's assets to his pallet company, Green Stream. *Id.* at 15–16, 27. Mr. Shah testified that the only "asset" Duro has now is this lawsuit. *Id.* at 15–16. Since Mr. Shah became sole owner of Duro, he has distributed all of the cash left over to himself. *Id.* at 16. The only thing that did not change after the settlement and Redemption Agreement were effectuated was the name of the company. Further, unlike here, *Summit* did not involve the acquiring of the corporation based on the settlement of disputed litigation. Based on the factors in *Summit*, the undisputed evidence before the Court does not support a finding that Mr. Shah's Duro is "a direct continuation" of Mr. Rodino's Duro and therefore, cannot fall under *Summit*'s exception to the bar of a legal malpractice claim assignment.

Duro additionally argues that the legal malpractice claim against MOL was properly filed by Mr. Shah, as a derivative claim on behalf of Duro, a year before the alleged assignment in the Redemption Agreement and Settlement Agreement. On June 29, 2015, Mr. Shah and Mr. Dugle filed the Second Amended Complaint and included a derivative legal malpractice claim against MOL and Warrick & Boyn. [DE 90 at 140–47]. The Indiana courts have not yet addressed the specific question of whether minority shareholders can bring a derivative suit alleging legal malpractice of the corporation's attorney. Nor have they addressed a fact pattern such as the one presented before the Court—where a minority shareholder's previous derivative legal malpractice suit is converted into a direct claim for legal malpractice when the minority shareholder becomes the sole owner of the corporation due to settlement with the majority

shareholder in the underlying litigation. However, Indiana law makes clear the importance of public policy when analyzing any type of assignment of legal malpractice claims: "Assignment should be permitted or prohibited based on the effect it will likely have on modern society, and the legal system in particular." *State Farm*, 873 N.E.2d at 1025. With the guidance of Indiana law and other jurisdictions regarding public policy and legal malpractice claims as well as the undisputed evidence before it, the Court finds that Duro's legal malpractice claim, as it is controlled solely by Mr. Shah, who never had an attorney-client relationship with MOL, constitutes a *de facto* assignment and is therefore prohibited as a matter of law.

In its response, Duro asserts that it is undisputed that Mr. Shah had standing to bring the derivative legal malpractice claim on behalf of Duro when he first filed those claims in June 2015. However, Duro cites no Indiana case law supporting this assertion nor has the Court found any. Moreover, the right to bring a derivative legal malpractice action has been rejected by at least one other state. In *McDermott*, the California Court of Appeals dismissed a derivative malpractice suit brought by shareholders against the corporation's outside counsel. *McDermott, Will & Emery v. Superior Ct.*, 83 Cal. App. 4th 378 (2000). The court explained the unique derivative action at play, noting that shareholders suing on behalf of a corporation cannot waive the corporation's attorney-client privilege. *Id.* at 383. The court explained that while shareholders "stand in the shoes" of the corporation for most purposes in a derivative action, "the one notable exception is with respect to the attorney-client privilege." *Id.* The court distinguished a derivative action from a direct malpractice action, where an individual suing on his or her own behalf waives the privilege, thus enabling the attorney to disclose privileged information necessary to defend against the action. *Id.* at 383–84. The court held that the corporation was the holder of the attorney-client privilege, not the shareholders, and dismissed the action because "in

the absence of a waiver by the corporate client, the third-party attorney [was] effectively foreclosed from mounting any meaningful defense to the shareholder derivative action." *Id.* at 381. Although the court declined to view a shareholder derivative action in the same vein as an assignment, it reasoned that "the rationale used to prohibit all assignments of legal malpractice actions, on the ground attorneys would be unable to defend such actions in the absence of a waiver of the privilege by their own client, applies with equal force" to the scenario found in *McDermott. Id.* at 385. *See also Reilly v. Greenwald & Hoffmann, LLP*, 127 Cal. Rptr. 3d 317, 327 (Ct. App. 2011) (applying *McDermott* to dismiss shareholder derivative action brought by a minority shareholder, alleging that corporation's attorney engaged in negligent and tortious conduct in facilitating majority shareholder's conversion of corporate funds to her own use after shareholders had agreed to dissolve the corporation, because attorney's due process right to present a defense would have been violated given inability to disclose confidential information). Here, when Mr. Shah filed the derivative legal malpractice claim, he could not have waived the attorney-client privilege held by Duro with MOL.

Even assuming Mr. Shah had standing to bring the derivative legal malpractice lawsuit when he filed the Second Amended Complaint, his position in the corporation and the outcome of any possible judgment stemming from the malpractice claim has drastically changed. Indiana law adheres to the well-established corporate law principle "that shareholders of a corporation may not maintain actions at law in their own names to redress an injury to the corporation even if the value of their stock is impaired as a result of the injury." *Massey v. Merrill Lynch & Co.*, 464 F.3d 642, 645 (7th Cir. 2006) (citing *Barth v. Barth*, 659 N.E.2d 559, 560 (Ind. 1995)). As a result, when a corporation suffers injury, either from corporate insiders or from a third party, it is the corporate entity—not the individual shareholders—who retains the cause of action and any

resulting recovery belongs to the corporation. *Id.* at 646. Therefore, hypothetically, if Mr. Shah and Mr. Dugle were successful in their derivative claims of legal malpractice against MOL as alleged in the Second Amended Complaint, Duro, the clients of MOL, not Mr. Shah and Mr. Dugle, would have received any judgment awarded from MOL. However, the operative complaint here is the Third Amended Complaint, filed June 8, 2018 and in that complaint, Mr. Shah converted the legal malpractice claims into direct claims, stating "all previous derivative claims against parties to the settlement agreement have been dismissed, and the remaining derivative claims previously made against the Defendant Law Firms are asserted as direct claims by the Duro Entities." [DE 408 at 3]. When the Third Amended Complaint was filed, Mr. Shah had, and continues to have, sole ownership of Duro. Undisputed evidence is before the Court that Duro is not an operating company, that Mr. Shah has sold any and all assets to his other company and has distributed all remaining Duro capital to himself. Any potential judgment against MOL and in favor of Duro would be Mr. Shah's, who never had an attorney-client relationship with MOL, which is in stark contrast to the outcome of the derivate claim.

It is this outcome that triggers the policy concerns examined in *Picadilly* and other jurisdictions (discussed further below). Here, unlike in *McDermott*, MOL has been able to defend itself only because Mr. Rodino, as majority shareholder of Duro at the relevant time and a client of MOL, as part of his consideration under the Settlement Agreement, executed a separately signed affidavit waiving all of his attorney-client privilege and attorney work product protections regarding all communications, disclosures, advice, and documents related to Duro between himself and MOL. [DE 471 at 5]. Further, the Settlement Agreement expressly reserved all claims against MOL. *Id.* at 9. Although *McDermott* presents a factually different scenario, its holding represents the problem (finding the lack of attorney-client privilege waiver from a

corporation in a derivative malpractice suit problematic) that Mr. Shah and Mr. Rodino tried to solve through the negotiation of a settlement agreement, which included Mr. Rodino's waiver of attorney-client privilege as consideration to the settlement. However, this solution runs afoul of *Picadilly*. *Picadilly* specifically rejects the use of a legal malpractice claim as consideration in a settlement agreement, which is exactly what has happened here. As noted above, the *Picadilly* court speculated that if legal malpractice claims were assignable, they would "become an important bargaining chip in the negotiation of settlements—particularly for clients without a deep pocket. An adversary might well make a favorable settlement offer to a judgment-proof or financially strapped client in exchange for the assignment of that client's right to bring a malpractice claim against his attorney." This is precisely what has happened here. No reasonable jury could conclude that Mr. Rodino's waiver of his attorney-client privilege was anything but a "bargaining chip" in the negotiation of their settlement agreement. In fact, it was expressly included in the Settlement Agreement as "Consideration." [DE 471 at 5]. Not only does *Picadilly* make this strictly prohibited under Indiana law but other jurisdictions have also similarly found it prohibited, and the Court finds their conclusions and public policy concerns persuasive and consistent with Indiana law.

In *Paonia*, the Western District of Kentucky, applying state law, granted summary judgment for Bingham, who were attorneys, and dismissed Paonia's legal malpractice claim because it found that there was a *de facto* assignment of the claim. *Paonia Res., LLC v. Bingham Greenebaum Doll*, LLP, 2015 WL 7431041 (W.D. Ky. Nov. 20, 2015). Paonia was formed solely to acquire assets from several other corporations. Paonia was sued in an attempt to stop its acquisition of these assets and Bingham represented Paonia in that litigation. That litigation was settled and Paonia was to receive $4.7 million in that settlement. Despite the agreement, the

Appalachian Fuels Creditors Trust ("Trust"), a non-party separate company, paid Paonia the $4.7

million. After the remittance of those settlement funds to its owners and creditors, including legal

fees to Bingham, Paonia had no assets, no liabilities, and no business operations or prospects.

The company was dissolved as a business entity in 2009. In June 2009, an involuntary

bankruptcy petition was filed against the Trust and in April 2011, the Trust replaced its officers.

The Trust then sued Paonia, which was then a shell corporation, along with others, regarding the

settlement agreement, arguing the payment from it was a fraudulent transfer that could be

recovered from Paonia. The parties settled this case and pursuant to that settlement agreement,

Paonia agreed to pay a judgment to the Trust and the Trust became the majority owner and

managing member of Paonia, which was reinstated as a corporate entity one day prior to the

settlement approval. At the time of the settlement, Paonia continued to have no assets, no

liabilities, and no business operations or prospects. A year later, Paonia, now owned by the Trust,

sued Bingham for legal malpractice alleging that Bingham failed to advise Paonia that the

settlement payment could be considered a fraudulent transfer. The court specifically notes that

the "Trust has never had an attorney-client relationship with Bingham and so has no malpractice

claims against Bingham" and that "Bingham's motion [for summary judgment] turns on whether

Paonia is merely a defunct entity that exists only to pursue a judgment for the Trust's benefit."

*Id.* at *2.

The *Paonia* court notes that Kentucky law prohibits the assignment of legal malpractice

claims and holds that Paonia and the Trust affected an impermissible legal malpractice

assignment. *Id.* at *3–*4. The court cites to other jurisdictions who also disfavor such

assignments, quoting the *Picadilly* passage concerning assignments becoming a bargaining chip

in the negotiation of settlement agreements. The concern, as the *Paonia* court discusses, is that

allowing assignments would incentivize collusion and convert "legal malpractice into a commodity." *Id.* at *3 (quoting *Kenco Enterprises Nw., LLC v. Wiese*, 291 P.3d. 261, 263 (Wash. Ct. App. 2013)). Paonia argued that its corporate structure should be respected and that an assignment never happened because it never divested itself of control over its legal malpractice claim. The *Paonia* court found that while this is true, Bingham's argument is that the "transaction was an assignment in form, if not in name." *Id.* Paonia also argued that the court should not look behind the corporate veil and prevent Paonia from pursing this claim. However, the court held that "[l]etting this claim proceed merely to respect the contrived corporate structure would require the Court to ignore the obvious" and it "need not look behind the corporate veil; the impermissible assignment is front and center." *Id.* at *4. It reasoned that Paonia exists solely to pursue this malpractice claim and if it recovered on the claim, the money would be used to satisfy its agreed judgment with its new owner, the Trust. *Id.*

Another case the Court looks to is out of the Washington Court of Appeals. In *Kenco*, the court conducted its analysis from the premise that a claim for legal malpractice is not assignable, directly or indirectly, to one's adversary in a proceeding from which that legal malpractice is alleged to have arisen. *Kenco*, 291 P.3d. at 262. The facts in *Kenco* are similar to *Paonia*. Kenco sued Sleeping Tiger for failing to make payments under a real estate purchase and sale agreement and Sleeping Tiger countersued. Kenco defended the counterclaims asserting an affirmative defense arising out of a clause of the agreement drafted by its attorney. The jury found for Sleeping Tiger and the parties ultimately settled for over a $3 million judgment against Kenco. Kenco then transferred its ownership interests in the real estate and company to Sleeping Tiger along with any legal malpractice claims it or its former owners might have against the attorney who drew up the purchase and sale agreement. *Id.* Sleeping Tiger, "having swallowed

its adversary Kenco" brought a legal malpractice claim nominally in Kenco's name against its former attorneys. *Id.* Kenco/Sleeping Tiger argued that there was no assignment because the claim still belongs to Kenco, an entity in its own right. However, the court stated that Kenco only has one asset, its claim against its former counsel on the transaction and "Kenco's metamorphosis as Kenco/Sleeping Tiger amounted to an assignment of that claim, something they had reason to know was problematic . . . ." *Id.* at 264. Kenco/Sleeping Tiger argued that the reason for the change in ownership is a question of fact that needs to be determined at trial. But the court found that the evidence was sufficient for the assertion that Kenco had no other assets and therefore Kenco/Sleeping Tiger cannot rest on its general assertions that there was value in the Kenco name.

While the above cases are non-binding, the Court finds the analyses of *Paonia*, *Kenco*, and *McDermott*, when applied to the undisputed facts of this case, to be persuasive and consistent with Indiana law. *See also Oceania Ins. Corp. v. Cogan*, 457 P.3d 276 (Nev. App. 2020) ("We recognize that Alutiiq's control over this litigation stems from its ownership interest in Oceania rather than from a direct assignment of the legal malpractice claim. But in light of the foregoing, we conclude (as have other courts in similar circumstances) that the transfer of ownership to Alutiiq nevertheless constituted a *de facto* assignment of the claim—which Oceania concedes is its only asset—in violation of Nevada's public policy."); *Trinity Mortg. Companies, Inc. v. Dreyer*, 2011 WL 61680, at *3–*4 (N.D. Okla. Jan. 7, 2011), *aff'd sub nom. Trinity Mortg. Companies, Inc. v. Dryer*, 451 F. App'x 776 (10th Cir. 2011) (finding that "Trinity gave Junker an ownership interest for the specific and sole purpose of permitting Junker to litigate Trinity's claims against [its former counsel]" and disallowing the *de facto* assignment because it was "clearly against public policy.").

The facts here, although not identical, present similar issues as were found in *Paonia* and *Kenco*. Just as the Trust in *Paonia* did not have an attorney-client relationship with Bingham, nor did Mr. Shah with MOL. Like in *Paonia* and *Kenco*, Duro has no hard assets, no customers, no employees, no revenue or income, no operations, and its business prospects are unknown. [DE 476-1 at 15–18, 27]. After the Settlement Agreement and Redemption Agreement were effectuated, Mr. Shah transferred all the Duro assets to his company, Green Stream. *Id.* at 15–16, 27. Mr. Shah has distributed any remaining cash in Duro to himself. *Id.* at 16. Duro exists solely to pursue the malpractice claim, just as the plaintiffs in *Paonia* and *Kenco*. *Id.* at 15–16. Further, similar to the arguments made by Duro, Paonia argued the corporate structure should be respected and it never divested control of its legal malpractice claim. But the *Paonia* court found, as the defendant attorneys argued there and here, the assignment was in form, if not in name. This conclusion is similar to the analysis made above by the Court as it pertains to *Summit*. Although the Duro name has not changed, it has changed owners and it no longer operates as it once did. And, again similar to *Paonia*, the Court need not look far behind the corporate veil to see this impermissible assignment. Permitting this claim to proceed merely to respect the contrived corporate structure would require the court to ignore the obvious, that any judgment here in favor of Duro would be used to satisfy the bargain made in its settlement with Mr. Shah, just as in *Paonia*, and would be contrary to public policy and Indiana law.

Lastly, Duro argues that the issue of an assignment of legal malpractice claim is a question of fact and therefore must be decided by the jury. However, nothing before the Court creates a disputed fact material to the question of whether an impermissible assignment of the legal malpractice claim against MOL has occurred. In its reply, MOL specifically notes that *Picadilly* affirmed the granting of summary judgment because the assignment was invalid as a

matter of law. Therefore, summary judgment is appropriate where, as here, there is no material fact in dispute that a *de facto* assignment of a legal malpractice claim occurred, and it is void as a matter of law. Accordingly, based on the undisputed facts before it and the public policy concerns emphasized in Indiana, the Court finds that an impermissible *de facto* assignment of legal malpractice claims has occurred and therefore Duro's claim, brought and controlled entirely by Mr. Shah who never had an attorney-client relationship with MOL, is prohibited as against public policy. Thus, MOL's motion for summary judgement is granted as to the legal malpractice claim.

Relatedly, in its motion for summary judgment, MOL asserts that Duro did not sufficiently state a cause of action for breach of duty of loyalty and to the extent the Court finds that Duro did properly allege a claim for breach of loyalty, disgorgement of attorneys' fees is not an appropriate remedy here and MOL is entitled to summary judgment on the issue. [DE 476 at 53–54]. Duro argues that its Third Amended Complaint, its discovery responses, and its expert witness testimony demonstrates that Duro is pursuing a claim for legal malpractice based on a theory of breach of fiduciary duty of loyalty and breach of the standard of care. Under the legal malpractice claim in the Third Amended Complaint, Duro alleges that the "Defendant Law Firms have breached their respective duties of care, honesty, and loyalty owed to the Duro Entities." [DE 408 at 15]. However, as Duro states in its response, it has pled its "legal malpractice claim premised on a theory of MOL's breach of fiduciary duty of loyalty and of negligence" [DE 488-1 at 49], the Court finds no difference between the two theories when analyzing whether a *de facto* assignment of legal malpractice claims occurred. Therefore, for the same reasons the Court finds that the *de facto* assignment of legal malpractice claim is prohibited, so too are any of Duro's possible claims made for breach of fiduciary duties proffered in support of its legal malpractice

claim, which were brought and are controlled entirely by Mr. Shah who never had an attorney-client or fiduciary relationship with MOL.

MOL also briefly asserts an undeveloped argument that Indiana's prohibition of assignment of claims is not limited to legal malpractice and asserts that Duro's CFAA claim is prohibited as well. [DE 476 at 38].  In its reply, MOL argues that Duro did not address whether the CFAA claim was impermissibly assigned and therefore conceded that it was. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003) (holding that claims not addressed in a summary judgment opposition brief are deemed abandoned). However, even though Duro waived the argument, the Court finds that MOL has not established that summary judgment should be granted as a matter of law on the *federal* CFAA claim based on a *state* law prohibiting a legal malpractice claim assignment. While Indiana has a general rule that a right to collect a penalty is a personal right which is not assignable, the CFAA is a federal statute. Accordingly, the Court does not extend Indiana's law to prohibit the bringing of a federal claim and thus, denies MOL's motion as to the CFAA claim on this basis.

### B.    Doctrine of *In Pari Delicto*

Alternatively, MOL argues that its motion for summary judgment should be granted as to both the legal malpractice claim and the CFAA claim on the basis of the *in pari delicto* equitable defense doctrine. "The doctrine known by the [L]atin phrase in pari delicto literally means 'of equal fault.'" *Theye v. Bates*, 337 N.E.2d 837, 844 (Ind. Ct. App. 1975) ("Plaintiffs who are truly in pari delicto are those who have themselves violated the law in cooperation with the defendant.") (citations omitted)). "The expression 'in pari delicto' is a portion of the longer Latin sentence, 'In pari delicto potior est conditio defendentis,' which means that where the wrong of both parties is equal, the position of the defendant is the stronger." *Id*.

MOL argues the facts of this case are similar to those in *Knauer v. Jonathon Roberts Fin. Grp., Inc.*, 348 F.3d 230 (7th Cir. 2003). In *Knauer*, Heartland Financial Services and JMS Investment Group ("Heartland") operated a Ponzi scheme that collected over $60 million from hundreds of investors. 348 F.3d at 231. Kenneth Payne founded Heartland and worked with Daniel Danker. Investors were promised high rates of return when in reality, Heartland did not invest most of the funds and Payne and his colleagues withdrew and spent the money from investors for their own personal benefit. The plaintiff, Knauer, was appointed as receiver for Heartland in connection with an SEC action against the individuals and entities involved in the Ponzi scheme. Knauer brought the action against the defendants alleging that they were in part responsible for losses resulting to Heartland and therefore were liable to Heartland for a variety of torts. The defendants were five broker dealers and Payne and Danker were, at various relevant times, licensed as registered securities representatives of these five broker dealers. The district court dismissed Knauer's complaint, holding that the doctrine of *in pari delicto* bars Heartland from pursuing losses for which it was largely culpable. The Seventh Circuit affirmed, holding the case was distinguishable from *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995), a case where the Seventh Circuit held that the doctrine did not apply. The *Knauer* court reasoned that "all of the liability, according to the complaint, arises from the employment or agency relationship between the broker dealer defendants and Payne and Danker." 348 F.3d at 237. But Payne and Danker were also employed by and ran Heartland, and "[Heartland's] nexus to Payne and Danker was far more immediate than that of the broker dealers." *Id.* at 238. The broker dealers were a step removed from Payne and Danker's operation of Heartland and were entitled to an equitable defense against the receivership.

In *Scholes*, there was also a Ponzi scheme perpetrated by a Michael Douglas and his three solely owned corporations. 56 F.3d at 752–53. Douglas' operations were derailed by the SEC and a receiver was appointed. In *Scholes*, the receiver sought to reach and recover additional funds, from certain beneficiaries of Douglas' largesse. The defendants argued "that the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors." *Id.* at 754. In other words, Douglas made the fraudulent conveyances to achieve an improper end, that is to put money beyond the reach of creditors and should not be allowed to undo them to secure a benefit for himself. The *Scholes* court found:

> That reason falls out now that Douglas has been ousted from control of and beneficial interest in the corporations. The appointment of the receiver removed the wrongdoer from the scene. The corporations were no more Douglas's evil zombies. Freed from his spell, they became entitled to the return of the moneys – for the benefit not of Douglas but of innocent investors – that Douglas had made the corporations divert to unauthorized purposes . . . That the return would benefit the limited partners is just to say that anything that helps a corporation helps those who have claims against its assets. The important thing is that the limited partners were not complicit in Douglas's fraud; they were its victims.

*Id.* at 754-55. "The defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated." *Id.* (citing *McCandless v. Furland*, 296 U.S. 140, 160 (1935)). The court reasoned that the corporations once created and initially controlled by Douglas were, at the time of the suit, controlled by a receiver who's only objective is to maximize the value of the corporations for the benefit of their investors and any creditors, we cannot see an objection to the receiver's bringing suit to recover corporate assets unlawfully dissipated by Douglas. *Id.* at 755. The Seventh Circuit finds the difference between *Knauer* and *Scholes* to be the following:

> The key difference, for purposes of equity, between fraudulent conveyance cases such as *Scholes* and the instant case is the identities of the defendants. The receiver here [in *Knauer*] is not seeking to recover the diverted funds from the beneficiaries of the diversions (e.g., the recipients of Douglas's transfers in *Scholes*). Rather, this

is a claim for tort damages from entities that derived no benefit from the embezzlements, but that were allegedly partly to blame for their occurrence.

*Knauer*, 348 F.3d at 236.

While this Court does not find that the facts of either *Knauer* or *Scholes* are directly on point to those here, it finds that, construing the facts most favorable to Duro, MOL has not established it is entitled to this equitable defense based on the balancing of the equitable positions of Duro and MOL. *Knauer* and *Scholes* "highlighted that the equitable alignment of plaintiff and defendant is crucial in applying the *in pari delicto* defense. In the Seventh Circuit's view, the key distinction between *Scholes* and *Knauer* was that in *Scholes,* the plaintiff receiver sought to recover diverted funds from the people who benefitted from the diversions, whereas in *Knauer* the receiver sued defendants who had derived no benefit from the embezzlements." *Marwil v. Ent & Imler CPA Grp., PC*, 2004 WL 2750255, at \*9 (S.D. Ind. Nov. 24, 2004) (Hamilton, J.) (denying motion to dismiss). The application of the *in pari delicto* defense was appropriate in *Knauer* because the equitable balancing in that case favored the defendants—they had not seen a cent of the diverted funds and their "involvement in the Ponzi scheme as a whole was quite minor" and there was no allegation that the five broker dealer defendants were directly involved in the embezzlements or benefited from them. *Id.* (quoting *Knauer*, 348 F.3d at 236). While it is true that Duro does not allege or designate evidence that the attorney fees paid by Duro to MOL constituted a fraudulent conveyance, it is undisputed that Duro paid MOL for its legal fees. Nor has MOL presented argument or authority that the *in pari delicto* defense can only be denied in cases involving claims of fraudulent conveyances. If Duro is held in equal fault with MOL under this doctrine, then the undisputed evidence that MOL received payment from Duro for MOL's legal representation leads the Court to concluded that MOL may be a beneficiary of those ill-gotten funds, which is in conflict with the Seventh Circuit's discussion of

*Scholes* in *Knauer*. *See Knauer*, 348 F.3d at 237 n.6 ("Had the broker dealers been directly involved in the embezzlements, or attained some tangible benefit from them, this would be a different case.").

Duro argues that the *in pari delicto* defense should be rejected because the wrongdoer who formally controlled Duro (Mr. Rodino) has since been removed, and cannot benefit from any recovery on Duro's claims, citing *Scholes*. The "equitable alignment" here resembles *Scholes* more closely than *Knauer*. The Court agrees Mr. Rodino's absence in Duro is relevant. It is not disputed that Mr. Rodino once controlled Duro and now does not, just as Mr. Douglas was no longer in charge of the corporations in *Scholes*, a fact the Seventh Circuit deemed critical, both in the *Scholes* opinion and the court's later analysis of *Scholes* in *Knauer*. The same principle applies here. Further, in arguing that *Knauer* alone applies here, MOL asserts that Payne and Danker were Heartland just as here, Mr. Rodino was Duro. However, in *Knauer*, it was undisputed that Payne and Danker's misuse of Heartland resulted in the "fattening of the companies' coffers." *Knauer*, 348 F.3d at 234. Here, there is disputed evidence as to whether Mr. Rodino's actions injured or benefited Duro. The Court particularly notes that the Seventh Circuit discussed the injury to the plaintiff corporation and its importance in a footnote in *Knauer*. The court noted that it "recognized that [Heartland was] made vulnerable to liability as a result of [its] shareholders' misconduct. And in a different factual scenario, we might find such exposure to liability a sufficient injury to accord faultless representatives of a corporation, whether a receiver or subsequent innocent shareholders, standing to sue for the greater liability or deeper insolvency created by earlier shareholders." *Knauer*, 348 F.3d at 234 n.4 (citing *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 354 (3d Cir. 2001); *Miller v. San Sebastian Gold Mines*, 540 F.2d 807 (5th Cir. 1976). The court goes on to explain that "[i]n a

Ponzi scheme such as this one, however, where the Ponzi fraud pervaded the entire entity at all relevant times, we cannot find a justiciable injury. At least at the sales stage of the Ponzi scheme, every dollar tortiously produced was revenue to Heartland." *Id.* The factual scenario discussed in this footnote more closely resembles the facts here. If it is established that Mr. Rodino did what Duro alleges, he did not benefit Duro, but rather caused it injury, leaving Duro as the victim and faultless under the doctrine. Neither party argues Mr. Rodino's "fraud pervaded the entire entity at all relevant times," like in *Knauer*. Rather, unlike *Knauer*, Duro argues that every dollar Mr. Rodino allegedly tortiously produced was not revenue to Duro and harmed it, which is why the minority shareholders brought this case on behalf of Duro in the first place.

MOL also argues that Duro's actions in settling with Mr. Rodino must also be considered. MOL argues that because Duro had claims against Mr. Rodino and the settlement for those claims did not include a cash transfer from Mr. Rodino to Duro it is evidence that "the Duro Entities are complicit with Mr. Rodino." *Id.* However, Duro argues, and the Court agrees, that a cash payment from Mr. Rodino to Duro is not the only consideration that can give value to a settlement agreement, as was the case here. In fact, MOL argues the claims against it were used as consideration in the settlement agreement, albeit improperly, as discussed above in Section IV.A. Further, Duro points to the evidence designated in the Redemption Agreement as proof that it received financial benefits in settling the claims with Mr. Rodino, including but not limited to, Mr. Rodino redeeming all stock and equity interests he owned in Duro, transfer of clear title of real estate at several locations, Mr. Rodino's resignation from all positions held with Duro, the dissolution of Apex, Mr. Rodino could not compete directly or indirectly with Duro for five years, and Mr. Rodino had to indemnify Duro and its shareholders for prospective tax liabilities. [DE 488-1 at 35–36; 474-7]. Contrary to MOL's argument, because of the

53

Redemption Agreement and consideration included in the Settlement Agreement, the Court does not find that Duro's settling of the claims against Mr. Rodino, for no cash payment, establishes that Duro was complicit with Mr. Rodino.

Accordingly, because MOL has not established that Duro is at equal fault for the wrongdoing alleged against it, the Court denies MOL's motion for summary judgment as to both claims on the basis of the *in pari delicto* equitable defense.

### C. Legal Malpractice Claim

MOL also argues that summary judgment in its favor is warranted because Duro cannot establish the elements of a legal malpractice claim, particularly the elements of proximate cause and damages. While the Court has previously found that MOL's motion is warranted due to Indiana's prohibition of the assignment of legal malpractice claims, the Court alternatively grants MOL's motion as to Duro's legal malpractice claim based upon Duro's failure to establish the necessary element of proximate cause.

MOL argues that Duro is unable to establish two necessary elements, proximate cause and damages, therefore the Court need not address the first two elements of legal malpractice. MOL argues the undisputed material facts demonstrate that MOL was not the proximate cause of the alleged harm to Duro—Mr. Rodino was. Further, it also argues, that because the supposed connection between MOL's alleged acts and omissions and the harm allegedly suffered are not within the knowledge of a lay person, Duro is required to provide expert testimony that establishes proximate cause. MOL asserts that Duro's expert did not opine on proximate cause. Duro argues that its two experts testified regarding the causal connection between MOL's breaches of its duties owed to Duro and the harms ultimately suffered by Duro, and therefore

MOL's motion for summary judgment should be denied because issues of fact exist regarding proximate cause.

"To prevail on a legal malpractice claim, the plaintiff must prove: 1) employment of the attorney and/or firm (duty); 2) failure of the attorney and/or firm to exercise ordinary skill and knowledge (breach); 3) proximate cause (causation); and 4) loss to the plaintiff (damages)." *Drendall L. Off., P.C. v. Mundia*, 136 N.E.3d 293, 304–05 (Ind. Ct. App. 2019), *transfer denied sub nom. Drendall L. Off., P.C. v. Mundia*, 143 N.E.3d 952 (Ind. 2020). It is appropriate for a trial court to grant an attorney summary judgment on a legal malpractice claim if the designated evidence negates at least one of these elements. *Flatow v. Ingalls*, 932 N.E.2d 726, 729 (Ind. Ct. App. 2010). The Indiana Supreme Court has made clear that the "trial-within-a-trial" doctrine governs claims of legal malpractice. Under the "trial-within-a-trial" doctrine, a client alleging legal malpractice must prove not only that the lawyer's conduct fell below the governing duty of care but also that the client would have prevailed had the lawyer not been negligent. *Roumbos v. Samuel G. Vazanellis & Thiros & Stracci, PC*, 95 N.E.3d 63, 64, 65–66 (Ind. 2018) ("[T]he client must show the outcome of the botched representation would have been more favorable to the client had the lawyer not been negligent."); *Drendall*, 136 N.E.3d at 304 ("[T]o prove proximate cause, a plaintiff alleging malpractice must show that the outcome of the underlying litigation *would have* been more favorable had the lawyer not been negligent."). "When the issue of [proximate] cause is not within the understanding of a lay person, testimony of an expert witness on the issue is necessary." *Singh v. Lyday*, 889 N.E.2d 342, 357 (Ind. Ct. App. 2008). Proximate cause is a question of fact and becomes a question of law only where "a single conclusion can be drawn from the facts." *Bunger v. Brooks*, 12 N.E.3d 275, 282 (Ind. Ct. App. 2014) (citations omitted).

The parties appear not to dispute that the alleged connection between MOL's negligence and the harm allegedly suffered by Duro is not within the knowledge of a lay person, and therefore requires expert opinion that establishes proximate cause. Duro designated two attorney experts, Hannah Joseph [DE 474-12] and Lucian Pera [DE 474-11], who opined on the standard of care applicable to MOL. Duro argues Ms. Joseph opined that by failing to adhere to the appropriate standard of care MOL caused the following harms to Duro: (i) the fees that Duro paid on Mr. Rodino's behalf to MOL, because these fees decreased Duro's corporate assets, and given the conflict of interest, those fees were improperly paid to MOL; (ii) guidance given by MOL to Mr. Rodino regarding the formation of Apex and the diversion of the KIK account to Apex; (iii) MOL's involvement in blocking the minority shareholders' discovery of financial records; and (iv) MOL's opposition to conducting an audit/accounting because MOL's duty should have been to Duro and not to the majority shareholder. [DE 488-1 at 40].

During Ms. Joseph's testimony, she testified that she did not "know what actions [MOL] took that did or did not benefit Duro entities." [DE 485-3 at 5]. When specifically asked if she made "any determination as to what harm or damages were caused by the concurrent representation of Mr. Rodino and the Duro Entities," Ms. Joseph responded that she did not "know all of the harm that was caused, but there are some categories of harm that seem fairly evident." *Id.* at 9. One category she testified about was that both Mr. Rodino's and Duro's fees were paid by Duro to MOL, thereby decreasing the corporate assets, and since there was a conflict of interest, those fees were "improperly paid" to MOL. *Id.* However, Ms. Joseph does not explain why Duro paying for Mr. Rodino's fees is a harm *caused* by MOL's negligence. Duro paid for Mr. Rodino's legal fees because an amendment to the Duro by-laws permitted it. [DE 474-10 at 2]. Whether Duro was paying MOL or another law firm for Mr. Rodino's legal

fees, corporate assets would have been depleted due to the by-laws allowing such payments. To the extent this harm is meant to be tied to the actual amendment of the by-laws permitting the indemnity, this connection was not made by Ms. Joseph. Further, Duro has not created a material dispute that MOL had anything to do with those amendments. Mr. Rodino affirmed that MOL did not amend the by-laws, he did not seek or receive advice from MOL regarding the changes to the by-laws that allow officers of Duro to be indemnified, nor did he seek, receive or need advice from MOL regarding payment of MOL's fees for their representation of him from the Duro accounts. [DE 474-10 at 2]. Additionally, there is evidence that Warrick & Boyn prepared the paperwork incorporating Duro and its entities. [DE 418 at 5–7]. Duro has not provided any evidence to dispute this.

The next category of harm Ms. Joseph testified to is the "concern about some of the guidance given regarding" the formation of Apex and the alleged diversion of the KIK account to Apex. In support of this, she references Mr. Walton's advice to Mr. Rodino regarding Apex. [DE 485-3 at 9]. Ms. Joseph later testified that she found Mr. Walton's advice to Mr. Rodino to be "surprising" and Mr. Walton's involvement in the formation of Apex seemed "troubling" to her. *Id.* at 10–11. However, she does not opine that but for MOL's involvement, Apex would not have been formed and used to take a corporate opportunity from Duro. Rather, she opines that "it's up to [the business owners] what they choose to do. If they want to set up a separate business and try and divert business opportunities, that's their decision and they know their situation better than I could ever know it." *Id.* at 11. She went on to testify that as an attorney she would "put it in writing that this is a risky decision, that this could result in liability." *Id.* However, Ms. Joseph does not opine that if MOL had done as she suggests, it would have created a more favorable outcome for Duro or changed the outcome of Mr. Rodino's

involvement with Apex. Therefore, she did not opine as to MOL's proximate causation of any harm caused by Mr. Rodino's formation or running of Apex. Additionally, Ms. Joseph testified that even if MOL was aware of a breach of Mr. Rodino's fiduciary duty to the minority shareholders regarding Apex, it could not have told the minority shareholders. *Id.* at 26.

Another category of "potential harm" Ms. Joseph discusses is MOL's involvement in blocking the discovery of financial records or assisting in obstructing the discovery of corporate records. *Id.* at 10. Duro asserts that because of MOL's actions, Duro was unable to prosecute its claims against Mr. Rodino. Ms. Joseph testified that if MOL was "just representing the company, they should have no interest in obstructing [production of documents] because their duty is to the best interest of the company, not the best interest of the majority shareholder." *Id.* She concludes, however, by stating that "in and of itself, that is again another example of an inherent conflict." *Id.* This is not an opinion as to proximate cause, however, but rather one regarding the standard of care and breach, elements that are not at issue here. She later testified that she believes MOL "made things much more complicated by . . . taking the dual representation" and MOL's "involvement significantly increased the cost and length of time this case took." *Id.* at 29. First, the Court points out that Ms. Joseph does not provide the basis for her opinion nor does Duro provide evidence that establishes that but for MOL's alleged obstruction of document production to the minority shareholders, the underlying litigation would have cost less and been shorter. The evidence that Duro argues establishes this is that many more boxes of documents and materials were produced after MOL withdrew as counsel. However, Duro has not argued or presented evidence that from this new production, a forensic accounting or audit of Duro actually took place, ending the litigation in Duro's favor. Nor does Duro set forth evidence or argument that MOL knew or should have known of the existence of additional boxes of discovery or that the

boxes contained previously undisclosed information. Further, Duro did not provide evidence or argument that this discovery was capable of being produced any earlier than they otherwise were but for MOL's acts or omissions. Duro argues that had these boxes of documents been produced earlier, the claims against Mr. Rodino would have settled "years earlier" and Duro would have suffered less harm. [DE 488-1 at 47]. Duro cites to deposition testimony by Ms. Joseph to support this assertion, however, the testimony does not support this assertion, nor does it reflect that Ms. Joseph reached this opinion. [DE 485-3 at 10]. Ms. Joseph opined that even if another independent firm was representing Duro during the litigation, Mr. Rodino, as majority shareholder and president, "would have been able to make the decisions for the Duro entities." *Id.* at 29. Instead, when asked if Duro would have experienced any harm had MOL withdrawn from the representation at the outset, Ms. Joseph stated "there's no way to know what would've happened after." *Id.* at 10.

A similar argument was unsuccessfully pursued in *Price Waicukauski & Riley, LLC v. Murray*, 47 F. Supp. 3d 810 (S.D. Ind. 2014). In *Price*, a law firm sued for attorneys' fees and the client countersued for legal malpractice. The client asserted that it had lost the chance to pursue certain claims because of the attorneys' negligence. It argued it could prove proximate cause through the loss of chance doctrine applied in medical malpractice cases. The court held "Indiana law simply does not allow [the client] to satisfy the causation factor by showing that [the attorneys'] negligence resulted in a lost opportunity." *Id.* at 820. Duro attempts to reframe this argument that it lost the opportunity to prosecute the claims against Mr. Rodino. However, unlike *Price* where the attorneys failed to include a claim in the complaint, a derivative action was maintained against Mr. Rodino on behalf of Duro for years and those claims were settled. Those claims were not involuntarily dismissed nor was the action forcibly ended due to a lack of

evidence. Duro and its expert have not made a causal connection between the production of materials after MOL's withdrawing as counsel and the settlement between the parties. The fundamental question in any legal malpractice claim is how the outcome would have been better for the client but for the negligence of the attorney and Ms. Joseph does not provide an opinion how but for MOL's discovery obstruction, the outcome of the underlying litigation would have had a better outcome for Duro. *See K.B. by Blade-Thompson v. Fies*, 2021 WL 1784298, at *10 (N.D. Ind. May 5, 2021) (finding that the plaintiff did not offer any argument or evidence that any delay caused by the attorney changed the outcome of her claims on the merits in the underlying litigation).

Ms. Joseph also opines that MOL should have had an independent investigation done into the allegations made by the minority shareholders. [DE 485-3 at 6, 7, 17]. However, when asked about her opinion that MOL would have been unable to meaningfully investigate the claims asserted by the minority shareholder due to their dual representation, she testified that there would be no way to know what would have happened if MOL had conducted such an investigation or got a third party to do so. In fact, she described that scenario as "purely speculation." *Id.* at 15. Accordingly, she did not opine regarding whether MOL's failure to thoroughly investigate the minority shareholders claims proximately caused harm to Duro.

Duro argues that their other expert, Lucian Pera, opined on the proximate causation issue.[10] Duro asserts that Mr. Pera testified that MOL's breach of its duties allowed Mr. Rodino to misappropriate and divert Duro's assets. Mr. Pera opined that MOL violated the Indiana Rules of Professional Conduct by its concurrent representation of Duro and Mr. Rodino. However, Duro agrees that violations of the Indiana Rules of Professional Conduct do not give rise to an

---

[10] A portion of Mr. Pera's expert testimony is subject to a motion to strike by MOL, however, that motion does not include or impact the issue of proximate causation.

independent cause of action, nor is MOL contesting the second element of legal malpractice, whether there was breach of duty to the client by a failure of the attorney and/or firm to exercise ordinary skill and knowledge. *See Liggett*, 877 N.E.2d at 183 ("[T]he Preamble [of the Rules] make[s] it clear that the [Rules of Professional Conduct] do not purport to create or describe any civil liability.") (internal quotations omitted). When asked if Mr. Pera agreed that his report does not contain opinions regarding "what harm" Duro suffered as "a proximate result" of the acts or omissions of MOL, Mr. Pera responded, "I think that's right." [DE 474-13 at 4]. He continues to say, "whatever it caused, [his] opinion that there was a conflict of interest" in the dual representation of Duro and Mr. Rodino leads to the "natural consequence" of a "conflict-free representation." *Id.* However, when ultimately asked: "[B]ut you haven't attempted to say whether [MOL] did cause an injury or to what extent they caused an injury?," Mr. Pera responded: "That is correct." *Id.* at 6.

Like Ms. Joseph, Mr. Pera opined as to what MOL should have done in relation to incorporating Apex, indicating he saw no MOL attorney saying "well, you know we're not going to do that for you, or well, you know, we'll form the corporation but … our representation does not include these other three things." [DE 485-1 at 13]. However, this does not establish that but for MOL's failure to give this advice, Mr. Rodino would not have created and used Apex in the manner Duro alleges. Rather, it goes to his standard of care and breach opinion, which are not at issue here. Mr. Pera testified that he "saw evidence that supported" the allegation that MOL and Warrick & Boyn advised Mr. Rodino concerning whether Apex was permitted to lawfully compete with Duro.  *Id.* at 12. Mr. Pera goes on to state that "it seemed as if both Warrick & Boyn and [MOL] were in some way, shape or fashion, assisting … Mr. Rodino in this plan to form and use Apex. . . I am not the finder of fact. So maybe there's . . . another explanation." *Id.*

Mr. Pera testified that Mr. Walton's advice to "get it in writing" that KIK does not want to do business with Duro because of Mr. Shah's involvement was "a way to support, establish, create facts on the ground that would help establish under the corporate opportunity doctrine that this was not in fact, the corporate opportunity of the Duro Entities." *Id.* at 13. When asked further as to why this would be problematic, Mr. Pera testified that even though he is "not an expert on corporate opportunity, [he doesn't] believe it's at all clear-cut that this was not a corporate opportunity." *Id.* Mr. Pera does not reach the opinion that the creation and use of Apex was a usurpation of a corporate opportunity from Duro nor does Duro attempt to argue or present evidence to prove the necessary elements under the usurpation of corporate opportunity. Mr. Pera's testimony and expert report also do not reach the opinion that but for Mr. Walton's advice to "get it in writing" why KIK did not want to do business with Duro, Mr. Rodino would not have formed and used Apex in the alleged way. Accordingly, Mr. Pera has not opined on whether but for MOL's negligence, the underlying litigation or the alleged diversion of corporate opportunity would have been different for Duro.

Additionally, Mr. Rodino has affirmed that he did not seek, receive or need advice from MOL regarding the formation of Apex. [DE 474-10 at 2]. He exercised his own business judgment in creating Apex to prevent Duro from losing profits. *Id.* at 2–3. He knew that as a majority shareholder he could not divert business from Duro to Apex and MOL did not advise him he could do so. *Id.* at 3. Further, MOL did not advise him that Apex was legally permitted to compete with Duro. *Id.* Alternatively, even if the Court had granted Duro's motion to strike Mr. Rodino's January 2020 Affidavit in Exhibit 9, the Court's conclusion does not change because Duro has not established that but for MOL's acts or omissions, Mr. Rodino would *not* have

formed Apex and diverted income from Duro.[11] Mr. Rodino testified that he went to Warrick & Boyn's office, not MOL's, after leaving KIK's office and told them to incorporate Apex and they did. [DE 484-4 at 10]. When asked if he ever spoke with MOL or received advice from MOL regarding Apex, Mr. Rodino stated that "I don't remember" and "Not that I know of." *Id.*

Accordingly, because neither expert opinion submitted by Duro provides an opinion connecting MOL's acts or omissions to Duro's harm, Duro has not established that MOL was the proximate cause of the harm alleged. Thus, MOL's motion for summary judgment is granted as to the legal malpractice claim. *Flatow*, 932 N.E.2d at 729 ("It is appropriate for a trial court to grant an attorney summary judgment on a legal malpractice claim if the designated evidence negates at least one of these elements."). Because the Court has granted MOL's motion for summary judgment regarding proximate cause, it need not reach the damages element.

### D.     Computer Fraud and Abuse Act ("CFAA")

Duro alleges that MOL conspired with Mr. Rodino and a former Duro IT professional, Mr. Mills, "to intentionally further a fraud by knowingly accessing a protected computer without authorization or in excess of 'authorized' access" and "to knowingly cause the transmission of computer commands and, as a result of such conduct, intentionally cause damage to the Duro computers" in violation of the CFAA. [DE 408 at 25]. MOL moves for summary judgment as to this claim, asserting that Duro cannot establish that there was a violation of the CFAA, that Duro suffered economic loss, and that MOL conspired with Mr. Rodino to violate the CFAA. [DE 476 at 60–64].

A person violates the CFAA when they "knowingly and with intent to defraud, access[] a protected computer without authorization, or exceed[] authorized access . . . further[ing] the

---

[11] The Court also notes that even if it had granted Duro's motion to strike Exhibit 16, that exhibit does not impact the outcome of the motion for summary judgment.

intended fraud" or "knowingly cause[] the transmission of a program, information, code, or command . . . intentionally caus[ing] damage without authorization, to a protected computer." 18 U.S.C. § 1030(a)(4),(a)(5). In this context, "intent to defraud" means that the individual acted "willfully and with specific intent to deceive or cheat, usually for the purpose of getting financial gain for himself or causing financial loss to another." *Fidlar Techs. v. LPS Real Est. Data Sols., Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2016) (citation omitted). The statute states whoever conspires to commit or attempt to commit this offense has violated the CFAA. 18 U.S.C. § 1030(b).

The CFAA "is primarily a criminal anti-hacking statute. However, § 1030(g) provides a civil remedy for any person who suffers damage or loss due to a violation of § 1030." *Fidlar*, 810 F.3d at 1079. The CFAA defines "loss" as: [A]ny reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offenses, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. 18 U.S.C. § 1030(e)(11). "[T]he term 'damage' means any impairment to the integrity or availability of data, a program, a system, or information," *id.* § 1030(e)(8), and includes "the destruction, corruption, or deletion of electronic files, the physical destruction of a hard drive, or any diminution in the completeness or usability of the data on a computer system." *Farmers Ins. Exch. v. Auto Club Grp.*, 823 F. Supp. 2d 847, 852 (N.D. Ill. 2011) (internal citations omitted). The CFAA's civil action is available to anyone who has suffered "damage or loss by reason of a violation of this section,", but requires the conduct must involve one of the factors set forth in subsection (c)(4)(A)(i)(I)-(V). 18 U.S.C. § 1030(g). MOL asserts, and Duro does not dispute, that the only relevant factor here is (I):

> (I) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only,

> loss resulting from a related course of conduct affecting 1 or more other protected
> computers) aggregating at least $5,000 in value

*Id.* § 1030(c)(4)(A)(i)(I)-(V).

MOL asserts that in order to create a genuine issue of material fact that prevents the entry of summary judgment in favor of a defendant on a CFAA claim, the plaintiff must designate expert opinion testimony concerning the deletion of computer files so as to establish a potential violation of the Act, citing *Meridian Fin. Advisors, Ltd. v. Pence*, 763 F.Supp.2d 1046, 1062 (S.D. Ind. 2011). Duro provides no response to this assertion. *See Palmer*, 327 F.3d at 597 (holding that claims not addressed in a summary judgment opposition brief are deemed abandoned). In *Meridian*, the CEO defendant was alleged to have engaged in misconduct, including breach of his duty of loyalty and the deletion of emails belonging to the corporation that trailed his misconduct. On behalf of the corporation a receiver brought an action against the defendant on a number of different claims, including a claim for violating the CFAA. The defendant moved for summary judgment and argued that there was no evidence that he deleted any data from the computers. The plaintiff designated a detailed report authored by two retained technology experts that provided analysis of the emails in question, through electronically stored data ("ESI") and opined that on dates certain, the defendant's email box on the server was reduced in size by ninety-eight percent. *Id.* at 1062. The defendant challenged the admissibility of the expert report due to its review of potentially excluded ESI relating to a prior order in the case. However, the court admitted the expert report and found that viewing the expert reports in the light most favorable to the plaintiff, a reasonable jury could conclude that the CEO defendant deleted the email in question. *Id.*

While the Court does not interpret *Meridian* as concluding that a CFAA claim *must* fail at summary judgment without an expert report, as argued by MOL, the case does suggest that an

65

expert report aids the court in determining whether a material fact regarding the improper access or alteration of data is disputed. Here, Duro relies entirely on Mr. Henning's declaration and the documents cited therein to defeat summary judgment as to this claim. [DE 488-1 at 54–61]. As discussed in detail in Section III.C., Duro has not provided the Court with expert testimony or an admissible report regarding the alleged unauthorized deletion of documents by Mr. Rodino or Mr. Mills. Those documents and reports created by Protek that Duro cites to in support of Mr. Henning's declaration cannot be presented at trial in admissible form because Duro failed to disclose an expert that could testify to the identification, retrieval, and analysis of those reports and the underlying data. *See supra* Section III.C. That failure to disclose was not substantially justified nor was it harmless. Duro attempts to use Protek reports to establish that *Mr. Rodino or Mr. Mills* deleted files, however, the reports, from the Court's understanding of them, do not reach the conclusion of who deleted the files in question. And to the extent Mr. Henning reaches any conclusion of who deleted the files in question, he does so through thin inferences on circumstantial evidence, such as the days and hours Mr. Mills worked on Duro computers. These inferences fall short however, because ultimately, the reports he cites in support of his declaration do not conclude the identity of who deleted the files—Mr. Rodino, Mr. Mills, or otherwise. If the reports do make a determination as to who deleted the files, without an expert to assist the Court in understanding this evidence, it cannot consider those conclusions. Without this evidence, Duro has not set out specific facts showing a genuine issue for trial and has failed to establish the existence of an element essential to its case, one of which it would bear the burden of proof at trial. Therefore, there is no material fact in dispute as to whether Mr. Rodino or Mr. Mills deleted or altered documents on the Duro computers.

Duro's CFAA claim also fails because it has not established that a material dispute in fact exists as to whether Mr. Rodino had authorization or exceeded his authorization to access or alter the documents in question, as required under the statute. At the time of the parties' merit briefing of the motion for summary judgment, it was recognized in the Seventh Circuit that previously authorized use of a computer system may become unauthorized when an employee breaches his duty of loyalty to his employer. *Int'l Airport Centers, L.L.C. v. Citrin*, 440 F.3d 418, 420–21 (7th Cir. 2006), *abrogated by Van Buren v. United States*, 141 S. Ct. 1648, 210 L. Ed. 2d 26 (2021).[12] In *Citrin*, the Seventh Circuit was called to decide the meaning of "exceeding authorization" under the CFAA in the context of a defendant-employee who was given a laptop to use in the course of his duties. *Id.* at 419. At some point, the defendant decided to quit and go into business for himself, in breach of his employment agreement. Before returning the laptop, he deleted all the data, and also installed a secure-erasure program to ensure that the data could not be recovered. The court held that the plaintiffs adequately stated a claim for a violation of the CFAA based on the defendant's conduct, even though the defendant had "authorization" to use the laptop in a general sense. *Id.* at 420. The court reasoned that the defendant's "authorization to access the laptop terminated when, having already engaged in misconduct and decided to [violate his employment agreement], . . . he resolved to destroy files that incriminated himself and other files that were the property of his employer, in violation of the duty of loyalty that agency law imposes on an employee." *Id.* In other words, the defendant's breach of his duty of loyalty "terminated his agency relationship . . . and with it his authority to access the laptop, because the only basis of his authority had been that relationship." *Id.* at 420–21.

---

[12] In June 2015, prior to its abrogation, the Court relied, in part, on *Citrin* when granting minority shareholders' motion for leave to file their Second Amended Complaint. [DE 89 at 8–9].

However, on June 3, 2021, the Supreme Court abrogated *Citrin*, putting an end to a disagreement among the Circuits on this issue. *See Van Buren*, 141 S. Ct. at 1648.[13] In *Van Buren*, a police officer was charged with violating the CFAA when he accepted a bribe to conduct a license plate search in a law enforcement computer database. The Government asserted that running the search exceeded Van Buren's authorized access of the computer system because his search was contrary to department policy. It was undisputed that his personal use of the system was a violation of department policy. The Supreme Court decided that Van Buren did not violate the CFAA. The statute specifies two distinct ways of obtaining or altering information in violation of it: when a person accesses a computer "without authorization" and when they "exceed[] authorized access." *Id.* at 1649. The "without authorization" clause protects computers from "outside hackers – those who 'acces[s] a computer without any permission at all.'" *Id.* at 1658 (quoting *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1133 (9th Cir. 2009)). The "exceeds authorized access" clause protects computers from "inside hackers – those whose access a computer with permission, but then exceed the parameters of authorized access by entering an area of the computer to which the authorization does not extend." *Id.*

The Supreme Court held that "an individual 'exceeds authorized access' when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him. *Id.* at 1662. Because Van Buren did not "excee[d] authorized access" to the database, even though he obtained information from the database for an improper purpose, he did not violate the CFAA.

---

[13] *Van Buren* was decided a month after the parties completed briefing on the motion for summary judgment. However, the parties did not complete briefing their motions to strike until early July 2021, after *Van Buren* was decided. MOL discusses *Van Buren* and its applicability to the instant action in its reply to its motion to strike Mr. Henning's declaration. Duro never sought leave to file a sur-reply in response to MOL's discussion on *Van Buren*. Nonetheless, the Court would have addressed *Van Buren*, regardless of whether it was discussed by the parties, as it is the law.

*Id.* Van Buren makes clear that the CFAA is about access, and therefore the focus must be on what access, if any, the person had. The provision at issue "covers those who obtain information from particular areas in the computer – such as files, folders or databases – to which their computer access does not extend. It does not cover those who, like Van Buren, have improper motives for obtaining information that is otherwise available to them." *Id.* at 1652.

To be sure, the precise conduct at issue in this case looks different from the conduct in *Van Buren*. Here, Duro is not only alleging that Mr. Rodino, in conspiracy with MOL, accessed information, but rather took the further step to delete or alter it. However, this does not change its application. The CFAA treats accessing and altering information identically by its plain terms. *See* 18 U.S.C. § 1030(e)(6) ("the term 'exceeds authorized access' means to access a computer with authorization and to use such access to obtain *or alter* information in the computer that the access[o]r is not entitled so to obtain *or alter*") (emphasis added)).

Given the recent decision in *Van Buren*, even if the Court had denied MOL's motion to strike Mr. Henning's declaration in its entirety, Duro has not submitted evidence or argument creating a material fact in dispute that Mr. Rodino, as majority shareholder and president of Duro at the relevant times, did not have authority or exceeded his authority in accessing and altering or deleting the documents purported to have been deleted. Nor does Mr. Henning's declaration suggest that Mr. Rodino exceeded his authorized access to the documents in question. The Court notes that that neither party addresses *Citrin*, which, although now abrogated, was the law of this Circuit at the time of their briefing. As a result, Duro has not set forth an argument similar to that analyzed and rejected in *Van Buren*; that Mr. Rodino or Mr. Mills may have had authorized access to the documents but exceeded that authorization by deleting documents in breach of their duty. Because the Court does not find a genuine issue of material fact as to whether Mr. Rodino

or Mr. Mills exceeded their authorized access to obtain or alter documents, the Court need not reach the issue of loss or damages.

Duro argues that in the Court's previous decision to dismiss the CFAA claim, it stated that the "allegations of the Third Amended Complaint strongly support an inference of some understanding or agreement between MOL and Rodino about what would happen to the relevant documents, prior to their allegedly improper deletion." [DE 443 at 6; 488-1 at 55]. However, the standard of review at summary judgment is very different than on a motion to dismiss. Duro, the nonmoving party, may not rest on allegations or denials in its own pleading but must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1); *Beard*, 840 F.2d at 410. As set forth above, Duro has not done so here. Duro has not created a material fact in dispute that Mr. Rodino deleted files in violation of the CFAA, nor that MOL entered into an agreement with Mr. Rodino regarding the deletion of those files. Regardless, there can be no conspiracy without an agreement to *commit an illegal act*. The Court finds no illegal act in violation of the CFAA has occurred. Since Duro cannot establish that Mr. Rodino deleted the alleged data or that even if he did, he was not authorized to so, Duro cannot establish that MOL conspired with Mr. Rodino or Mr. Mills to violate the CFAA. *United States v. Pust*, 798 F.3d 597, 602–03 (7th Cir. 2015) ("To establish the existence of a conspiracy, the offering party must show that there was an agreement to commit *some illegal act* and the alleged conspirator knew something of its general scope and objective.") (internal quotation omitted) (emphasis added)). Accordingly, for the above reasons, the Court grants MOL's motion for summary judgment as to Duro's CFAA claim.

## V. CONCLUSION

For the forgoing reasons, Defendants E. Spencer Walton, Jr., Georgianne Walker, and May Oberfell Lorber's motion for summary judgment is GRANTED as to both remaining claims of the Third Amended Complaint and the Court DIRECTS the Clerk to enter judgment accordingly. [DE 473]. Plaintiffs' motion to strike Defendants' Exhibits 16 and 9 is DENIED. [DE 484]. Defendants' motion to strike and/or exclude the expert opinion of Lucian Pera is DENIED. [DE 497]. Defendants' motion to strike and/or exclude the expert opinion of Ronald Braver is DENIED AS MOOT. [DE 498]. Defendants' motion to strike portions of the declaration of John Henning is GRANTED in part and DENIED in part. [DE 499].

SO ORDERED.

ENTERED: September 29, 2021

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court